1

HONORABLE RONALD B. LEIGHTON

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

7

8

9   DOUGLAS WOOD and SANDRA
    KARLSVIK, husband and wife,

10
                        Plaintiffs,
11
            v.                                      NO.  C05-5575RBL
12
    KITSAP COUNTY; WEST SOUND            DEFENDANTS SCHUSTER, HALSTED
13  NARCOTICS ENFORCEMENT TEAM;          AND DOUGIL'S MOTION FOR
    OFFICER MATTHEW DOUGIL, WestNET);    SUMMARY JUDGMENT
14  GIG HARBOR POLICE DEPARTMENT
    DETECTIVE JOHN DOE SCHUSTER          NOTE FOR HEARING:
15  (WestNET) DETECTIVE JOHN HALSTED     November 24, 2006
    (POULSBO POLICE DEPT, WestNET, Badge
16  #606); DETECTIVE G.R. MARS (WSP      ORAL ARGUMENT REQUESTED
    STATEWIDE INCIDENT RESPONSE
17  TEAM, Badge #685); DETECTIVE JOHN
    DOE WILSON and JOHN DOES 1-25
18
                        Defendants.
19

20                      **I.  RELIEF REQUESTED**

21      Defendants  Dale  Schuster,  John  Halsted  and  Matt  Dougil  (hereinafter  "Defendants")

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 1

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   respectfully request that this Court enter an order of summary judgment dismissing all claims

2   against them on the grounds that they are entitled to qualified immunity and are otherwise free from

3   liability as set forth below.

4   ## II. **STATEMENT OF FACTS**

5   The plaintiffs, Douglas Wood and his wife, Dr. Sandra Karlsvik, are residents of Fox Island,

6   Pierce County, Washington.  Complaint, ¶ 2.1.  Their address on Fox Island is 1215 or 1225 11th

7   Ave E.  Dep. of Wood, 28:5-14, Exhibit B to Declaration of Jason M. Rosen.

8   The West Sound Narcotics Enforcement Team ("WestNET") is a multi-jurisdictional drug

9   task force designed to centralize supervision and enhance the efforts of law enforcement agencies to

10  combat controlled substance trafficking.  Declaration of John Halsted.  The task force was created

11  by agreement of the counties of Kitsap and Mason and the cities of Bainbridge Island, Bremerton,

12  Port Orchard, Poulsbo, Shelton, and the Washington State Patrol and Naval Criminal Investigation

13  Services.  *Id*.  Personnel from the task force are drawn from police personnel of the various

14  participating agencies.  *Id*.  The defendants were all members of the WestNET task force at the time

15  of plaintiff's arrest.[1]

16  In 1998, Officer Dougil of the Gig Harbor Police Department spoke with an informant who

17  had attempted to steal some marijuana from plaintiffs' house.  Declaration of Matt Dougil.  The

18  informant had heard from some teenage friends that plaintiff Wood was growing marijuana on his

19  back deck.  *Id*.  The informant went to the residence and noticed the deck was raised in the air and

20

21  [1] WestNET itself is not a legal entity, and is not subject to suit.

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 2

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   the marijuana plants were growing underneath.  *Id*.  The plaintiff caught the informant before he

2   was able to steal any marijuana, and he was detained by the Pierce County Sheriff's Office.  *Id*.  The

3   police report indicated that the property owner, Douglas E. Wood, date of birth 4/6/52, was

4   installing a motion sensor alarm system on the property to warn of any intruders.  *Id*.  The informant

5   described the property as having a tan colored multi-story residence and two Geodesic dome style

6   buildings.  *Id*.  The informant observed pots and potting soil inside of one of the dome structures.

7   *Id*.

8          In 2001, Officer Dougil received a tip from the marijuana hotline about a subject growing

9   marijuana on Fox Island in Pierce County.  *Id*.  The tipster reported that he or she was looking for an

10  address when they drove into the driveway of 1215 11th Avenue East on Fox Island.  *Id*.  The tipster

11  indicated that he or she drove up to a residence and surprised two males who were unloading

12  numerous marijuana plants from the bed of a truck.  *Id*.

13         On August 27, 2002, at 1517 hours, Officer Dougil and Detective Schuster of WestNET

14  flew over the plaintiff's property in an MD 500 helicopter at an altitude of 700 feet.  *Id*.  Both

15  officers spotted growing marijuana plants on the south side of the residence, behind a small shed.

16  Declarations of Schuster and Dougil.  The officers took a GPS reading of the property and

17  photographs of the marijuana plants.  *Id*.  The photographs showed the growing marijuana, a tan

18  colored residence, and two dome buildings.  *Id*.  The marijuana is planted close to the house, and the

19  photographs also showed that the deck is in the raised position.  *Id*.

20         Both Detective Schuster and Officer Dougil have completed aerial marijuana spotter school

21  and have spotted marijuana from the air over 100 times, from both fixed wing and rotary wing

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 3

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1    aircraft.  Declarations of Schuster and Dougil.

2         Plaintiffs' neighbors had reported to Officer Dougil that they had heard automatic gunfire

3    coming from plaintiffs' property.  Declaration of Dougil.

