THE HONORABLE RONALD B. LEIGHTON
NOTED FOR: JAN. 5TH, 07

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| DOUGLAS WOOD and SANDRA KARLSVIK, husband and wife,<br><br>Plaintiffs,<br><br>v.<br><br>KITSAP COUNTY; WEST SOUND NARCOTICS ENFORCEMENT TEAM; OFFICER MATTHEW DOUGIL WestNET); GIG HARBOR POLICE DEPARTMENT; DETECTIVE JOHN DOE SCHUSTER (WestNET) DETECTIVE JOHN HALSTED (POULSBO POLICE DEPT, WestNET, Badge #606); DETECTIVE G.R. MARS (WSP STATEWIDE INCIDENT RESPONSE TEAM, Badge #685); DETECTIVE JOHN DOE WILSON and JOHN DOES 1-25<br><br>Defendants. | No. C05-5575RBL<br><br>DECLARATION OF DOUGLAS WOOD IN RESPONSE TO MOTION FOR SUMMARY JUDGMENT |

DOUGLAS EDWARD WOOD, declares on oath as follows:

1. I am one of the plaintiffs in the above-captioned lawsuit;

2. I am 54 years old and reside on Fox Island in Pierce County, Washington;

3. I purchased the property on which I live in 1973. Sometime during the mid-1970s, ownership was transferred to the Solar Steam Company, a for profit corporation in which I had a controlling interest. Sometime in the early 1990s it was transferred to the Organic

Decl. of Douglas Wood                                1

Sunflower Foundation, a 501 (C)(3) foundation founded to research and demonstrate Earth friendly alternatives to an oil based economy, and which holds part of the property as a nature conservancy.   I have lived on this property nearly continuously from 1973 until the present.  For a period of about a year or less in 1975 and 1976 a friend acted as a house sitter while I was on a Brigantine sailing ship.  In 1995 my wife and I lived in Spokane during her residency.  My wife, Sandra Karlsvik, is a physician and psychiatrist, and is employed by the State of Washington at Western State Hospital.

4. I make this declaration to fully describe from my first-hand knowledge some of the incidents referred to in declarations provided on behalf of Defendants' Motions for Summary Judgment, as well as to accurately provide the facts concerning my arrest and the raid of my home on September 5, 2002.

5. There is mention in the search warrant affidavit of persons being involved in illegal drugs putting the property in the name of fictitious corporations.  Neither Solar Steam Company nor the Organic Sunflower Foundation was fictitious nor were either organized for any illegal purpose.  I have never been involved in any criminal enterprises.  Initially I studied journalism and produced for a public television documentary about the Port of Tacoma that won an Emmy.  Since the early 1970s I have been interested in and engaged in the production of power from solar energy.  I invented a new kind of solar collector and devised a process for using it to produce steam.  The Solar Steam Company was a legitimate for profit business established to manufacture and sell solar collector technology.  Since the early '70s I have continued to research and work in this field as much as my health would allow, and continue to do so today.   I was awarded the Washington State Energy Offices Energy Innovation Award in July of 1984.  In

September of 1984 I was awarded the United States Department of Energy National Award for Energy Innovation. I have received both State and Federal Solar Research Grants and hold four patents for solar technology. Recently I have been in discussions with investors concerning methods of manufacturing ethanol using solar power. I believed and believe that solar power is a viable alternative to nonrenewable resources in many applications, both commercial and personal.

6. There has been nothing secretive or clandestine about my work in solar power. Articles about my work have appeared in local and national newspapers since at least the late '70s. Attached hereto as Exhibits A, B, C and D, are articles from the Seattle Times, the Tacoma News Tribune (a nationally syndicated story written by Jack Anderson), the Wall Street Journal (from June 1993), and the Peninsula Gateway, a newspaper sold in Gig Harbor. The date of this latter exhibit is September 11, 2002, 6 days after the raid on my home. However, the reporter and photographers researching this story were at my home several weeks before, interviewing me and walking all around the property. If any police agencies wanted to find out about me or what I was doing on the foundation's property, they could have just asked around about me on Fox Island. Fox Island is tiny and Gig Harbor is a small town. I am widely known in both. Regarding "information" supplied in support of the search warrant in this case, none of the substantive information in it is true, whether or not any police officer indicates that he heard it.