4         Based on a description of the property provided by Officer Dougil, on August 30, 2002,

5    Detectives Schuster and Halsted drove to the area around plaintiffs' property.  They located the

6    driveway of the property where the marijuana was growing and noticed that it was marked with a

7    small white sign with the numbers "1215."  Declarations of Schuster and Halsted.  A driver's check

8    on Douglas E. Wood indicates that his address is 1215 11th Avenue, Fox Island, Washington.

9    Declaration of Halsted.  A check with the Pierce County Assessor's Office indicates that the number

10   for the property was 1225 11th Avenue and not 1215 11th Avenue as indicated on Wood's driver's

11   license.  *Id*.  The parcel number is 0220073068.  *Id*.  The records show there is a single story 1,215

12   square-foot residence on the property belonging to the Organic Sunflower Foundation, Inc.  *Id*.  The

13   property was deeded to the Organic Sunflower Foundation, Inc. in 1995 by Solar Steam, Inc.  *Id*.  In

14   1989, Douglas E. Wood deeded the property to Solar Steam, Inc.  *Id*.  The Washington Department

15   of Revenue has a record for Organic Sunflower Foundation that lists both 1225 and 1215 11th

16   Avenue, and P.O. Box 32, Fox Island, Washington.  *Id*.  They also have a record for Solar Steam,

17   Inc.  *Id*.  The records indicate Douglas Wood had an affiliation with Solar Steam, Inc. and that the

18   business has not been in operation for a number of years.  *Id*.  Thus, defendants believed that the

19   subject property was under the control of plaintiffs.  *Id*.

20        The Washington State Department of Licensing indicates one vehicle registered to Organic

21   Sunflower Foundation and one vehicle registered to Solar Steam, Inc.  *Id*.  Both vehicle registrations

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 4

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1    list plaintiffs' P.O. Box as the registered address. *Id.*

2          Based on the above observations and information available to WestNET personnel,

3    Detective Halsted obtained a Kitsap County Superior Court search warrant for 1215 11th Avenue,

4    Fox Island, Washington. *Id.*

5          There were a number of known hazards to law enforcement personnel who might be called

6    upon to serve a warrant on the plaintiffs' property. *Id.* These included the reported use of gunfire

7    on the property, surveillance and warning devices reported to be present on the property, as well as

8    a "bunker-like" reinforced residence. *Id.* Because of these hazards, Detective Halsted contacted the

9    Washington State Patrol SIRT Team and requested their assistance in serving the search warrant on

10   plaintiff. The SIRT Team accepted the mission, and Detective Halsted gave the information

11   pertaining to the warrant to WSP Detective Mars. *Id.* Detective Mars made a safety plan for the

12   warrant service, and on September 5, 2002 at 5:00 a.m., personnel involved in the initial entry were

13   briefed at Pierce County Fire Station No. 59. *Id.*

14         At 0600 hours, WestNET personnel and the WSP SIRT Team arrived at the suspect

15   residence. *Id.* The WSP SIRT Team made their way up to the house and were unable to locate an

16   entry point to the residence. *Id.* Douglas Wood came to an upstairs window and was warned to

17   show his hands. *Id.* He eventually came and opened the door for the team to enter. *Id.* The door

18   was actually a drawbridge into the second level of the home. *Id.*

19         The WSP SIRT Team were the first personnel to enter plaintiff's home. *Id.* Based on later

20   reports made to Detective Halsted, plaintiff had three dogs that became aggressive towards the WSP

21   SIRT Team members within the house. *Id.* A pepper ball gun had to be deployed against the dogs,

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 5

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   and one of them was apparently struck in the eye by a shot fired by a SIRT Team member. *Id*.

2   When asked by Detective Halsted whether plaintiff wanted medical attention for his dog, plaintiff

3   declined. *Id*.

4          After the residence was cleared and plaintiff was held in custody, Detective Halsted

5   contacted plaintiff, who was sitting in a chair on his deck. *Id*. Detective Halsted read plaintiff his

6   Miranda rights, which plaintiff acknowledged and agreed to speak to Detective Halsted without an

7   attorney. *Id*. Plaintiff informed Detective Halsted that he was allowed to grow marijuana and had

8   medical authorization for it in his wallet. *Id*. He indicated that his physician was Sandra Karlsvik,

9   his wife. *Id*. In his wallet, plaintiff had a yellow "post-it" note with the following words: "I am

10  advising that Mr. Doug Wood consume oral cannabis t.i.d. for a neurological disorder with pain and

11  anorexia," signed by Sandra Karlsvik, M.D. *Id*. Detective Halsted recognized that the note

12  provided by Mr. Wood did not comply with the requirements of the Medical Marijuana statute. *Id*.

13         Detective Halsted located marijuana plants near the house. *Id*. It was later determined that

14  there were 36 marijuana plants either growing or that had been cut down and were lying on the

15  nearby grass. *Id*. Detective Halsted recognized that the number of plants exceeded what would be

16  allowed under the Medical Marijuana statute. *Id*. The plants were removed and marked as evidence.

17  *Id*.