7. With regard to the allegation that an informant indicated that he had gone onto my property to steal marijuana and saw marijuana growing either on a deck or underneath a deck, I believe I know the source of that information. There were two burglary attempts on my property by two brothers whose last name I was informed by the police was

Stafford. The first time I chased them away. The second time I got the license plate of the vehicle in which they were driving, and reported them to the Pierce County Sheriff's Office. They were arrested and charged with attempted residential burglary (Pierce County Superior Court, Juvenile Division, Cause No. 98-8-03420-1, and 98-8-03421-9). Moments after I called 911, Deputy Armstrong from the Pierce County Sheriff's Office came to our house and told me the Stafford brothers were being detained by the side of the road. He said that they were claiming to be looking for drugs, which he said burglars often claim. I accompanied Deputy Armstrong through my house and around the property to prove that there were no drugs anywhere on the property, which there were not. I am not certain of exactly the date on which the incident occurred, but I still have paperwork indicating that Deputy Armstrong referred this case to the Juvenile Court Prosecutor's Office on November 9 of 1998.

8.  On another occasion in 1997 or 1998 a Pierce County Deputy Sheriff named Curt Beaupre along with two other deputies came to my house. He said that a male voice had made a phone call tip indicating there was marijuana growing on our property. The three deputy sheriffs made a thorough search of our home and property, including the out building and sheds. No drugs were found, as there were none present. According to Mr. Beaupre's card, he was with the Special Investigations Unit of the Pierce County Sheriff's Office, the office of the unit is 930 Tacoma Avenue South, Tacoma, Washington. After the search of my property, Deputy Beaupre thanked me for allowing him to look through the property and indicated he would not be returning. The incident about the 2001 "tip" from the Confidential Marijuana Hotline is not only untrue, it is impossible. In the first instance, to the best of my knowledge, no one has ever unloaded

Decl. of Douglas Wood                        4

marijuana plants from the bed of a truck on the property on which I live on Fox Island. Furthermore, this tipster supposedly saw this when he or she was looking for an address on Fox Island and drove into my driveway. As the police officers clearly discovered when they drove onto my property on the day of the raid, the driveway does not come up to the house. In fact, you cannot see the driveway from the house. In order to get to the house, you would have to go off the road and across a field. Perhaps for this reason, the officers who approached my property initially did so on foot.

9. The idea that another police officer heard automatic weapon fire and other gun fire coming even from the general direction of my property is very difficult to believe. To the best of my knowledge, no one has fired a gun on my property since I first lived here. I own two long guns. One was an antique shotgun that was broken when I got it. I once checked in to having it fixed, and it is no longer manufactured, and parts are unavailable. The other was a hunting rifle I got as a gift from my father. Although I may have fired it when I originally got it I never used it, and had not for many years. My wife and I are vegetarians, and I do not hunt. Both of these guns were stored on the top shelf in the basement. Although I have had prowlers on my property on several occasions, I do not and will not carry a gun, even empty, to confront trespassers under any circumstances. The only automatic weapon fire I have heard from my property on Fox Island seemed to me to be coming from Ft. Lewis. Even this is very faint. Fox Island is a very small community. If anyone was firing an automatic weapon on Fox Island, it is impossible for me to believe that there would not be multiple calls to the police.