18         Even if plaintiff had a medical condition that arguably qualified under the Medical

19  Marijuana statute, Detective Halsted recognized that Mr. Wood's "authorization" and the amount of

20  marijuana in his possession were not in compliance with the statute. *Id*. Because it reasonably

21  appeared that Mr. Wood was in violation of the Uniform Control Substance Act by harvesting

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 6

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   marijuana, Detective Halsted had Mr. Wood arrested. *Id.* Plaintiff was transported to the Pierce

2   County Jail and booked for manufacturing a controlled substance – marijuana. *Id.*

3       The home was searched and additional marijuana was found throughout. *Id.* In addition,

4   two guns were located, a double-barrel 12-gauge shotgun and a Winchester Model 100 semi-

5   automatic .308 caliber. *Id.* At approximately 0915 hours, the property was cleared. *Id.* Detective

6   Halsted left a certified copy of the search warrant, a receipt for property taken, and an inventory and

7   return at the home. *Id.*

8       At approximately 1400 hours, Detective Halsted called and spoke with Sandra Karlsvik. *Id.*

9   She asked what occurred with her dog, and Detective Halsted explained the events and that Mr.

10  Wood declined any aid for injury to the dog. *Id.* Detective Halsted asked Ms. Karlsvik if she

11  signed a note that authorized her husband to smoke marijuana, and she declined to answer the

12  question on the advice of her attorney. *Id.* Neither Detective Halsted, Detective Schuster, nor

13  Officer Matt Dougil participated in the initial entry by the WSP SIRT Team. Declarations of

14  Halsted, Schuster and Dougil. Detective Halsted entered the home only after it had been entered

15  and cleared by the SIRT Team. Officer Dougil was established on the back perimeter of the home

16  for the duration of the search of plaintiffs' home. Detective Schuster was in a helicopter providing

17  aerial support during the initial entry into plaintiffs' home, entering the home only after it had been

18  secured and the helicopter had landed.

19      The sworn investigative report prepared by WSP Detective G.R. Mars contains the

20  following relevant description of the entry into plaintiffs' home (and is attached in its entirety to the

21  Declaration of Jason M. Rosen as Exhibit A, filed contemporaneously with this motion):

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 7

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

At approximately 0630 hours SIRT executed the warrant service at the residence.  The residence sat down a long dirt driveway off of 11th Ave.  A Pierce County Deputy, in a marked patrol car, followed the SIRT van down the driveway that led to the residence along with other perimeter personnel vehicles.   SIRT members exited the vehicle and approached the residence on foot.  As Detective Mars led the team toward the residence he noticed the occupant, later identified as Douglas E. Wood standing in a window on the main floor.  Detective Wilson took up a position of over watch on WOOD as Detective Mars proceeded to the south end of the house where he observed a set of wooden stairs that led up to a small landing.  As he approached the steps he noticed the wooden landing ended approximately 8 feet short of the doorway approximately 6 feet above the ground.

When they realized that they were not going to be able to access that door, part of the entry team moved to the basement door, which was located at the northwest corner of the house.  The door was not a standard size door.   It was approximately 8 feet high and approximately 3 feet wide.  It was mounted flush to the exterior of the house and opened inward from right to left.  It was mounted on an approximate 1 foot wooden door jam.  SIRT was unable to gain access into the door after numerous attempts with the "Ram." Detective Mars attempted to gain access through a large glass window that was located next to the door.  Again SIRT was unable to gain access due to a wood/metal covering over the window.  (See attached photo's)

As the main team was trying to gain access into the residence from the lower level, Detective Wilson was still communicating with Mr. Wood who was still standing in the window on the main floor. Detective Wilson was able to persuade Mr. Wood into lowering his "Draw Bridge" thus allowing access to his house.  SIRT entered the residence and cleared it and found no other personnel.

SIRT members met three large growling dogs coming up the basement stairs as they were descending them.   SIRT deployed several pepper balls on the lead dog in order to deter its aggressive approach.   The pepper balls are deployed from a long gun that fires the projectile.  Each SIRT member is trained in the use of this devise. SIRT implemented the use of the pepper ball gun several years ago

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 8

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1       as a less than lethal devise to use in the deterrence of an aggressive
2       animal.  The dog was struck in the head area and immediately fled
    the house with the other dogs following.

3       As SIRT and WESTNET personnel searched the residence they
4       found that the house heavily fortified.  The house appeared to have
    been designed and built with these fortifications in mind.  Each
5       window had a counter balanced weights that when released would
    allow a wooden/metal device to slid upward covering the entire
6       window.  There were motion detection devices all around the house
    and on the driveway to warn of travelers up the driveway.  The walls
7       to the house were cement and each opening was fortified.  (See
    attached photo's)

8       SIRT members cleared the area without incident.

9   ### III.  ISSUES PRESENTED

10      1.    Because they did not violate any of plaintiffs' constitutional rights, should this
11  Court grant defendants qualified immunity from all of plaintiffs' claims?

12      2.    Even if this Court were to find that defendants violated one or more of plaintiffs'
13  constitutional rights, should this Court grant them qualified immunity since a reasonable police
14  officer faced with the same circumstances and law known to him would have believed
15  defendants' conduct to be lawful?