10. It is very difficult, if not impossible for me to believe that officers could have identified the marijuana growing next to my vegetable garden from 750 feet in the air. The area in

Decl. of Douglas Wood                                      5

which the marijuana was growing was about the size of a small dining room table. However, if the officers did see the marijuana, it should have been clear to them that this was a very small patch of plants, and nothing like what I imagine you would expect to see from a large criminal enterprise. The marijuana that was grown on my property was grown by me solely for my own personal use. I have suffered for many years from a neurological condition known as trigeminal neuralgia. This disorder produces extreme intense disabling pain. Over the years, I have seen numerous health care providers for this condition and have been prescribed numerous medications in many categories in an attempt to obtain some relief from this pain. Ironically the only medication from which I got any relief was aspirin. However, continued use of aspirin resulted in uncontrolled bleeding and I had to discontinue it. Both the frequency and duration of these bouts of pain are irregular and unpredictable. When they occur with their full intensity, I am virtually entirely disabled by pain. At times in my life I have entertained suicide as a result of this pain and have even been hospitalized for this suicidal ideation.

11. During the public discussion surrounding Washington's Medical Marijuana Act, I heard and read of patients who claim to get relief from pain and loss of appetite, both symptoms which I frequently experience, from the use of marijuana for medicinal purposes. At this point I began to think that perhaps I could get some relief from marijuana. I discussed this possibility with physicians, including my father and my wife, who is a licensed psychiatrist. My wife and I discussed the potential benefits and potential harms of marijuana. She has seen the effects of trigeminal neuralgia on me on numerous occasions. She indicated to me that I might want to give it a try to see if it gave me some relief. She also advised me not to smoke it, because of potential damage to my lungs.

Decl. of Douglas Wood                                   6

This made sense to me, as I try to maintain my health, and other than the trigeminal neuralgia, I consider myself to be a very healthy person.

12. After the Medical Marijuana Act passed and became effective, I decided to try marijuana in an attempt to get some relief from the pain of trigeminal neuralgia. I did some research on the various ways of ingesting marijuana other than by smoking it. I discussed this possibility with my wife as well, and she agreed that, among the ways of ingesting marijuana, drinking it in tea would be acceptable.

13. After the Washington State Medical Association developed a document reflecting its understanding of the requirements of the Medical Marijuana Act, I reviewed this document with my wife, and she signed the document indicating that we had reviewed the necessary information to comply with the Act. She was very conscientious about complying with the duties imposed on physicians by the Act. We reviewed the potential harms and benefits of marijuana on a regular basis and she provided me with a signed certificate in the form prescribed by the Medical Association every year. A copy of this form is attached hereto as Exhibit E. I believe that this particular form was signed by my wife around Thanksgiving of 2001. I had it among my possessions in my house on September 5, 2002, and could have produced it if given time. However, as detailed below, none of the police officers involved in the raid asked for it or indicated in any way that the small note they recovered from my wallet was insufficient documentation of a doctor's advice.

14. At the point in time when my wife was advising me about marijuana, I had no other primary care physician. As I previously indicated, I am a reasonably healthy person except for trigeminal neuralgia. I had seen many doctors for that condition and

Decl. of Douglas Wood             7

ultimately none of them was able to provide me with any relief. Accordingly, I was not currently seeing any physician for trigeminal neuralgia in the fall of 2002. The only reason I needed a primary care physician in the fall of 2002 was to make sure to comply with the requirements of Washington's Medical Marijuana Act. Because my wife is a physician and qualified to discuss this matter with me, it simply made no sense to seek other medical care for that reason.

15. I find that in fact I get some relief from the pain and loss of appetite associated with my trigeminal neuralgia from drinking the marijuana tea. I have always tried to comply with the Medical Marijuana law. The law does not state how many plants a person can have, but rather speaks in terms of a 60 day supply. I have never measured the amount of marijuana I have used in making tea, and do not really know what would be a 60 day supply for a person who uses it to make tea. However, I have never grown very many plants, and I have always believed that my growing and using marijuana was within the boundary of the Medical Marijuana law.