16      3.    Should plaintiffs' claim for violations of their Fourteenth Amendment rights be
17  dismissed, as defendants did not violate plaintiffs' constitutional rights and there is no evidence
18  of any conduct that "shocks the conscience" or is "utterly intolerable" in civilized society?

19      4.    Should plaintiffs' claims against the City of Gig Harbor be dismissed with
20  prejudice, as there is no evidence of any unconstitutional custom or policy promulgated by the
21  City that served as the moving force behind defendants' actions?

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 9

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1

## IV.  EVIDENCE RELIED UPON

2          Defendants rely upon the pleadings already filed herein and the following materials

3    submitted herewith:

4          1.      Declaration of Detective John Halsted, with exhibits attached;

5          2.      Declaration of Sergeant Matthew Dougil, with exhibits attached;

6          3.      Declaration of Sergeant Dale Schuster; and

7          4.      Declaration of Jason M. Rosen, with exhibits attached.

8

## V.  ARGUMENT AND AUTHORITY

9    A.      Summary Judgment Standard

10         Summary judgment is appropriate where there is no genuine issue of material fact and the

11   moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party

12   bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex*

13   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the

14   opposing party must show that there is a genuine issue of fact for trial.  *Matshushita Elec. Indus.*

15   *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   The opposing party must present

16   significant and probative evidence to support its claim or defense.   *Intel Corp. v. Hartford*

17   *Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991).   For purposes of this motion,

18   reasonable doubts as to the existence of material facts are resolved against the moving parties

19   and inferences are drawn in the light most favorable to the opposing party.  *Addisu v. Fred*

20   *Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

21         Here, summary judgment is appropriate as there is no genuine issue of material fact that

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 10

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1  would preclude dismissal of plaintiffs' claims in their entirety.  There is no evidence to support

2  plaintiffs' claims that defendants violated plaintiffs' Fourth or Fourteenth Amendment rights.

3  **B.**      **Applicable Legal Standard For Qualified Immunity.**

4        To establish a cause of action under 42 U.S.C. §1983, plaintiffs must prove (1) that the

5  defendants deprived them of a federal constitutional or statutory right; and (2) that the defendants

6  were acting under the color of law.  42 U.S.C. §1983; *Wood v. Ostrander*, 879 F.2d 583, 597 (9th

7  Cir. 1989).  In this case, plaintiffs allege that the defendants violated Mr. Wood's and Dr.

8  Karlsvik's constitutional rights under the Fourth and Fourteenth Amendments.  These claims fail

9  since the undisputed evidence demonstrates the defendants acted lawfully and objectively

10  reasonably at all times.

11        "Qualified immunity is granted to police officers performing discretionary functions

12  insofar as their conduct 'does not violate clearly established statutory or constitutional rights of

13  which a reasonable person would have known.'" *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102

14  S.Ct. 2727 (1982).  A right is clearly established if the "contours of the right" are "sufficiently

15  clear that a reasonable official would understand that what he is doing violates that right."

16  *Brosseau v. Haugen*, 534 U.S. 194, 199, 125 S.Ct. 596 (2004) (*citing Anderson v. Creighton*, 483

17  U.S. 635, 640, 107 S.Ct. 3034 (1987)).  Even where an officer violates a constitutional right, he

18  may be entitled to qualified immunity.  *Hunter v. Bryant*, 502 U.S. 224, 112 S.Ct. 534 (1991).

19                    The purpose of the defense of qualified immunity is to protect
                     public officials "from undue interference with their duties and
20                    from potentially disabling threats of liability." *Harlow*, 457 U.S. at
                     806.  This defense recognizes that the interests of both the public
21                    official and society are best served by shielding officials from

DEFENDANTS SCHUSTER, HALSTED AND              **CHRISTIE LAW GROUP, PLLC**
DOUGIL'S MOTION FOR SUMMARY                   2100 WESTLAKE AVENUE N., SUITE 206
JUDGMENT (C05-5575RBL) - 11                          SEATTLE, WA 98109
                                                      206-957-9669

liability in order to permit the officials to carry out discretionary functions without fear of harassing litigation, "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office.  Finally, there is the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.'"  *Id*. (cites omitted).

*Devereux v. Perez*, 218 F.3d 1045, 1052 (9th Cir. 2000).

The Supreme Court has established a two-step analysis for determining whether qualified immunity applies.  First, the court must determine whether, "[b]ased upon the facts taken in the light most favorable to the party asserting the injury, did the officer's conduct violate a constitutional right?"  *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001).   If no constitutional right was violated, the analysis ends and there is "no necessity for further inquiries concerning qualified immunity."  *Id*.  The second step requires the court to determine "whether the officer could nevertheless have reasonably but mistakenly believed that his … conduct did not violate a clearly established constitutional right."  *Id*. at 201-02.

Whether an officer is entitled to qualified immunity for an allegedly unlawful act "generally turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time it was taken."  *Anderson*, 483 U.S. at 639.