16. Much has been made of the "fortifications" in my house. None of what has been described as such was in fact intended as, nor I thought, even useful as a fortification. The insulation in the doors and the insulated coverings for the windows were all designed by me for the purpose of energy efficiency. I provide heat and hot water through passive solar design. A passive solar home must be very efficient. The exterior insulation, insulated shutters, and insulated doors are standard designs in passive solar homes, and are especially necessary in a cloudy climate such as exists in the Puget Sound area. While I designed the energy efficiency measures for my house, the concrete and rebar in the foundation was engineered for me by one of the leading engineering companies in the

1 area. The reason for the concrete and rebar was to earthquake-proof the home. It too had nothing to do with fortification.

17. I have no surveillance equipment of any kind on my property. I do have some motion detectors. As indicated above, one cannot see the driveway from my house. After the second time the Stafford brothers attempted to burglarize my home, I got two wireless motion detectors of a kind one can buy at Radio Shack or similar stores. In the daytime, they act as something of a doorbell, letting me know when someone is coming down the driveway. However, they turned out to be practically useless for the purpose for which I got them. Part of our property is a nature conservancy. We have numerous deer living on the property, and the motion detector chimes are set off so frequently at night by deer that they are virtually useless as a security signaling device at home. We also had an infrared activated sprinkler at the end of the driveway. This sprinkler was intended to interrupt dogs chasing deer. The reason for having two sensors, which are not hidden had nothing to do with protecting our home from anything. We used them primarily for preventing our dogs from encountering deer moving down the driveway, a common occurrence. By having more than one with different chimes for each, we could tell if the deer were moving toward or away from the house. If only one of the signals went off, there was no way for us to tell whether it was people, deer, dogs or some other animal. If we only heard one chime, and nobody approached down the driveway, we assumed it was probably deer and kept the dogs inside for 15 minutes. The motion sensors on the driveway were the only ones anywhere on our property. We have no such sensors in or around the house, we have no alarm system, and in fact there is no mechanism for locking our door.

Decl. of Douglas Wood                9

18. There are two doors to our house. The main door is on a lower floor. This is the primary living space in our home. Our bedroom, living area and kitchen are all on this main lower level. The upper level is one big room in which we have a spare bed and an office area. The door on that floor is hinged at the bottom and opens downward onto a landing from which there is now a set of stairs down to the ground. It is not a draw bridge, or anything like it. Indeed that door is virtually never open. The reason it was built in the first place was so that we could get furniture into the upper floor. The stairway from the main floor upstairs is too narrow and turns too sharp a corner to enable moving furniture up it. When the home was originally built, it was built with a ramp up to the landing rather than stairs. In this way, hand carts, etc., could be used to roll furniture and other household items up to the landing and into the house. However, the ramp proved to be difficult to walk on, so ultimately we put stairs in. We go in and out through the main door on the lower level. We have taken to considering the upstairs door solely as an emergency exit.

19. In one of the police reports from the case involving the attempted burglary by the Staffords, there was mention of one of the Staffords indicating something about marijuana growing under our "deck." We have no deck. I never understood this reference to have anything to do with the upstairs door, since, as stated above, that door is virtually never open. There was also mention in the police report about there being marijuana growing under dome shaped buildings. Because it was mentioned in the plural I always assumed that this was a reference to the solar collectors that I had designed and built. These collectors are concave when facing the sun. However, when they are not in use they rotated face down. When viewed this way, their shape is like a dome. There is

in fact one geodesic dome shaped building on the property. That is the original house in which I lived when I first lived on the property. It has neither running water nor power. There have never been plants of any kind grown inside that building, nor has there ever been potting soil or pots or any kind of plants in that building. This was among the places Deputy Armstrong looked when he came to look around my property.