This, in turn, is a "fact-specific inquiry," such that the conduct at issue must be closely analogous to conduct previously found to be unconstitutional.  *Floyd v. Laws*, 929 F.2d 1390, 1393 (9th Cir. 1991).  The Ninth Circuit has gone so far as to hold:

[I]f the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can

DEFENDANTS SCHUSTER, HALSTED AND DOUGIL'S MOTION FOR SUMMARY JUDGMENT (C05-5575RBL) - 12

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

> rarely be considered "clearly established" at least in the absence of closely corresponding factual and legal precedent.

*Brewster v. Bd. of Education*, 149 F.3d 971, 980 (9th Cir. 1998).

The relevant question, then, is whether a reasonable officer could have believed that the actions taken were lawful in light of clearly established law and the information the acting officer possessed at the time. *Anderson*, 483 U.S. at 641; *Fuller v. M.G. Jewelry*, 950 F.2d 1437, 1443 (9th Cir. 1991). It must also be remembered that the qualified immunity standard "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (*quoting Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)).

As set forth below, the undisputed material facts demonstrate that the officers who obtained and executed the search warrant, including officers Halsted, Dougil and Schuster, did not violate plaintiffs' constitutional rights. Therefore, these officers are entitled to qualified immunity under the first prong of the *Saucier* test. Moreover, even if this Court, viewing the facts in the light most favorable to the plaintiffs, were to find that the defendants *did* violate plaintiff's constitutional rights, they are still entitled to qualified immunity under the second prong of the *Saucier* test, as their actions were objectively reasonable under the law and facts known to them at the time.

## C.   Defendants Did Not Violate Plaintiffs' Fourth or Fourteenth Amendment Rights.

In paragraph 4.2 of their Complaint, plaintiffs contend that "by invading plaintiffs' home, taking plaintiff Wood into custody, deploying chemical weapons in their home, and blinding

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 13

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

their dog, defendants acted unreasonably in violation of the Fourth and Fourteenth Amendments to the United States Constitution." Plaintiffs' claims should be dismissed in their entirety because the warrant to search plaintiffs' property was obtained on probable cause, through valid means, and there is no evidence of excessive force, nor is there evidence suggesting that the defendant officers were involved in any activities which might constitute plaintiffs' excessive force claim.

        1.    <u>The Search and Arrest Were Based on Probable Cause.</u>

There is no question but that probable cause was required to support the search warrant of plaintiffs' home. *State v. Thein*, 138 Wash.2d 133, 140, 977 P.2d 582 (1999). Probable cause exists if the affidavit in support of the warrant sets forth facts and circumstances sufficient to establish a reasonable inference that the subject is probably involved in criminal activity and that evidence of the crime can be found in the place to be searched. *Id*. Probable cause is determined by the totality of the circumstances, and cannot be reduced to a neat set of legal rules. *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317 (1983). Based on the information discovered by, and available to, defendants, probable cause for the search warrant was established.

        a.    *The Aerial Observation of Plaintiffs' Property Did Not Violate the Fourth Amendment.*

The touchstone of the Fourth Amendment analysis is whether a person has a "constitutionally protected reasonable expectation of privacy." *California v. Ciraolo*, 476 U.S. 207, 210, 106 S.Ct. 1809 (1986) (citing *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507 (1967). "*Katz* posits a two-part inquiry: First, has the individual manifested a subjective

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 14

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1    expectation of privacy in the object of the challenged search?  Second, is society willing to

2    recognize that expectation as reasonable?"  *Id*.

3            *Ciraolo*, a case involving police officers' aerial observations of an outdoor marijuana

4    grow, concludes that an individual does not have a reasonable expectation that his garden is

5    protected from aerial police observation. *Id*., at 213-214. In *Ciraolo*, police received an

6    anonymous telephone tip that marijuana was growing in respondent's back yard.  *Id*., at 209.

7    Police were unable to observe the content of the respondent's yard from ground level because of

8    a six-foot outer fence and a 10-foot inner fence enclosing the yard.  *Id*.  The police secured a

9    private plane and flew over respondent's house at an altitude of 1,000 feet, within navigable

10   airspace.  *Id*.  Police officers trained in marijuana identification observed what they could

11   identify by the naked eye as marijuana growing in a part of the respondent's yard.  *Id*.  The

12   police obtained a search warrant based on an affidavit describing the anonymous tip and their

13   observations. *Id*.

14           The test as to whether the search is legitimate does not turn on whether the individual

15   chooses to conceal assertedly "private" activity, but instead whether the government's intrusions

16   infringe upon the personal and society values protected by the Fourth Amendment.  *Id*., at 212.

17   The *Ciraolo* court concluded that our society is not prepared to honor as reasonable the

18   expectation that one's activities in his garden are afforded an unqualified protection from

19   observation.  *Id*., at 214.

20           The instant case is factually similar to *Ciraolo*.  Here, tipster information led West NET

21   to conduct an aerial observation of the plaintiffs' property.  Officers Dougil and Schuster,

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 15

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   conducting the observation from a helicopter at an altitude of 700 feet, were able to identify by

2   the naked eye a patch of marijuana growing on plaintiffs' property.   They photographed and

3   documented their observations and passed this information along to WestNET Detective John

4   Halsted.   Detective Halsted used this information in his affidavit as a basis for obtaining the

5   warrant to search plaintiffs' property.   Both the Supreme Court and Ninth Circuit have continued

6   to uphold, and even expand upon, the police's right to establish probable cause based upon

7   observations made from a public vantage point.   See *Florida v. Riley*, 488 U.S. 445, 109 S.Ct.