20. The first I had any indication of the invasion of my home by the police on September 5, 2002, was when I heard the chime from the driveway motion sensor sound numerous times. I was upstairs in my house at the time. Alarmed, I went to the south facing window to see who or what was approaching. I saw a large group of what appeared to me to be soldiers or some kind of military personnel walking across the field towards the south side of my house. They appeared to be coming from the direction of the driveway. These persons had on helmets and were all dressed in black, complete with heavy body armor. They appeared to be carrying large caliber automatic weapons. The sight of them approaching was terrifying. The main door in my home on the lower level is on the north side of the house. The upper door, that I commonly think of as the fire escape, is on the west side of the house. The driveway enters the property from west to east. However, the closer end of the driveway does not end near the house. Rather it opens into the field to the south of my house. Accordingly, the soldiers were approaching my house in the general direction from south to north straight toward the house.

21. As I was standing in the window I called to them, and asked what was going on. One or more of the soldiers saw me in the window. I was ordered to show them my hands. At this point many of them (it appeared to me to be all of them) pointed their weapons at me. They appeared to be tense and teed up, and I was afraid they were going to shoot me. I

Decl. of Douglas Wood                                    11

raised my hands to show them I had nothing in my hands and then lowered them again. When I did this, they started screaming at me again to raise my hands. At this point I was extremely afraid, and believed that I might be shot. They looked to be very excited, and to me appeared as if they might be afraid. I then told them that I was going to open the door and come out. I did this so they could see I was no threat and would not be as likely to shoot me. One Officer was yelling at me to stay where I was and not to open the door. They all seemed to be getting more and more excited.

22. I was so afraid that I decided to open the door against their orders and come outside to show them that I was no threat. I kept my hands up as I walked from the south of the house to the west. I then opened the upstairs door down onto the landing and came out on the landing. At that point one of the soldiers, I believe his name was Wilson, came up and put plastic handcuffs on me behind my back. These handcuffs were extremely tight and were cutting off the circulation in my hands. At some point I complained about this and the soldier cut the handcuffs off and put on a different pair. As I was outside and handcuffed a large number of these black-clothed soldiers ran into the house. The soldier who had put the handcuffs on me told me that they were police and had a search warrant. While I was out on the landing with him, I heard a loud banging coming from the north side of my house. I started yelling for the people to stop banging on my house and asked the officer with me to tell them to stop banging on my house. He would not do so. The banging continued and I heard the sound of glass breaking. I thought that they had broken the downstairs window, which I later found to be true. From later appearances it also appeared that they were then banging on the window cover, although

Decl. of Douglas Wood   12

apparently couldn't break it. This actually surprised me as I designed the cover myself, and it is just a piece of Styrofoam with sheets of aluminum on the front and back.

23. After several minutes I saw one of the men who looked like soldiers appear with pry bar. It later appeared that they had pried the door open. The door latch and wood around the door were broken, and you could see the impression of the bar in the jamb. By this time there were many of the black dressed police officers already in the house who could have opened the door simply by pulling on the handle. There is an ordinary door knob on the inside of the door. In fact, the officers outside the house could have opened the door themselves if they had simply looked closely rather than banging on my house and door. There is a rope hanging by the door. If you pull the rope, it disengages the door latch and the door can simply be pushed open. There is no lock on this door.

24. Eventually, some officers came and started asking me about the marijuana growing next to my garden. I told them that I was growing it for myself for medicinal purposes in accordance with the Medical Marijuana law. They asked if I had any documentation. I then directed them to my wallet, which was downstairs on a shelf in my house. In my wallet, I had a small note made out by my wife indicating that she had advised me to use marijuana for trigeminal neuralgia. The reason that I had this small note was that I wanted to make sure that I always had with me some proof of the legality of my use of marijuana. The full document that my wife and I went through and she signed every year is on an 8-1/2 x 11 piece of paper, and cannot conveniently be carried with me all the time. No one indicated that the note in my wallet was not adequate, nor did anyone ask me if I had any other documentation.

Decl. of Douglas Wood                        13

25. The further conversation about the marijuana that I remember involved officers sitting and doing math at my table concerning the amount of marijuana. I remember that Officer Halsted was one of the officers who were trying to figure out the math. They asked me how many plants there were and I told them that I did not know. When they kept pressing me I told them I thought there were about 20, which was as close as I could estimate since I had never counted them. Then two of them went downstairs.