8   693 (1989) (police observation of marijuana growing inside defendant's partially open

9   greenhouse from helicopter 400 feet above defendant's property did not constitute a search for

10  which a warrant was required), and *United States v. Hammett*, 236 F.3d 1054 (2001 9th Cir.).

11         Clearly, the defendants did not violate plaintiffs' Fourth Amendment rights when they

12  flew over his property and observed that he was growing marijuana on his property.

13                      b.   *The Warrant Was Valid*

14         In the complaint, plaintiffs allege that "[t]he search warrant was obtained by presenting to

15  the Judge materially inaccurate and incomplete information."   The standard by which

16  information used to obtain a valid warrant has been well defined by the U.S. Supreme Court.

17  "Only where the warrant application is so lacking in indicia of probable cause as to render

18  official belief in its existence unreasonable, … will the shield of immunity be lost."   *Malley v.*

19  *Briggs*, 475 U.S. 335, 344-345 (1986) (citing *United States v. Leon*, 468 U.S. 897 (1984)).

20         In his deposition, Mr. Wood took exception to the way his motion sensor alarm system

21  was described, the height at which the helicopter observing his property was flown, whether

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 16

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WASHINGTON 98109
206-957-9669

1   automatic gunfire had been heard coming from his property, and whether the Organic Sunflower

2   Foundation and Solar Steam, Inc. were fictitious entities.  Wood Dep., 92:8-93:11, attached as

3   Exhibit B to Declaration of Jason M. Rosen.  The issues raised by Mr. Wood are merely

4   differences in opinion at best, not the type of inaccurate information that would invalidate a

5   warrant for lack of probable cause.  Plaintiffs do not assert that the officers who provided

6   information in support of the warrant did not reasonably believe that the information they were

7   providing was accurate.  In fact, Mr. Wood acknowledged in his deposition that he had no idea

8   of knowing what information regarding his property other individuals had provided to the police.

9   Wood Dep., 95:1-9.   Moreover, even disregarding the information Mr. Wood suggests is

10  inaccurate, there remains substantial information which otherwise justifies the warrant.  The fact

11  that the police observed Mr. Wood growing marijuana on his property from an area in which

12  they were legally entitled to make such an observation, provides probable cause in and of itself.

13          Under the clearly established laws of this country, the officers who provided information

14  used to obtain the warrant are entitled to qualified immunity.  Because plaintiffs do not assert

15  that any information used to obtain the warrant was intentionally misrepresented to the court, any

16  inaccuracies in the warrant amount to no more than mere mistake.  A plaintiff in a civil suit

17  cannot, merely by alleging that information in the affidavit is incorrect, strip an affiant of his

18  qualified immunity. *Reed v. Marker*, 762 F.Supp. 652, 655 (W.D. Pa., 1991).

19          Plaintiffs' claims based on the content and issuance of the warrant should be dismissed.

20          2.    There Was No Excessive Force Used Against Plaintiff.

21          To the extent plaintiff's allegations constitute claims of excessive force, they are to be

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 17

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   analyzed under the Fourth Amendment's objective reasonableness standard.  *Graham v. Connor*,

2   490 U.S. 386 (1989).  Summary judgment on these claims is appropriate on multiple bases.

3             a.   *The Defendants Did Not Engage in the Cited Conduct.*

4        There is no evidence to suggest that the moving defendants participated in any of the

5   conduct giving rise to plaintiffs' excessive force claims.  It is undisputed that once the strategy

6   and tactics formulated to enter plaintiffs' property were developed, they were executed solely by

7   the WSP SIRT Team.  Sgt. Schuster, Sgt. Dougil and Det. Halsted all provided perimeter

8   support, entering plaintiffs' home only after it had been entered and secured and Mr. Wood had

9   been placed in custody.

10             b.   *The Force Alleged Was Not Excessive as a Matter of Law.*

11        Addressing the merits of plaintiffs' claim, there is no basis to find that the strategy,

12   tactics and execution of the warrant were unreasonable.  "It is an unfortunate but stark an

13   inescapable truth of law enforcement today that the so-called war on drugs is a shooting war, and

14   officers who execute search warrants on suspected drug distribution or production points must be

15   prepared to use stealth, surprise, an advantage in numbers merely to reduce their risk of injury or

16   death."  *Reed*, at 655-656.

17        In light of the information provided to the police suggesting that plaintiffs' property was

18   protected by motion sensors, plaintiff may have been in possession of automatic weapons, and

19   the home had been constructed as a fortified enclose designed to prevent entry, the tactics

20   employed by the WSP SIRT Team were clearly objectively reasonable.

21        Further:

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. (Citation omitted.) …Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, (citation omitted)… violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation.

*Graham* at 396-97.

Plaintiff alleges no specific conduct that would be so offensive as to even to come into question as being unreasonable under the circumstances.