26. After we had completed the discussion about medical marijuana, I heard someone yell "Fire" from downstairs, and all the officers started running out of the house. I was rushed outside as well. I asked if my house were on fire, and someone said "No." A cloud of what looked to me like smoke was bellowing up out of the lower level of the house. I heard one of the officers ask another if that was CS. The other responded that it was not, it was CN. I did not know what this meant at the time. I since have found out that both CS and CN are abbreviations for long chemical names for different kinds of tear gas. Whatever it was that they set off in the lower level of my house, it left a white residue on everything which was very difficult to remove. My wife and I were afraid that there was some kind of toxic chemical remaining in our home. We thoroughly cleaned the whole downstairs area before we would move back into our house. We had to throw everything made of cloth in the dump, as it could not be cleaned. During this time I slept in the empty geodesic dome in my backyard, and my wife stayed at an apartment she keeps in Tacoma near to her work.

27. The entire incident took what I would estimate to be about 20 minutes. Ultimately, the officers had to call the Pierce County Sheriff's Office to get an officer to pick me up to take me to jail as there was no one from Pierce County with the officers conducting the

Decl. of Douglas Wood                                14

raid. All of the cars of the raiders were brought into a field, So that the Pierce County Sheriff's vehicle could get in. I was then taken to the Pierce County SUV that had been brought up to the southwest corner of the house and put in it, still handcuffed. There were many other police, some dressed differently than the black dressed soldier looking men, moving all over my house and property. At some point, the handcuffs were removed so I could urinate. It was while I had my handcuffs off my dog Clancy came up and lay down next to the car. I have three dogs. One, a four year old German shepherd, had run up the stairs and outside after the men came rushing into my house. The other two were old dogs who could not get up and down the stairs. There was a German shepherd and Clancy, a Golden Retriever. Both were about 11 years old, and stayed downstairs, as they could not get up and down the stairs. I had heard the dogs barking when the men were pounding on the house. I had not heard them barking until then. When Clancy lay down near the car, I could tell that she was injured. When she came over to me it looked like one of her eyes had been exploded, and seemed to be coming out of the socket. She was bleeding. I sat down with her to comfort her. While I was down on the ground with her, I was picked up and forcibly slammed face first into the SUV. I reached out to Clancy again, and I was lifted forcibly and slammed several more times face first into the hood of the SUV. Contrary to what I have been told the officers say, no one asked me if I wanted to get help for my dog. Officer Halsted, said he had called animal control. I did not want my injured dog taken to the pound, and told them to leave my dogs on the property. When my wife eventually got home and could take the dog to the vet, the vet told us that Clancy's eye had essentially been destroyed and

Decl. of Douglas Wood                    15

30. I believe that some items of our personal property were taken during the course of the raid and search of our property. At one point, while I was being held in the front of the house, I heard my chain saw being started in the shed where it is kept. I asked why someone was starting my chainsaw, but received no answer. When I returned from the jail, the chain saw was gone. Also gone, was a jade heart my wife had been given by her father. The heart had been kept on a gold chain. The chain was left behind empty. While I did not see anyone take either of these items, I believe they were taken by one or more of the people conducting this raid.

31. The way in which this raid was conducted was not only completely unnecessary, it was absolutely terrifying. It is almost impossible to express the feeling created by seeing what looks to be a band of armed soldiers dressed in black approaching toward your house with automatic weapons pointed at you. I truly feared that I was about to be killed. I have never experienced this kind of fear before, and I continued to have lingering memories and nightmares of this experience of which I have been unable to rid myself. At one point during the raid I said to the officers that Americans have fought and died to protect all of us from this kind of terrorism, and asked them why they needed to behave this way. I received no answer. In my mind there isn't one.

I declare under the penalty of perjury under the laws of the State of Washington that the above is true and correct.

12/29/2006 Fox Island WA
DATE/PLACE

_____
DOUGLAS WOOD