3.    <u>Plaintiffs' Fourteenth Amendment Rights Have Not Been Violated</u>.

Plaintiffs allege that the deployment of pepper gas in their home rendered it uninhabitable for several months. Plaintiffs allege their dog was shot with a pepper ball during the execution of the warrant. Plaintiffs allege Mr. Wood being taken into custody violated their civil rights. Assuming these as well as any other allegations made by plaintiffs are asserted under the Fourteenth Amendment, they are subject to summary judgment dismissal. The Fourteenth Amendment of the United States Constitution provides that no person shall be deprived of life, liberty or property without due process of law. The Fourteenth Amendment protects the individual against "arbitrary action of government." *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)). Only the most egregious official conduct can be said to be "arbitrary in the constitutional sense." *Id.*, at 846 (quoting *Collins v. Parker Heights*, 503 U.S. 115, 129 (1992)). In order for conduct to be

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 19

1  sufficiently arbitrary and egregious to sustain a claim under the Fourteenth Amendment, it must

2  "shock the conscience." *Id.*, at 846.

3     In explaining what types of claims are viable under this test, the court explained:

4        We have accordingly rejected the lowest common denominator of
         customary tort liability as any mark of sufficient shocking conduct
5        and have held that the Constitution does not guarantee due care on
         the part of its officials; liability for negligently inflicted harm is
6        categorically beneath the threshold of Constitutional due process.

7  *Id.*, at 848-49.

8     Inasmuch as all the actions of the defendants alleged by plaintiffs stem from the search

9  and seizure, they should be reviewed under the Fourth Amendment analysis.  Because all of the

10  conduct was objectively reasonable as outlined above, there can be no argument that the same

11  conduct would be in violation of the plaintiffs' Fourth Amendment rights given the more

12  stringent analysis applicable to such claims.   Simply put, the facts of this case, even when

13  viewed in the most favorable light conceivable, do not approach the requisite degree of arbitrary

14  egregiousness to support a claim under the Fourth, let alone the Fourteenth, Amendment.  First,

15  as discussed above, the officers' actions were at all times objectively reasonable and lawful and

16  never violated any of plaintiffs' Fourth Amendment Constitutional rights.   Second, even if the

17  Court were to hold that any of plaintiffs' Fourth Amendment rights were violated, their conduct

18  does not "shock the conscience" so as to give rise to a claim under the Fourteenth Amendment.

19  Finally, plaintiffs were afforded due process.  There have been no allegations that the steps taken

20  in executing the search, seizure and arrest were lacking in due process of law.  Nor are specific

21  facts alleged that would allow one to make such allegations.   Accordingly, defendants are

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 20

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1    entitled to summary judgment dismissal on all counts.

2    **D.      The City of Gig Harbor Is Entitled To Summary Judgment.**

3    Because the defendant officers acted lawfully and did not violate any of the plaintiffs'

4    constitutional rights, the City of Gig Harbor should be dismissed from this case.  Plaintiffs fail to

5    establish a prima facie case for a civil rights violation against the defendant officers.  But, even if

6    plaintiffs had suffered civil rights violations, the City of Gig Harbor is not liable under §1983 for

7    the conduct of its front-line officers.  *Cf. Pembauer v. Cincinnati*, 475 U.S. 469, 481, 106 S.Ct.

8    1292, 89 L.Ed.2d 452 (1986).

9    A municipality cannot be held liable for 42 U.S.C. §1983 damages under the theory of

10   *respondeat superior*.  *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56

11   L.Ed.2d 611 (1978).  A local government cannot be liable under §1983 for injury inflicted solely

12   by its employees or agents, but, rather, only when execution of the government's policy or

13   custom, whether made by lawmakers or by those whose edicts or acts may fairly be said to

14   represent official policy, inflicts the injury.  *Id.*

15   To impose municipal liability under §1983 based solely on a single incident, a plaintiff

16   must demonstrate that the incident "was caused by an existing unconstitutional municipal policy

17   which policy can be attributed to a municipal policy maker."  *Oklahoma City v. Tuttle*, 471 U.S.

18   808, 824 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

19   Absent actual evidence of an unconstitutional policy, a single event such as that alleged

20   by plaintiffs is insufficient to create municipal liability under §1983, and their claims against the

21   City should be dismissed.  *Bd. Of Cty. Comm. of Bryan Cty. v. Brown,* 520 U.S. 397, 404, 117

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 21

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1   S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997).

2   Similarly, plaintiffs cannot establish deliberate indifference to constitutional rights on the

3   part of the City of Gig Harbor.  *Cf. City of Canton v. Harris*, 489 U.S. 378, 388-91, 109 S.Ct. 1197,

4   103 L.Ed.2d 412 (1989); *Davis v. City of Ellensburg*, 869 F.2d 1230, 1235 (9th Cir. 1989).

5       A plaintiff seeking to establish municipal liability on the theory that
        a facially lawful municipal action has led an employee to violate a
6       plaintiff's rights must demonstrate that the municipal action was
        taken with "deliberate indifference" as to its known or obvious
7       consequences.  [*Canton v. Harris*], at 388, 109 S.Ct. at 1204.  A
        showing of simple or even heightened negligence will not suffice.

8   *Bd. Of Cnty Comm. of Bryan Cty., supra*, 520 U.S. at 407.  " '[D]eliberate indifference' is a

9   stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious

10  consequence of its action."  *Id.*, 520 U.S. at 410.  The "deliberate indifference" that must be

11  demonstrated by the plaintiff is deliberate indifference to the risk that a violation of a particular

12  constitutional or statutory right will flow from the municipality's decision. *Id.*, 520 U.S. at 411.

13      In common parlance, the specific deficiency or deficiencies must be
        such as to make the specific violation 'almost bound to happen
14      sooner or later,' rather than merely 'likely to happen in the long run.'
        (Citation omitted).
15

16  *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987).

17      As previously discussed, the reasonableness and constitutionality of the defendant

18  officers' actions negates the potential for municipal liability in this case.  However, even if the

19  manner in which they obtained and executed the search warrant was unlawful, there is no

20  evidence to support their claim of municipal liability under *Monell* and its progeny.  Plaintiffs

21  cannot demonstrate that the City of Gig Harbor implemented any unconstitutional policy of

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 22

1   depriving citizens of their constitutional rights.   There is also no evidence of any deliberate

2   indifference to individual constitutional rights on the part of the City.   Because there is a

3   complete void of evidence to support a claim for municipal liability, plaintiffs' claims against the

4   City of Gig Harbor should be dismissed as a matter of law.

5                               **VI.  <u>CONCLUSION</u>**

6          Defendants did not violate any of plaintiffs' constitutional rights.  The warrantless search of

7   plaintiff's property by helicopter has been deemed constitutional by clear federal law.  The police

8   established probable cause to support the warrant to search plaintiffs' home.

9          Based on the information available and know to the police at the time the search warrant

10  was executed, the tactics, strategy and force used were objectively reasonable.    Therefore,

11  defendants are entitled to qualified immunity on all of plaintiffs' constitutional claims under the

12  second prong of *Saucier* and those claims should be dismissed as a matter of law.

13         Moreover, nothing plaintiff has alleged rises to a level that "shock the conscience" so as to

14  warrant liability under the Fourteenth Amendment.  Nor does plaintiff make allegations, or assert

15  specific facts, that would constitute the deprivation of due process.

16         Finally, there is no evidence that the City of Gig Harbor violated any of plaintiffs' rights.

17  Furthermore, the City never instituted any unconstitutional custom or policy that served as the

18  moving force behind defendants', or any other officer's, actions.  Therefore, plaintiffs' 42 U.S.C.

19  § 1983 claims against the City of Gig Harbor should be dismissed as a matter of law.

20  / / /

21  / / /

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 23

1    DATED this 2nd day of November, 2006.

2                                              CHRISTIE LAW GROUP, PLLC

3
                                               By _____/s/  Robert L. Christie_____
4                                                    ROBERT L. CHRISTIE, WSBA #10895
                                                     JASON M. ROSEN, WSBA #26550
5                                                    Attorneys for Defendants Gig Harbor Police
                                                        Department, Officer Matthew Dougil,
6                                                        Detective John Doe Schuster and
                                                        Detective John Halsted
7                                                    2100 Westlake Avenue N., Suite 206
                                                     Seattle, WA  98109
8                                                    Telephone:  (206) 957-9669
                                                     Fax:  (206) 352-7875
9                                                    Email:  bob@christielawgroup.com

10

11

12

13

14

15

16

17

18

19

20

21

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 24

CHRISTIE LAW GROUP, PLLC
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on November 2, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the

3

following:

4

Mark Leemon, WSBA #5005
LEEMON & ROYER PLLC

5

2505 Second Avenue, Suite 610
Seattle, WA 98121

6

leemon@leeroylaw.com

7

Ione S. George, WSBA #18236
Deputy Prosecuting Attorney

8

Kitsap County Prosecuting Attorney's Office
614 Division Street, MS-35A

9

Port Orchard, WA  98366-4676

10

Jeffrey Stier, WSBA #6911
Assistant Attorney General

11

Tort Claims Division
7141 Cleanwater Drive S.W.

12

P.O. Box 40126
Olympia, WA  98504-0126

13

14

CHRISTIE LAW GROUP, PLLC

15

By ___/s/ Robert L. Christie_____

16

ROBERT L. CHRISTIE, WSBA # 10895
JASON M. ROSEN, WSBA #26550

17

Attorneys for Defendants Gig Harbor Police
Department, Officer Matthew Dougil,

18

Detective John Doe Schuster and
Detective John Halsted

19

2100 Westlake Avenue N., Suite 206
Seattle, WA  98109

20

Telephone:  (206) 957-9669
Fax:  (206) 352-7875

21

Email:  bob@christielawgroup.com

DEFENDANTS SCHUSTER, HALSTED AND
DOUGIL'S MOTION FOR SUMMARY
JUDGMENT (C05-5575RBL) - 25

**CHRISTIE LAW GROUP, PLLC**
2100 WESTLAKE AVENUE N., SUITE 206
SEATTLE, WA 98109
206-957-9669