THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR THE COUNTY OF KITSAP

STATE OF WASHINGTON

       Plaintiff,

       vs.

1215 11TH Avenue East also known as 1225 11th Avenue East, Parcel number R0220073068, Fox Island, Pierce County, Washington State described as a multiple story, cream colored residence with aluminum siding and two white colored geodesic dome structures, accessed with a driveway that is marked with the numbers 1215 written on a white colored sign.

       Defendant

NO.  *2002 0247*

COMPLAINT FOR SEARCH WARRANT FOR FRUITS / INSTRUMENTALITIES AND / OR EVIDENCE OF A CRIME FOR: A Violation of the Uniformed Controlled Substances Act ("V.U.C.S.A."), R.C.W 69.50.401, Manufacturing, Possession, Possession with Intent to Deliver and/or Delivery of a Controlled Substance, to wit: Marijuana

Officer John Halsted, Being first duly sworn upon oath, deposes and says:

That I am a duly appointed, qualified, and acting commissioned Police Officer for the Poulsbo Police Department, and I am charged with the responsibility for the investigation of criminal activity occurring within the State of Washington. I have probable cause to believe, and do, in fact, believe that, in violation of the laws of the State of Washington with respect to Manufacturing, Possession, Possession with Intent to Deliver and/or Delivery of a Controlled Substance, to wit; Marijuana, as defined by law in violation of the Uniformed Controlled Substances Act ("V.U.C.S.A."), R.C.W. 69.50.401, evidence, fruits, and/or instrumentalities of said offense(s) are presently being kept, stored, or possessed, and can be located and seized at the above described premises, said belief being based upon information acquired through personal interviews with witnesses and other law enforcement officers, review of reports from other law enforcement officers, and personal observations, said information being as further described herein;

See attached Affidavit A for my training and experience.

COMPLAINT FOR SEARCH WARRANT - 1

*Ex./*

1   This affidavit made in support of an application for search warrant for the premises described as:

2

3   1215 11TH Avenue East also known as 1225 11th Avenue East, Parcel number R0220073068, Fox

4   Island, Pierce County, Washington State described as a multiple story, cream colored residence with

5   aluminum siding and two white colored geodesic dome structures, accessed with a driveway that is

6   marked with the numbers 1215 written on a white colored sign.

7

8       **Probable cause to request this warrant consists of the following information:**

9

10      Officer Matthew Dougil of the Gig Harbor Police Department spoke with an informant in

11   1998 who had attempted to steal some marijuana from a house at 1225 or 1215 11th Ave on Fox

12   Island. The informant heard from some teenage friends that the person was growing marijuana on his

13   back deck. The informant went to the residence and noticed the deck was raised in the air and the

14   marijuana plants were growing underneath. The resident caught the informant before he was able to

15   steal any marijuana and he was detained by the Pierce County Sheriff's Office. The report also

16   indicated that the property owner, Douglas E. Wood date of birth 04-06-1952, was installing a

17   motion sensor alarm system on the property to warn of any intruders.

18

19      The informant described the property as having a tan colored multi story residence and two

20   geodesic dome style buildings. The informant observed pots and potting soil inside of one of the

21   dome structures.

22

23      Officer Dougil received a tip from the Marijuana Hotline in 2001 about a subject growing

24   marijuana on Fox Island in Pierce County. The tipster reported that he or she was looking for an

25   address when they drove into the driveway of 1215 11th Ave East on Fox Island. The tipster

26   indicated that he or she drove up to a residence and surprised two males who were unloading

27   numerous marijuana plants from the bed of a truck.

28

29      On 08-27-2002 at 1517 hours, Officer Dougil and Detective Schuster of WestNET flew over

30   the property in a MD 500 helicopter at an altitude of 700 feet. Both officers spotted growing

31   marijuana plants on the south side of the residence, behind a small shed. The officers took a GPS

1    reading of the property and photographs of the marijuana plants. The photographs show the growing

2    marijuana, a tan colored residence and two dome buildings. The marijuana is planted very close to

3    the residence. The photograph also shows the deck is raised in the up position however it is not clear

4    whether there are plants growing underneath. See attachment A for photograph.

5

6       Both Detective Schuster and Officer Dougil have completed aerial marijuana spotters school.

7    Both officers have spotted over 100 marijuana plants from the air from both fixed wing and rotary

8    wing aircraft.                                          in various locations

9

10      Officer Dougil advised me that neighbors in the area have heard automatic gunfire sounds

11   coming from the suspects property.

12

13      On 08-30-2002, Detective Schuster and I drove to the area. Officer Dougil described the

14   driveway to me as the first one on the south side of the road after turning onto 11th Ave. I located the

15   driveway and noticed that it was marked with a small white sign with the numbers "1215".

16

17      A drivers check on Douglas E. Wood indicates his address is 1215 11th Ave, Fox Island WA.

18   An inquiry into his criminal history shows a V.U.C.S.A. arrest in 1973 by the Pierce County Sheriffs

19   Office. The Washington statewide court database describes Wood's address as P.O. Box 32, Fox

20   Island, WA 98333.

21

22      A check with the Pierce County Assessors Office indicates that numbers for the property as

23   1225 11th Ave and not 1215 11th Ave as indicated on Wood's drivers license. The parcel number is

24   0220073068. The records show there is a single story 1215 square foot residence on the property

25   belonging to the Organic Sunflower Foundation Inc. See attachment A for Assessor's record. The

26   property was deeded to the Organic Sunflower Foundation Inc. in 1995 by Solar Steam Incorporated.

27   In 1989, Douglas E. Wood deeded the property to Solar Steam Incorporated.

28

29      The Washington Department of Revenue has a record for Organic Sunflower Foundation that

30   lists both 1225 and 1215 11th Ave, and PO Box 32, Fox Island, Washington. They also show a

31

1  record for Solar Steam Inc. Their records indicate Douglas Wood had an affiliation with Solar Steam
2  and that the business has not been in operation for a number of years.
3

4      The Washington State Department of Licensing indicates one vehicle registered to Organic
5  Sunflower Foundation and one vehicle registered to Solar Steam Incorporated. Both vehicle
6  registrations list the address of P.O. 32, Fox Island WA 98333. The same post office box address as
7  Douglas Wood.
8

9      It is my belief that both Organic Sunflower Foundation and Solar Steam Incorporated are
10  names belonging to Douglas Wood. I know from investigating marijuana growers that they
11  commonly place properties, assets and public records under fictitious names.
12

13     Based on the facts listed in this affidavit, your affiant has probable cause to believe, and
14  does, in fact, believe, that there is evidence, fruits, and/or instrumentalities of violations of the
15  Uniformed Controlled Substances Act in and on the premises and/or vehicles described above. I
16  request that a search warrant be issued for the following items:
17  1) Marijuana in all forms, but not limited to, live, growing, drying, dried, and packaged or
18      processed,
19  2) any books, record books, research products and materials, including formulas, microfilms, tapes,
20      data, receipts, notes, ledgers, computer disks or records, and other papers relating to the sale,
21      ordering, transporting, manufacture, purchase and distribution of marijuana;
22  3) drug paraphernalia (all equipment, products, and materials of any kind which are used, intended
23      for use, or designed for use in planting, propagating, cultivating, growing, harvesting,
24      manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing,
25      packaging, storing, containing, concealing, ingesting, inhaling, or otherwise ingesting into the
26      human body marijuana, including but not limited to kits used to manufacture marijuana, scales,
27      and balances, bags, materials used in the manufacture of marijuana, such as, but not limited to,
28      chemicals, heating, cooling, and venting, devices, electronic and lighting equipment, soil, and
29      fertilizers, and any items described as drug paraphernalia under RCW 69.50.102);
30  4) all monies, jewelry, proceeds, securities, and negotiable instruments that relate to the
31      manufacture, possession and distribution of marijuana;

COMPLAINT FOR SEARCH WARRANT - 4

5) any weapons and ammunition;

6) any papers showing evidence of occupancy, residency, and ownership, or dominion and control of the premises described;

7) any papers, documents, computer disks that would indicate how drug transaction funds are utilized, such as tax records, and other items of evidence showing the obtaining, secreting, transfer, and/or concealment of assets and expenditures of monies and any papers, tickets, notes, schedules, receipts, and other items relating to domestic travel;

8) telephone books, telephone records and bills relating to co-conspirators or persons to whom marijuana have been delivered. Also photographs or video recordings that record drug manufacturing operations, use or transactions by the suspect or co-conspirators for the manufacture, use, delivery or purchase of marijuana;

9) electronic equipment, such as pagers, telephones, answering machines, scanners, computers, telex machines, facsimile machines, currency counting machines, calculators and related manuals used to generate, transfer, count, record and/or store information about drug manufacturing and trafficking.

10) any items used for surveillance or to protect the premises from law enforcement officers.

Officer John Halsted, #606

SUBSCRIBED AND SWORN BEFORE ME this 3rd day of September, 2002.

JUDGE

RECEIVING OF COMPLAINT AND
ISSUANCE OF SEARCH WARRANT
APPROVED BY:

COMPLAINT FOR SEARCH WARRANT - 5

1

2   Deputy Prosecuting Attorney

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

COMPLAINT FOR SEARCH WARRANT - 6

1    I was a narcotics detection canine handler from 1999 to 2002. During that time, my dog and I
2    assisted numerous local and federal law enforcement agencies in locating drugs and currency that
3    had been in recent close contact with drugs.
4
5    I have also participated in drug cases involving the purchase of marijuana, methamphetamine,
6    cocaine, and black tar heroin. I am familiar with drug language, use, packaging, marketing and
7    consumption. I have assisted in the execution of over 20 narcotics related search warrants, which
8    resulted in the seizure of illegal narcotics and related items. I have been the affiant on at least 7
9    search warrants.
10
11   I have investigated or assisted in investigating numerous marijuana cases. I am familiar with the
12   odor of fresh or growing marijuana and the odor of burning marijuana. I am a certified aerial
13   marijuana spotter and as of this date I have spotted over 100 growing marijuana plants from both
14   rotary and fixed wing aircraft.
15
16   Based upon my training and experience, and participation in controlled substance investigations and
17   based upon my conversations with other experience law enforcement agents with whom I am
18   associated and based upon my conversations with drug users, I know;
19   1. Drug traffickers maintain books, records, receipts, notes, ledgers, airline tickets, money orders,
20      and other papers relating to the transportation, ordering, possession, sale and distribution of
21      drugs. The aforementioned items may be carried by the suspect, or in suspect's vehicle, or be
22      kept in the suspect's house;
23   2. Individuals involved in the distribution of drugs more often than not maintain addresses, and/or
24      telephone numbers in books or papers or in computers that reflect names, addresses and/or
25      telephone numbers for drug customers and associates in their illegal drug organizations;
26   3. Individuals involved in the manufacture and distribution of controlled substances, sometimes
27      take or cause to be taken photographs and video recordings of them, their associates, and their
28      property and their illegal product. These individuals usually maintain these photographs and
29      recordings in their possession of at their premises;
30   4. Individuals involved in the distribution of controlled substances almost always keep
31      paraphernalia for packaging, weighing, and distribution of their illegal drugs. That paraphernalia

AFFIDAVIT A - 2

1    includes, but is not limited to scales, kits for manufacturing drugs, packaging material,
2    chemicals, to cut the drug product, razor blades, straws, pipes, as well as weapons for their
3    protection of their illegal enterprises;

4    5.   That individuals who manufacture and distribute drugs commonly hide the drugs, their
5        paraphernalia, the proceeds of their drug sales, and records of drug transactions in vehicles under
6        their control, on their person, or in their residence, not only for easy access, but also to conceal
7        them from law enforcement personnel;

8    6.   That individuals involved in the manufacture and distributions of drugs almost always maintain
9        sums of money, financial instruments, jewelry and valuables, which are proceeds from or
10       intended to be used to facilitate drug transactions. Further that these individuals often place their
11       assets under false names, or under other person's names to avoid detection. Even though these
12       assets are in some other person's name, the drug trafficker continues to use the assets and
13       exercises dominion and control over them. In addition, individuals involved in the manufacture
14       and distribution of controlled substances often use fictitious names on utility records and/or
15       fictitious business names associated with the suspect's property and/or placing property and
16       utility records in the names of others. All such items, in addition to being evidence of drug
17       trafficking violations, are forfeitable to the State pursuant to RCW Chapter 69.50;

18   7.   That, individuals who manufacture and distribute illegal controlled substances commonly secret
19       contraband including drugs, the proceeds of drug sales and records of drug transactions in secure
20       locations within the premises under their dominion and control, in their vehicles, safe deposit
21       boxes, self storage units and on their person not only for ready access but also to conceal them
22       from law enforcement;

23   8.   That, in addition to weapons, drug manufacturers and traffickers protect their illegal enterprises
24       through the use of surveillance equipment, scanners, binoculars, other miscellaneous equipment,
25       and dogs or other pets situated on the property to warn suspects of intruders or law enforcement
26       personnel;

27   9.   That, in order to conduct their enterprise with the smallest amount of detection from law
28       enforcement officers, yet to allow their customers easy access to them, drug manufacturers and
29       traffickers commonly use pagers, cellular telephones, telephones, answering devices, computer
30       monitors, and other types of communication devices;
31

AFFIDAVIT A - 3

10. People involved in the distribution of controlled substances will often accept stolen property in exchange for controlled substances. These distributors will also accept jewelry in lieu of cash for their product. From my training and experience this occurs quite often. Most people caught burglarizing homes often take jewelry to trade for controlled substances. These items are not only seizeable as evidence of the trade, but are forfeitable under RCW 69.50.50 as proceeds from their illegal operation.

11. With respect to marijuana growers, they may not actually live at the location where they are growing marijuana at, or they allow a caretaker to stay there for a free rent or to "a share crop";

12. With respect to indoor marijuana cultivation and propagation operations, suspects routinely utilize the following items and cloaking methods in their attempt to avoid detection:

    a) blackened out or covered windows, doors or other visibly detectable areas to avoid detection and to preclude outsiders from identifying any portion of the enterprise;

    b) fixed, movable, or other type of venting systems, usually located away from detection or upon high area off buildings to vent heat and odors escaping the cultivation structure;

    c) dogs or other pets situated on the property to warn suspects of intruders or law enforcement personnel;

    d) the diversion of electric power to conceal the large amounts of electricity usually needed to support an indoor marijuana cultivation operation;

    e) the use of artificial lighting systems utilizing high pressure sodium bulbs, metal halide bulbs and/or fluorescent lighting systems which require large amounts of electrical power for their operation; and

13. Marijuana growers often dump out pots of soil outside their residence in order to repot plants. This helps to ensure the health of the plants as frequent repotting ensures that insects or diseases in the soil are removed on a frequent basis.

14. With respect to outdoor marijuana grow operations, I know that it takes a greater amount of time for marijuana plants to mature than indoor grow operations. Typically it takes approximately 45 to 60 days for indoor marijuana plants to mature.

**I certify (declare) under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct. (RCW 9A.72.085)**

AFFIDAVIT A - 4

1

Detective John Halsted        09/03/02        Kitsap County, Washington

2                          Date                 Place

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

AFFIDAVIT A - 5

Hotmail Message



MSN Home | My MSN | Hotmail | Search | Shopping | Money | People & Chat

Get a **free** price quote

**Hotmail**   Home   Inbox   Compose   Contacts   Options   Help

blackdogcole@hotmail.com

Save Address(es) | Block

Previous  **Next** | **Close**

From : "Dougil, Matt"
To :
Subject : ref Fox Island
Date : Thu, 29 Aug 2002 16:46:35 -0700

Reply | Reply All | Forward | Delete | Put in Folder...

**Printer Friendly Version**

PROSECUTOR

John and Dale,

This is some of the information that I recieved from an informant on the first
occasion who had admitted to trespassing on the property to steal marijuana
plants that he had "heard" were growing on the property from other teenagers.
These are the actual notes I wrote at the time I recieved the information in
early 1999. Additional info from one of our officers who lives aprox. 3 blocks
south of this compound is that he "regularly" hears automatic gunfire coming
from the direction of this compound in addition to single shots in succession.
It is unknown if there are any dogs. Officer Jahn, who lives near the guy, said
that he has never seen the subject coming or going but I do recall hearing from
somebody that he drives a blue Ford Explorer and a pick-up truck (which can be
seen in the photos).

I also recieved a Marijuana Hotline Tip approx. 1 year ago from a guy that
stated he was searching for an address in the area when he pulled up to the area
of the home. He said that the resident had motion sensor sprinklers set up that
tripped when he drove by them spraying the car. The hotline info also stated
that as they drove up they surprised two males unloading a pick-up truck that
was full of potted marijuana plants that were 3-4' high. The tipster said that
they then left the property in a hurry.

Additional information, and my original tip on the place, came from the old TNET
team who, acting on a tip, were walking the lower NE section of the property
when they found themselves in an outdoor grow. At that time a male subject
suddenly appeared from the home running down towards their position (the team
was sneaking) and it was evident to them that he was holding a long gun. The
team quickly left the property and as they entered their vehicles found
themselves being pursued by the suspect around Fox Island. They eventually shook
the guy but he cleverly came into the GHPD the next day saying that he was
walking his dog when he observed the big commotion and was curious about what
happened. Our clerk at the time told him not to worry, it was only our narcotics
team checking on a marijuana grow and the guy subsequently threatened legal
action aginst the trespassers (police) and thus TNET did not pursue their case.
Det. Kim Pecheos has been informed of this case and he has confirmed that he is
not working it and has given his OK. We are ready to go on our end for the 5th
(Thu) so let me know what time you will be here and if you think you may need
another Tactical team for perimeter or something else. The Metro SRT unit is
also available if you guys think it may be necessary.  If there is anything else
I can do or prep for yya let me know. Ill be working graves on Fri-sat but will
be hunting until I see you on the 5th. The conference room here at the GHPD is
available for the briefing just let me know what time  we'll be meeting.

Matt

B.  Douglas E. Wood  040652
         1215 11th Ave NW    /  PO Box 32

Wood,/Karlsvik
0067

_Ex._ 2

Fox Island, Wa.

Property is located across from 11th Ave/Makah PL on Fox Island. There is a
small dirt drive on the South side of the road with a "road closed" sign at the
entrance. There are very thick trees concealing the property from the road.
Apparently there is a geodesic dome house that is in serious disrepair on the 3
acre tract Approx 50 yards inside the property. CI has told us that this has
contained old pots and potting soil but no plants. It is also not lived in.
There is another main house lower on the property That appears to be 3 stories.
The lower portion of the house (south side) has a unique structure to it that
has walls Approx 15' high w/no windows. Our CI has told us that there are large
"sunroofs" on this structure that do face the sun.

When the CI was on the property on 10/22/98 he was stopped and detained by PCSO.
A report was taken at that time. According to the report Wood has since
installed a "trip alarm system" on the property to warn of intruders. Subject
Wood is very reclusive. The property is not marked with the address and there is
a large metal bar that crosses his driveway preventing access.

The property is also supplied by solar power to augment the electric power that
is hooked up to the property. There are no excessively high power consumption
records to indicate a grow operation but this can be accounted for by the solar
panels generating enough power to offset this.

House is cream colored w/aluminum siding.
SUBJ Known to be armed.

PROSECUTOR

Reply | Reply All | Forward | Delete | Put in Folder... | 

Previous  Next | Close



MSN Home | My MSN | Hotmail | Search | Shopping | Money | People & Chat
© 2002 Microsoft Corporation. All rights reserved. TERMS OF USE  Advertise  TRUSTe Approved Privacy Statement
GetNetWise

Wood /Karlsvik
0068

# AERIAL OBSERVER WORKSHEET

## Report Information

DATE/TIME OBSERVED: _08/27/02 – 1517_ CASE# _____ SITE # _____

OBSERVER: _Dougil / Schuster_ AGENCY: _GHPA Westnet_ COUNTY: _Pierce_

PILOT/AIRCRAFT: _____ MD 500 EST. HEIGHT: _700'_

PHOTOGRAPHER: _Dougil_ CAMERA/LENS: _Pentex 35mm_

WEATHER CONDITIONS: _Clear / Hot_

REPORTED TO: _Sgt Randy Drake – WSP_ DATE: _08/27/02_

## Location Information

GPS-LATITUDE: _47, 14, 13_ LONGITUDE: _1 22.36; 55_

TOWNSHIP: _T-20-N_ RANGE: _R-2-E_ SECTION: _7_ ¼ SECTION: _NW_

MILITARY COORDINATES: _____

NEAREST ROAD: _11th Ave E.I._       PROSECUTOR

LAND STATUS: _____

## Garden Information

EST. # PLANTS: _25_ EST. # GARDENS: _1_

ADDITIONAL PLANT/GARDEN INFORMATION: _Plants Lined Behind Small Shed on South Side of Prop. South Deck was Raised._

GARDEN ERADICATION INFORMATION: _____

## Misc. Information (use reverse side for site diagram)

_____ Wood /Karlsvik
_____ 0058

Worksheet completed by: _____ Date _____

EX 3

Deposition of Matthew Dougil                          10/3/2006

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DOUGLAS WOOD and SANDRA KARLSVIK,      )
husband and wife,                      )
                                       )
              Plaintiffs,              )
                                       )
      vs.                              )
                                       )    NO. C05-5575RBL
WEST SOUND NARCOTICS ENFORCEMENT       )
TEAM; OFFICER MATTHEW DOUGIL           )
(WestNET; GIG HARBOR POLICE            )
DEPARTMENT; DETECTIVE JOHN DOE         )
SCHUSTER (WestNET); DETECTIVE JOHN     )
HALSTED, (POULSBO POLICE DEPARTMENT,)  )
WestNET, BADGE 606; DETECTIVE G.R.     )
MARS (WSP STATEWIDE INCIDENT           )
RESPONSE TEAM, BADGE 685);             )
DETECTIVE JOHN DOE WILSON and JOHN     )
DOES 1-25,                             )
              Defendants.              )

DEPOSITION OF MATTHEW R. DOUGIL
TUESDAY, OCTOBER 3, 2006

APPEARANCES

For Plaintiff:                    MARK LEEMON
                                  Leemon & Royer, PLLC
                                  2505 2nd Avenue, Ste 610
                                  Seattle, Washington 98121-1483

***APPEARANCES CONTINUED ON NEXT PAGE***

Court Reporter:                   VICKY L. PINSON, RPR-CSR
                                  License No. 2559

*EX.4*

Vicky L. Pinson, CSR-RPR
James, Sanderson & Lowers Court Reporters (800) 507-8273

a9156f07-7252-49d3-ad33-2b0244056024

Deposition of Matthew Dougil                                    10/3/2006

---

Page 2

1       DEPOSITION OF MATTHEW R. DOUGIL
2
3       APPEARANCES (CONTINUED)
4
5
        For Defendant Gig Harbor:     JASON M. ROSEN
6                                     Christie Law Group
                                      2100 Westlake Ave. North, Ste 206
7                                     Seattle, Washington 98109
8
9       For Defendant Mars:     JEFFREY D. STIER
                                Assistant Attorney General
10                              629 Woodland Sq. Loop SE
                                P.O. Box 40126
11                              Olympia, Washington 98504-0126
12
13                  * * *
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 3

1       DEPOSITION OF MATTHEW R. DOUGIL
2
3
                        I N D E X
4
                                              Page
5
6       Examination by Mr. Leemon ........................     4
7
8
9
10
11                      E X H I B I T S
12                                            Page
13      (None marked)
14
15
16
17
18      INFORMATION REQUESTED
                                              Page
19
        (None requested)
20
21
22
23
24
25

---

Page 4

1            BE IT REMEMBERED that the deposition upon oral
2       examination of MATTHEW R. DOUGIL was taken on TUESDAY,
3       OCTOBER 3, 2006, commencing at 3:09 p.m., in Port Orchard,
4       Washington, before Vicky L. Pinson, Notary Public in and for
5       the State of Washington.
6
7            MATTHEW R. DOUGIL, having been first duly sworn
8       upon oath by the Notary, testified as follows:
9
10                      EXAMINATION
11      BY MR. LEEMON:
12      Q    Please state your full name.
13      A    Matthew R. Dougil.
14      Q    And how are you employed, Mr. Dougil?
15      A    I am a police sergeant with the City of Gig Harbor.
16      Q    How long have you worked for the Gig Harbor Police?
17      A    Approximately nine years.
18      Q    When did you become a sergeant?
19      A    Three years ago.
20      Q    Prior to nine years ago, had you had any other experience in
21           law enforcement with any other agency?
22      A    I was a police officer with the City of Mesa, Arizona for
23           three years prior.
24      Q    Was it the immediate three years prior?
25      A    Yes.

---

Page 5

1       Q    And other than that, have you had any other law enforcement
2            experience?
3       A    No, I have not.
4       Q    What's your educational background?
5       A    High school graduate, some college.
6       Q    Where did you graduate from high school?
7       A    Spanaway Lake High School in Spanaway, Washington.
8       Q    What year was it?
9       A    1984.
10      Q    What did you do between graduating high school and becoming
11           a police officer in Mesa?
12      A    I spent a little over eight years in the Navy, stationed at
13           submarine base Bangor, five and a half years on the U.S.S.
14           Georgia, and three years on Trident Refit Facility.
15      Q    The most beautiful ground zero in the world.
16      A    Yeah.
17      Q    That's how we always referred to Bangor.
18           Okay.  We are here talking about a case that resulted
19           in the execution of a search warrant on Fox Island at
20           1215 11th Avenue, Fox Island, on September 5 of '02,
21           involving a suspect named Douglas Wood.
22           Do you recall that case?
23      A    Yes, I do.
24      Q    Have you reviewed anything to prepare yourself for this
25           deposition?

---

                                         2  (Pages 2 to 5)

a9156f07-7252-49d3-ad33-2b0244056024

Deposition of Matthew Dougil                                    10/3/2006

Page 6

1   A   I have reviewed the WESTNET case report and I reviewed an
2       e-mail that I wrote to John Halsted and Dale Schuster. And
3       I've got a couple of other little things in here from State
4       Patrol that really didn't pertain to my part of it.
5   Q   All right.
6           I think that other than blocking out the e-mail
7       addresses, which I, frankly, have on another version of
8       this, is Exhibit 27 the e-mail you're talking about?
9   A   Yes, it is.
10  Q   And can you tell me how, -- better question: Can you tell
11      me why that e-mail was written?
12  A   It was written in preparation just to brief, kind of to
13      gather information for Detective Halsted. I know he was
14      preparing to write a search warrant. And I was just kind of
15      preparing information for him.
16  Q   All right. I'm going to show you what's been marked as
17      Exhibit 21. Do you recognize that form?
18  A   Yes, I do.
19  Q   And what is it?
20  A   This is a worksheet that we were taught to use in the
21      Marijuana Aerial Observer School that we were attending at
22      the time. And this is basically a form that, when you spot
23      a marijuana grow on the ground, you fill this information
24      out.
25  Q   Okay. And when you say "at the time," at the time you did

Page 7

1       this fly-over, were you in a school?
2   A   Yes. Yes, I was.
3   Q   So this flight with, let's see, I think he was a detective
4       then, Schuster --
5   A   Schuster, yes.
6   Q   -- was part of a school for marijuana observation?
7   A   Yes.
8   Q   Do you know how it came to be that you flew over this
9       particular property?
10  A   I had received, we were flying Pierce County that particular
11      day. We were preparing to fly Pierce County.
12          And part of the preparation for aerial observers is any
13      information you may have about outdoor grows, you kind of
14      gather information ahead of time. That way you can fly to
15      those locations and look.
16          Well, one of the places that I had been receiving
17      information on over the years was the Fox Island address;
18      and so that particular day we did fly out to that location.
19  Q   Okay. Who was conducting the school you were taking part
20      in?
21  A   It was sponsored by WESTNET. The State -- I can't remember
22      if the State Patrol, overall, was sponsoring it.
23  Q   Where did the classroom part of it take place?
24  A   It took place in Silverdale at a hotel on the waterfront. I
25      can't recall the name of it, though.

Page 8

1   Q   Where did the flight start from?
2   A   They started from, it's a little air strip in Silverdale.
3       You know which one I'm talking about?
4   Q   It actually doesn't matter. Silverdale is good enough,
5       because one of the other witnesses already said the name of
6       it, so I'm assuming it's the same place.
7           And do you know what agency provided the helicopter?
8   A   I believe it was a DEA helicopter I was in.
9   Q   Now, Exhibit 21, did you fill that out?
10  A   I filled most of this. Some of it is not in my
11      handwriting, though.
12  Q   What appears not to be in your handwriting? The GPS?
13  A   Yes. Everything else looks like it's in my handwriting.
14  Q   Exhibit 23, do you think you had any part in creating that
15      document?
16  A   I can't recall if I did, or not.
17  Q   So the reason for going out to this particular property is
18      because you had received information about it over the
19      course of some period of time?
20  A   Yes.
21  Q   Now, is it true that the most recent information you had was
22      sometime the year previous?
23  A   Yes, it is.
24  Q   All right. Let me ask you some questions about that. I'm
25      going to look at this e-mail to ask you the questions. If

Page 9

1       you want to, you can, too. If you don't want to, you don't
2       have to.
3           In the first paragraph of this e-mail it says, "This is
4       some of the information that I received from an informant,"
5       et cetera. It says, "These are the actual notes I wrote at
6       the time I received the information in early 1999."
7           Now, what are you referring to when you're saying these
8       are the actual notes?
9   A   That's a good question. I read that myself and was trying
10      to figure exactly what I was talking about. I believe that
11      I may have had -- I probably had jotted down notes over a
12      period of time as information had come to me, that didn't
13      necessarily amount to anything, necessarily. Any notes I
14      would have had, I would have turned over to Detective
15      Schuster or Detective Halsted.
16  Q   So you don't still have any such notes?
17  A   No.
18  Q   Do you know how it is that you came to speak with this
19      informant who had been arrested by -- the alleged informant
20      who was arrested by the Pierce County Sheriffs for burglary
21      on Mr. Wood's property?
22  A   He is somebody that had had run-ins with the police on
23      several occasions. He was involved in illegal drug activity
24      and such. And it was just during one of our interviews with
25      him on an unrelated case, and I can't remember exactly which

3 (Pages 6 to 9)

Vicky L. Pinson, CSR-RPR
James, Sanderson & Lowers Court Reporters  (800) 507-8273

a9156f07-7252-49d3-ad33-2b0244056024

Deposition of Matthew Dougil                                    10/3/2006

Page 10

1   one it was. We had many contacts with him.
2       But that's when he brought up this particular incident
3   of what occurred out on Fox Island.
4   Q   Okay. And this fellow, you say he had a lot of run-ins with
5   the police. Is this Gig Harbor Police that he's had a lot
6   of run-ins with, or many agencies?
7   A   Many agencies.
8   Q   Did you ever use this fellow as any kind of informant in
9   pursuing any kind of law enforcement activity?
10  A   No.
11  Q   Is he somebody who in any manner had proved himself to you
12  to be credible?
13  A   Only in that he was knowledgeable about drugs and
14  marijuana. He knew what marijuana was and looked like
15  because he had been involved in it. So that aspect of his
16  information, he knew what a marijuana plant looked like.
17      He was there to steal marijuana plants, the way he
18  described them. That's about all the credibility I gave him
19  at that point.
20  Q   Did you continue to have run-ins with him after 1999?
21  A   For a little while, but then he just kind of disappeared,
22  and I found out that he became a heroin addict, and he's no
23  longer in our fair city.
24  Q   Okay. Then it says, "Additional info from one of our
25  officers who lives approximately three blocks south of this

Page 11

1   compound is that he "regularly" hears automatic gunfire
2   coming from the direction of this compound, in addition to
3   single shots in succession."
4       Is this Officer Jahn, who you're talking about, below,
5   or is it some other officer?
6   A   No, it's Officer Jahn.
7   Q   And when it says that there's gunfire coming from the
8   direction of the compound, did he ever get any more specific
9   than that?
10  A   No. He just, you know, said it was in that general
11  direction. He lives pretty close to the guy.
12  Q   How did this come up in your conversation with Officer Jahn?
13  A   That was a while back, but I believe I was just asking him
14  if he had seen anything suspicious around that property,
15  because he passes by it every day, coming and going from his
16  home.
17  Q   And why were you interested in that property, which is
18  actually not in the jurisdiction of the Gig Harbor Police
19  Department?
20  A   I investigate narcotics for our department and all
21  throughout Pierce County and sometimes Kitsap County.
22  Q   Did you ever talk about this particular property with
23  officers from Pierce County?
24  A   I have, yes.
25  Q   And what have they told you?

Page 12

1   A   Some had said that they had heard some things about the
2   property, themselves. Nobody had any information, enough
3   information to do anything or to pursue any investigation,
4   per se.
5   Q   Okay. In that same first paragraph it says, "I do recall
6   hearing from somebody that he drives a blue Ford Explorer
7   and a pickup truck (which can be seen in the photos.)"
8       What photos are those? The ones that you took on the
9   fly-over?
10  A   I don't have the originals of those. It might be.
11  Q   Do you know what other photos it might be referring to?
12  A   It would probably be to those photos. There were no other
13  photos that I had taken of the property, other than from an
14  aerial position.
15  Q   Okay. And did you, in fact, on this fly-over with Detective
16  Schuster take photographs?
17  A   Yes.
18  Q   And with what camera did you take the photographs? Is that
19  the Pentax that's listed on -- I think it was a Pentax.
20  A   Yes.
21  Q   Was that your camera or the Department's camera?
22  A   It was the Department camera.
23  Q   And where would all of those photographs have turned up?
24  Where did they go to, if they were taken?
25  A   Everything was basically handed over to Detective Schuster

Page 13

1   from my end, and I believe he turned over a lot to Detective
2   Halsted.
3   Q   Okay. So sooner or later, this stuff got filtered to
4   WESTNET?
5   A   Yes. Well, Schuster was with me in the helicopter, so --
6   Q   And why was he with you? Was he with you as a student or
7   was he with you as an instructor, or what was he doing in
8   the helicopter?
9   A   We had already passed the portion of the class as far as
10  identifying marijuana and everything else, so we were now
11  searching for or just identifying marijuana grows.
12  Q   All right. And so he was part of the class, as well?
13  A   He was in my class. And I'm, I'm just trying to think. I
14  have to look at my -- I'm not positive if we were actually,
15  if that was the year we were in school or not.
16      I'm going to have to look at my graduation certificate
17  on that.
18  Q   Does your graduation certificate indicate somehow what
19  flights you took?
20  A   Well, it has the year that we completed that course. I'd
21  have to look at that. If it wasn't this time, it was the
22  year before that we had done the school.
23      But Schuster was with me in the helicopter during this
24  flight, so I'm going to have to verify when I completed that
25  school.

                                        4 (Pages 10 to 13)

a9156f07-7252-49d3-ad33-2b0244056024

Deposition of Matthew Dougil                        10/3/2006

Page 14

1  Q   If it wasn't part of the school, do you have any reason for
2      why it is you were taking this particular flight?
3  A   We were following up on just on the tips that were there,
4      and seeing if it was something that was still occurring.
5  Q   All right. It was just something that had been in the back
6      of your mind and you were just following up on it?
7  A   Right.
8  Q   All right. Let's see. There's an indication in this e-mail
9      that you had received a marijuana hot line tip about a year
10     ago from a guy that said he had been searching for an
11     address, et cetera.
12         Now, when it says you had received a marijuana hot line
13     tip, how did you receive that?
14 A   I just get them in my box, and --
15 Q   From whom, though?
16 A   Well, they come from the State Patrol Marijuana Hot Line.
17     But because, and I don't know specifically if it was because
18     this was for Gig Harbor that I received this one, but I had
19     received -- I was the one receiving a lot of the hot line
20     tips at that time for the Gig Harbor area.
21         If a marijuana hot line tip comes in to the GHPD, it
22     comes to me because I do all the drug investigations. So
23     sometimes I delegate those out to other officers to work or
24     investigate, but I'm always involved in them anyways.
25 Q   Do you know why this would come to the Gig Harbor Police if

Page 15

1      it is not in Gig Harbor?
2  A   It could have been a couple of things. Sometimes if a
3      tipster knows I work narcotics, they may be referring it to
4      me, specifically.
5          Sometimes the State Patrol just automatically sees that
6      it's in Gig Harbor or the Gig Harbor area. They don't know
7      what the boundaries are in the city limits and
8      jurisdictions, so they basically, if it says Gig Harbor,
9      they send it out to Gig Harbor P.D.
10 Q   Did this come to you in a written form?
11 A   It's a fax. It comes over as a fax.
12 Q   Are they collected anywhere?
13 A   You mean, are they saved?
14 Q   Yes.
15 A   They're only saved if they actually turn into, if the
16     information is turned into an actual case where an
17     investigation occurs and search warrants are obtained, and
18     all of that stuff. That one didn't turn into anything.
19 Q   That's what I'm going to ask you. It ultimately did turn
20     into something in terms of there was a case and search, et
21     cetera, but by then this tip didn't have anything to do with
22     it, I take it?
23 A   Yeah. Just the information on this tip was not enough
24     information to do anything or get a search warrant.
25 Q   Was there any followup, at all, at the time of this tip in

Page 16

1      2001?
2  A   If there was, it was very minimal. I did not personally do
3      a case on this, at all. I think basic -- I think the most I
4      did was inform the Pierce County deputies that worked in the
5      areas to just kind of be aware of the situation.
6  Q   "Additional information in my original tip on the place came
7      from the old TNET team who were acting on a tip, walking in
8      the lower northeast section when they found themselves in an
9      outdoor grow."
10         What do you remember about that original tip?
11 A   I started working in Gig Harbor in 1997. Officer Brad
12     Carpenter had been with the Department for some time at that
13     point. He had worked narcotic investigations prior to my
14     arrival.
15         I came from Mesa, Arizona with a lot of narcotic
16     experience; and kind of being debriefed from him on what was
17     going on in the general area, he brought this particular
18     incident up, in reference to the Fox Island grow. And so
19     that's where that information came from.
20 Q   Do you know why, if they found an outdoor marijuana grow in
21     this particular location, they didn't subsequently seek a
22     warrant and/or search this place?
23 A   According to Detective -- or Officer Carpenter, they really,
24     they had an idea where this grow may have been, were
25     actually trying to sneak around the outside of the property,

Page 17

1      but suddenly found themselves because of the wooded area and
2      darkness, they basically found themselves on this guy's
3      property, and they were kind of alerted to it when they saw
4      him running at them with what looked like a gun. What they
5      believed was a gun.
6          So they felt that they had seen trespassing. That they
7      were on his actual property. So they didn't pursue anything
8      with that. And that had been five years prior to '97.
9  Q   Finally, there's a reference here to Detective Kim Pecheos.
10     And it says that he has been informed of this case and has
11     confirmed that he is not working it and has given his okay.
12         When was he informed of the case?
13 A   I probably, just looking at this, informed him after we had
14     determined that there was marijuana being grown on the
15     premises.
16 Q   All right. So sometime between the fly-over on August 27
17     and the e-mail of August 29?
18 A   Yes. And that's his jurisdiction, and that's why I, just a
19     common courtesy to him.
20 Q   Now, did you take part in the actual execution of the search
21     warrant?
22 A   I was there as kind of a perimeter guy.
23 Q   How close did you get to the house?
24 A   During the initial search warrant --
25 Q   Yes.

5 (Pages 14 to 17)

a9156f07-7252-49d3-ad33-2b0244056024

Deposition of Matthew Dougil                          10/3/2006

Page 26

1    done.
2         Was the estimate of 25 marijuana plants on Exhibit 21
3    your estimate?
4  A  Yes. It's hard to -- they were bunched up in a perfect
5    square, so it's hard to tell how many there are.
6  Q  I'm not faulting you for it. I just want to know if it's
7    your estimate.
8  A  Yeah.
9  Q  Frankly, from 700 feet, I couldn't tell what was down there
10   but that it was green.
11        Going back to Exhibit 27, the e-mail, I just have a
12   couple of other questions I wanted to ask you about that.
13        It says here, it says, "We are ready to go on our end
14   for the 5th." Who is the "we" that are ready to go on our
15   end?
16 A  It looks like, I don't remember doing it, but it looks like
17   we may have had, kind of had everybody gather there before
18   heading out to Fox Island. Which would have included me
19   reserving a room or something.
20 Q  Well, I'm not sure you did. I think you were offering it,
21   here. But I just want to know who the "we" was.
22 A  That just means Gig Harbor P.D.
23 Q  The next sentence says, "The Metro SRT unit is also
24   available."
25        Who is that?

Page 27

1  A  That's just a small town SWAT team. And that was being
2    offered, as well, if WESTNET was not able to provide an SRT
3    team, or the SIRT team.
4  Q  Who is Metro?
5  A  That's, that includes, at the time Gig Harbor had a guy on
6    the team; Bonney Lake; Puyallup; Auburn; Sumner; I think
7    Fife; and Milton had a couple of guys on the team. Just all
8    the small towns.
9  Q  And SRT is some kind of response team? What does the "S"
10   stand for?
11 A  I don't know. Maybe the same thing SIRT stands for. I'm
12   not sure.
13 Q  I think the "S" in SIRT stands for State, so it probably
14   isn't that.
15 A  I'm not sure.
16 Q  But it's a group of cities, and they have a tactical team
17   that might be available?
18 A  Yes.
19 Q  On the next page there's an indication where it says CI has
20   told us that this old clone that's in serious disrepair has
21   contained old pots and potting soil.
22        Is that the same guy who had been arrested a bunch of
23   times?
24 A  Yes.
25 Q  In the last part of the paragraph it says that there's

Page 28

1    another main house lower on the property, and it appears to
2    be three stories, et cetera. Is this information you got
3    from flying over the place?
4  A  Where is that?
5  Q  Just at the end of that first paragraph on page two. It's a
6    description of the house and the walls and the windows, et
7    cetera. I'm just wondering if that was --
8  A  That was the informant that told me about that, too. It was
9    basically describing it as kind of a fortress, an
10   odd-looking home.
11 Q  15-foot high walls with no windows.
12 A  Yeah.
13 Q  Okay. The last paragraph or second to last paragraph, "The
14   property is also supplied by solar power to augment the
15   electric power" -- where did you get that information?
16 A  I believe when I requested the power consumption records
17   from Peninsula Light, I think they told me that this is
18   also, I don't know if it's in their notes or whatever, but
19   that this person also does solar power.
20        And the information I got was there is no high power
21   consumption at this residence. So it wasn't indicative of
22   an indoor marijuana grow, anyway.
23 Q  Is the information you got from Peninsula Power, again,
24   information that probably was obtained sometime between
25   August 27 and August 29, then?

Page 29

1  A  No. That was, that would have been back in, probably, 1998,
2    years before, when I first got that information. And it
3    just basically went to a dead end.
4  Q  All right. Did you at any time speak with either Mr. Wood
5    or Dr. Karlsvik, the residents of this property?
6  A  I don't think so. I don't recall.
7  Q  Okay. At the end of this e-mail, the last thing it says is
8    subject is known to be armed.
9        What information did you have that would indicate that
10   the subject of this property was known to be armed?
11 A  The information that was given to me back in '97 about him
12   coming down the hill with a shotgun or a long gun in his
13   hand. That's where that came from.
14 Q  I see. And that would have happened in '92 or something?
15 A  Yes.
16 Q  Just out of curiosity, from the residence of Officer Jahn
17   toward Mr. Wood's property, is that in the direction of
18   Ft. Lewis, as well?
19 A  The opposite direction.
20 Q  Okay. So this is gunfire that's coming from the opposite
21   direction of Ft. Lewis?
22 A  Yeah. From his house --
23 Q  From Jahn's house.
24 A  Yeah.
25 Q  Because Mr. Wood says he can hear automatic gunfire from his

8  (Pages 26 to 29)

Deposition of John Halsted                          10/3/2006

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DOUGLAS WOOD and SANDRA KARLSVIK,    )
husband and wife,                    )
                                     )
              Plaintiffs,            )
       vs.                           )
                                     )  NO. C05-5575RBL
WEST SOUND NARCOTICS ENFORCEMENT     )
TEAM; OFFICER MATTHEW DOUGIL         )
(WestNET; GIG HARBOR POLICE          )
DEPARTMENT; DETECTIVE JOHN DOE       )
SCHUSTER (WestNET); DETECTIVE JOHN   )
HALSTED, (POULSBO POLICE DEPARTMENT,)
WestNET, BADGE 606; DETECTIVE G.R.   )
MARS (WSP STATEWIDE INCIDENT         )
RESPONSE TEAM, BADGE 685);           )
DETECTIVE JOHN DOE WILSON and JOHN   )
DOES 1-25,                           )
              Defendants.            )

DEPOSITION OF JOHN HALSTED
TUESDAY, OCTOBER 3, 2006

APPEARANCES

For Plaintiff:                MARK LEEMON
                              Leemon & Royer, PLLC
                              2505 2nd Avenue, Ste 610
                              Seattle, Washington 98121-1483

***APPEARANCES CONTINUED ON NEXT PAGE***

Court Reporter:               VICKY L. PINSON, RPR-CSR
                              License No. 2559

$Ex5$

Vicky L. Pinson, CSR-RPR
James, Sanderson & Lowers Court Reporters (800) 507-8273

7e2031f1-e943-4f55-892a-06727d8e82ea

Deposition of John Halsted                    10/3/2006

## Page 6

1    the sheriff's office uses to basically track the property
2    that we submit. And so that's the reason.
3  Q  Okay. And then the rest of this is your investigative
4    report?
5  A  Yes.
6  Q  Other than the documents pertaining to the search warrant,
7    is there any other documentation that you might have
8    prepared concerning this case?
9  A  Can you ask that one more time?
10 Q  Yes. Actually, I don't mean it as a trick question, so I
11   want to make sure it isn't one.
12       (Exhibit No. 26 was marked for identification.)
13 Q  Can you tell me what Exhibit 26 is?
14 A  Sure. This is a case information sheet that I filled out
15   for this case.
16 Q  And what is the use of this sheet?
17 A  There's statistics that the task force has to keep and send
18   off to different agencies, and this is just essentially a
19   reporting sheet.
20 Q  Now, this is the way that this was sent to me, and it looks
21   like there was something that may have been either whited
22   out, or whatever, under "Justification." I can't tell.
23       Would the original of this be with the original WESTNET
24   packet on this case?
25 A  It should, yes.

## Page 7

1  Q  All right. "Violator Class" says 3, and "Justification" is
2    under 100 plants. What does Violator Class 3 mean?
3  A  If the marijuana grow is under 100 plants.
4  Q  And what are the other classifications?
5  A  Class 1, I believe — you have to understand that they've
6    changed this since then, so now our reporting is different.
7        But as I recall, a Violator Class 1 was 500 or more
8    plants. Violator Class 2 was somewhere between that and
9    under 100 plants. I don't remember exactly what the numbers
10   are.
11 Q  Okay. Was there another class below Class 3?
12 A  I think there's a Class 4, but I don't know what it is.
13 Q  Okay. Let's go back to your report, Exhibit 25. I just
14   want to go through some of the details listed on that.
15       There is an indication that Officer Dougil of the Gig
16   Harbor Police spoke with an informant in 1998 who had
17   attempted to steal some marijuana from this house on Fox
18   Island.
19       First, did you, yourself, ever speak with this supposed
20   informant?
21 A  No.
22 Q  Do you know why the subject of this particular house even
23   came up at this time?
24 A  It came up from Matt Dougil.
25 Q  And do you know why Mr. Dougil was interested in this

## Page 8

1    particular property at this particular time?
2  A  No, other than he had received that prior tip.
3  Q  Well, that was in 1998. This is in 2002. And then further
4    on, it says he got a tip from the marijuana hot line in 2001
5    about a subject growing marijuana on Fox Island in Pierce
6    County, et cetera.
7        Do you know what is being referred to when they're
8    talking about the marijuana hot line?
9  A  Yes.
10 Q  What is that?
11 A  Marijuana hot line is a tip line that people can call in to
12   anonymously give information about marijuana grows. They
13   then receive payment from the tip line, based on the number
14   of plants seized and guns seized, and a couple of other
15   factors like that.
16 Q  Do you know when this was in 2001 that Officer Dougil got
17   this tip?
18 A  No.
19 Q  Would there be some sort of record with the marijuana hot
20   line, somehow, of this tip so that if someone needed to get
21   paid later on, there would be a record of it?
22 A  I would think so. You have to check with them. I would
23   imagine so.
24 Q  Who conducts this marijuana hot line?
25 A  It's a federally-funded program that is manned by people

## Page 9

1    from the State Patrol, is my understanding.
2  Q  If it is manned by the State Patrol, how would it be that
3    Officer Dougil would get this tip from the marijuana hot
4    line? Do you know?
5  A  I don't know.
6  Q  Okay, I'll ask him.
7        Do you know if this tipster or anybody else was paid
8    anything as a result of this particular raid on this Wood's
9    house?
10 A  I don't know that either.
11 Q  Okay. All right, on the next page of your report there's an
12   indication that Officer Dougil advised you that neighbors in
13   the area have heard automatic gunfire sounds coming from the
14   suspect's property.
15       Do you know anything more about that?
16 A  No.
17 Q  Do you know whether any kind of weapons capable of making
18   that sound were seized in this particular raid?
19 A  There were no automatic weapons found, no.
20 Q  It looks like you and Detective Schuster and Officer Dougil
21   drove out to this place on August 30?
22 A  No. It was just Schuster and I.
23 Q  Oh, I see. Dougil had described it to you previously?
24 A  Correct.
25 Q  All right. So when you and Schuster drove out there, do you

Vicky L. Pinson, CSR-RPR
James, Sanderson & Lowers Court Reporters (800) 507-8273

7e2031f1-e943-4f55-892a-06727d8e82ea

Deposition of John Halsted                    10/3/2006

## Page 10

1    remember anything about that particular trip?
2  A  Well, I remember that we drove out there, based on Officer
3    Dougil's directions, and found the driveway with the sign on
4    it, marking the driveway with the numbers of the house.
5  Q  Now, this is probably not your complete report, and I
6    apologize. I have the other pages, but you may want to look
7    at the one you have.
8        There's an indication here that a check with the Pierce
9    County Assessor's Office indicates certain things, and what
10   the parcel is. It shows that there's a single-story
11   residence on the property, who it belongs to, and it shows
12   that the property was deeded to the Organic Sunflower
13   Foundation sometime in 1995, seven years earlier by Solar
14   Steam, Incorporated in 1989, which is 13 years before this
15   particular incident. It was deeded to the property by
16   the -- Mr. Wood deeded the property to the Solar Steam,
17   Incorporated. And it shows that Mr. Wood has an
18   affiliation, and that Solar Steam hasn't been in operation
19   for a number of years.
20       Do you have an idea or did you make any effort to find
21   out what kind of business Solar Steam, Incorporated was?
22  A  No, I didn't.
23  Q  Do you know whether or not that was a legitimate business?
24  A  Solar Steam?
25  Q  Yes.

## Page 11

1  A  No, I don't.
2  Q  Do you know or did you find out at any time what the Organic
3    Sunflower Foundation was?
4  A  No. Not that I remember.
5  Q  Well, I didn't see any indication that you had, but do you
6    know that you can check with the Secretary of State's office
7    to get the articles of incorporation of businesses like
8    this?
9  A  Yes, I'm familiar with that.
10 Q  The next page says that due to the hazards involved in
11   serving the warrant, you contacted the State Patrol SIRT
12   team and requested their assistance.
13       What were the hazards involved that led you to request
14   the assistance of SIRT?
15 A  Well, the information about the automatic gunfire. The
16   information about the, I don't remember what I'm trying to
17   say, the sensors that are supposed to be around the
18   driveway, which would give up our approach. Those kinds of
19   things.
20 Q  Do you know, for example, from the location on Fox Island
21   near where this property is, if you could hear automatic
22   weapons firing from Ft. Lewis?
23 A  I have no idea.
24 Q  Okay. And can you tell me why it is that the West Sound
25   Narcotics Enforcement Team was taking interest in a property

## Page 12

1    in Pierce County which was not one of the jurisdictions
2    involved in the West Sound Narcotics Enforcement Team?
3  A  We work all over. We go to Pierce County all the time. We
4    go to King County.
5        As a matter of fact, I'm going to get a search warrant
6    signed this afternoon for a residence in Pierce County.
7    It's not uncommon for us to work in different areas of the
8    state.
9  Q  And as far as you know, is that within the authority of the,
10   this Interlocal Drug Task Force, to investigate crimes
11   involving drugs all over the state?
12 A  Can you ask the question one more time?
13 Q  Okay.
14 A  Are you asking do we have jurisdiction to do that?
15 Q  I'm going to give you an exhibit here, Exhibit 22, and if
16   you'll look at -- just a moment.
17       I wanted to look at a couple of things in this exhibit,
18   and the first is the purpose. There's an indication there
19   that the purpose of the agreement is to provide for and
20   regulate the joint efforts of the city, county and state law
21   enforcement to combat violation of controlled substance laws
22   within the contracting jurisdictions for their mutual
23   advantage.
24       And if you'll look at the page before, "Jurisdictions"
25   is defined as the cities of Bainbridge Island, Bremerton,

## Page 13

1    Port Orchard, Poulsbo, and Shelton, counties of Kitsap,
2    Mason, state of Washington.
3        So, first of all, did you know in 2002 that just the
4    simple thing, that Pierce County was not a member of this or
5    a party to this Interlocal Drug Task Force agreement?
6  A  Well, it was my understanding that it didn't matter where in
7    the state we were. We were covered as far as our
8    commission.
9  Q  Let me --
10       MR. ROSEN: His question was whether Pierce County
11   was a member of the task force at that time.
12 A  Oh, no, they were not. And still are not.
13 BY MR. LEEMON:
14 Q  Okay, if you look at article, here we go, it's Article 3F,
15   General Duties. It's on page six. Oh, it's not. I lied.
16   It's on page five.
17       And it says, "Pursuant to RCW 10.93.070(1) --
18 A  I'm not on the same page, I don't think.
19 Q  I'm on page five. Is that a different page? It's F.
20 A  Okay, thank you.
21 Q  "Pursuant to RCW 10.93.070(1), law enforcement personnel
22   assigned on a full or part-time basis to the task force
23   shall have full police powers within the geographical area
24   of Kitsap and Mason counties."
25       Is that different than what your understanding was when

Vicky L. Pinson, CSR-RPR
James, Sanderson & Lowers Court Reporters (800) 507-8273

7e2031f1-e943-4f55-892a-06727d8e82ea

Deposition of John Halsted                                    10/3/2006

## Page 14

1   working with this task force?
2  A   Yes.
3  Q   So no one ever told you that the agreement, by its terms,
4      limits the task force's, quote, full police powers to the
5      geographical area of Kitsap and Mason counties?
6  A   No.
7  Q   Prior to the obtaining of the search of this property, did
8      you notify anybody from any Pierce County agency that you
9      were going to do so?
10 A   The only contact that I had from a representative from that
11     area was Officer Dougil.
12 Q   Okay. And, of course, Fox Island is not in Gig Harbor, is
13     it?
14 A   It's not within the city limits, no.
15 Q   Do you know if anyone contacted anybody from the Pierce
16     County Sheriff's Office whose jurisdiction Fox Island is in?
17 A   Yes. According to an e-mail that I received from Officer
18     Dougil, he had spoken with Detective Kim Pecheos from the
19     Pierce County Sheriff's Office, and advised him.
20         (Exhibit No. 27 marked for identification.)
21 Q   Is this the e-mail you're talking about?
22 A   Yes.
23 Q   Now, this is directed to John and Dale. Do you know who
24     John and Dale are?
25 A   I'm John and Dale is Dale Schuster.

## Page 15

1  Q   All right. So he was sending you this e-mail on August 29th
2      about this information.
3          What was the purpose of this e-mail, do you know?
4  A   Well, I guess he wanted to let us know what he knew about
5      this case.
6  Q   Did you know about the case, so far? I mean, what did you
7      know about it on August 29?
8  A   Well, I knew that Officer Dougil and Detective, at that time
9      Detective Schuster had flown over a marijuana grow over Fox
10     Island, and he was -- I think that's all I knew up until
11     that point. Didn't have a whole lot of detail about it.
12 Q   Okay. Down in the further area, third paragraph of this
13     same e-mail it's talking about the TNET team.
14         Do you know who the TNET team is?
15 A   They were the Tahoma Narcotics Enforcement Team.
16 Q   And who was involved in that?
17 A   Well, TNET still exists, but it's now a DEA task force.
18     Back then, prior to that I believe it was Pierce County
19     Sheriff's Office, Tacoma Police, and there might have been
20     some other agencies involved, similar to our task force.
21     I'm not exactly sure.
22 Q   Now, does Detective Kim -- how do you pronounce it?
23 A   Pecheos.
24 Q   P-E-C-H-E-O-S?
25 A   Yes.

## Page 16

1  Q   What do you know about him?
2  A   Well, he's a detective with the Pierce County Sheriff's
3      Office.
4  Q   And does he work on narcotics cases?
5  A   He did. I don't think he does anymore.
6  Q   Okay. There is a, in this e-mail it says, "We are ready to
7      go on our end for the 5th, (Thursday), so let me know what
8      time you will be here and if you think you may need another
9      tactical team for perimeter or something else."
10         Do you know whether this e-mail was sent out before
11     there was a request made to the State Patrol SIRT team for
12     assistance?
13 A   I'm not sure.
14 Q   Okay. It says here, "The Metro SRT unit is also
15     available." Who is that, do you know?
16 A   I believe that they are another tactical team from the
17     Pierce County area. But I --
18 Q   You don't know who it refers to, though?
19 A   No.
20 Q   When it came to serving this warrant, apparently the
21     Washington State Patrol SIRT team was in the front. What --
22     first of all, were you with the party that went to serve
23     this warrant?
24 A   Yes.
25 Q   And what was your role in this search?

## Page 17

1  A   I was on some sort of a perimeter duty. I checked on a
2      couple of outbuildings while they were at the main house.
3  Q   Did you find any evidence of any criminal activity in any of
4      these outbuildings?
5  A   Not that I remember, no.
6  Q   There's an indication that Wood came to an upstairs window
7      and was ordered to show his hands.
8          Where were you when that happened?
9  A   I was back, behind the team, on a perimeter position.
10 Q   And did he show his hands when he was ordered to do so?
11 A   I assume he did. I'm not -- I wasn't real close to the
12     house, so I don't know. I didn't have a clear view.
13 Q   It says he eventually came and opened the door for the team
14     to enter. How long is "eventually"? Do you have any idea?
15 A   No, I remember them yelling orders at him to -- for a
16     while. It seemed like probably longer than it really was,
17     but it seemed like it took him a while to comply with what
18     they wanted him to do.
19 Q   Now, it says next, Wood was detained and the team entered
20     the house to clear it of any occupants. Who is "the team"?
21 A   The State Patrol.
22 Q   So you weren't involved in that?
23 A   No.
24 Q   From what you saw, where did the "team" enter the house?
25 A   Through a second floor door that is accessed with a draw

5 (Pages 14 to 17)

Deposition of John Halsted                    10/3/2006

---

Page 22

1    any. I can't answer your question. I don't remember if
2    there was some there or not. I don't have a specific
3    recollection.
4    Q   Why would you seize the guns?
5    A   They were listed on the search warrant as items to take. We
6    find guns many times.
7    Q   And ammunition was also listed on the search warrant, wasn't
8    it?
9    A   Yes.
10   Q   If you had found some, you would have seized it and listed
11   it. Right?
12   A   Yes.
13   Q   There's an indication on the last page of this report, it
14   says that about 2:00 you called and spoke with Sandra
15   Karlsvik. Did you call her at her work, at Western State?
16   A   I'm not sure whether I called her there or somewhere else.
17   Q   Do you remember what it was that led you to call her at
18   2:00, several hours after you cleared the area of the
19   search?
20   A   Well, I wanted to clarify a few things, as far as this note
21   that she wrote to her husband saying that she could use
22   marijuana.
23   Q   And she wouldn't talk to you about that?
24   A   Correct.
25   Q   I want to go through a few things in your complaint for the

---

Page 23

1    search warrants.
2        What, if anything, do you know about the reason that
3    Officer Dougil and Detective Schuster flew over this
4    property on August 27 of 2002?
5    A   Well, I can only assume that it was based on this prior tip
6    that he got, that he wanted to fly over and see if there
7    were plants out there.
8    Q   Officer Dougil has been in WESTNET. He was in WESTNET
9    before August of 2002.
10   A   No, he wasn't a member of WESTNET.
11   Q   So he just had joined?
12   A   No, he hadn't joined either.
13   Q   Oh, he was a police officer with the Gig Harbor Police
14   Department?
15   A   Right.
16   Q   And do you know how it was that he and Detective Schuster
17   ended up flying over this property?
18   A   Well, each year we have a period set aside usually during
19   late summer, where we fly, in helicopters, around different
20   areas, searching for outdoor marijuana grows. And this was
21   one of those periods of time.
22   Q   Why would Officer Dougil be involved with that if he was an
23   officer with the Gig Harbor Police Department?
24   A   Well, I believe that during this year we sponsored a class
25   on how to spot marijuana. And during that class, officers

---

Page 24

1    from around the state come in and learn how to spot
2    marijuana from the air. And part of that class is hands-on
3    practical flying and searching for marijuana grows.
4        And I believe that he had gone through that class, and
5    this was a part of that practical exercise.
6    Q   So you think that the flight over this particular area was
7    part of a class?
8    A   Well, the class runs in conjunction with our flight times,
9    so although we're sponsoring a class, we're also using the
10   flight time for us to go out and search for marijuana
11   grows. So it's kind of one and the same, I guess.
12   Q   And this was a class that was conducted by WESTNET?
13   A   Sponsored by WESTNET.
14   Q   Who put it on? Who actually conducted it?
15   A   The training, itself? I'm not exactly sure. There's a
16   couple of different instructors that we've used in the past.
17   Q   Do you know where it was conducted?
18   A   I know that they've conducted it -- when I went through it,
19   it was at the Silverdale Hotel. And I don't know if it was
20   conducted there or somewhere else.
21   Q   Should WESTNET have some information concerning the
22   sponsoring of this class in 2002?
23   A   There should be something, yeah.
24   Q   In the third paragraph of your Complaint For Search Warrant
25   it says, Officer Dougil advised me that neighbors in the

---

Page 25

1    area had heard automatic gunfire sounds coming from the
2    suspect's property. And it's on page three, in the third
3    paragraph, one sentence long.
4        Is that information that you got from this e-mail,
5    Exhibit 27?
6    A   Well, yeah, from the e-mail and then him telling me about
7    it.
8    Q   If you look at the e-mail, what it says there is
9    Officer Jahn, who lives in the area, says that he hears
10   shots coming from the direction of the property.
11       Is that, to you, the same thing as saying that a person
12   hears automatic gunfire coming from the property?
13   A   No, that's different.
14   Q   Why did you put in this complaint that someone supposedly
15   heard automatic gunfire sounds coming from the property,
16   when apparently what Officer Dougil told you is that someone
17   heard automatic gunfire coming from the direction of the
18   property?
19       MR. ROSEN: Object to the form of the question.
20   A   This is what he told me.
21   Q   And so what he told you is different than what was in his
22   e-mail to you?
23   A   I guess.
24   Q   Let's go to page four. It says it is your belief that both
25   Organic Sunflower Foundation and Solar Steam, Incorporated

---

Vicky L. Pinson, CSR-RPR
James, Sanderson & Lowers Court Reporters  (800) 507-8273

7e2031f1-e943-4f55-892a-06727d8e82ea

Deposition of George Mars                    10/3/2006

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DOUGLAS WOOD and SANDRA KARLSVIK,      )
husband and wife,                      )
                                       )
                Plaintiffs,            )
                                       )
        vs.                            )
                                       )        NO. C05-5575RBL
WEST SOUND NARCOTICS ENFORCEMENT       )
TEAM; OFFICER MATTHEW DOUGIL           )
(WestNET; GIG HARBOR POLICE            )
DEPARTMENT; DETECTIVE JOHN DOE         )
SCHUSTER (WestNET); DETECTIVE JOHN     )
HALSTED, (POULSBO POLICE DEPARTMENT,)
WestNET, BADGE 606; DETECTIVE G.R.     )
MARS (WSP STATEWIDE INCIDENT           )
RESPONSE TEAM, BADGE 685);             )
DETECTIVE JOHN DOE WILSON and JOHN     )
DOES 1-25,                             )
                Defendants.            )

DEPOSITION OF GEORGE R. MARS
TUESDAY, OCTOBER 3, 2006

APPEARANCES

For Plaintiff:              MARK LEEMON
                            Leemon & Royer, PLLC
                            2505 2nd Avenue, Ste 610
                            Seattle, Washington 98121-1483

***APPEARANCES CONTINUED ON NEXT PAGE***

Court Reporter:             VICKY L. PINSON, RPR-CSR
                            License No. 2559

EX6

Deposition of George Mars                    10/3/2006

---

**Page 2**

1        DEPOSITION OF GEORGE R. MARS
2
         APPEARANCES (CONTINUED)
3
4
5   For Defendant Gig Harbor:    JASON M. ROSEN
                  Christie Law Group
6                 2100 Westlake Ave. North, Ste 206
                  Seattle, Washington 98109
7
8
    For Defendant Mars:    JEFFREY D. STIER
9                 Assistant Attorney General
                  629 Woodland Sq. Loop SE
10                P.O. Box 40126
                  Olympia, Washington 98504-0126
11
12
                  * * *
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1        DEPOSITION OF GEORGE R. MARS
2
3            I N D E X
                              Page
4
5   Examination by Mr. Leemon ........................  4
6
7
8
            E X H I B I T S
9                             Page
10  11 - Operations Safety Plan          12
11  12 - WSP Investigative Report         14
12  13 - Aerial Photos                    19
13  14 - Sketch of Property               21
14  15 - Narrative                        22
15  16 - Clandestine Lab Checklist        37
16  17 - Case File Checklist              38
17  18 - Photocopies of Photos            39
18  19 - WSIN Subject Card                48
19  20 - Call Out/Response Checklist      49
20
21
22
23
            INFORMATION REQUESTED
24
        (None requested)
25

---

**Page 4**

1        BE IT REMEMBERED that the deposition upon oral
2   examination of GEORGE R. MARS was taken on TUESDAY,
3   OCTOBER 3, 2006, commencing at 10:15 a.m., in Port Orchard,
4   Washington, before Vicky L. Pinson, Notary Public in and for
5   the State of Washington.
6
7        GEORGE R. MARS, having been first duly sworn upon
8   oath by the Notary, testified as follows:
9
10           EXAMINATION
11  BY MR. LEEMON:
12  Q   Please state your full name.
13  A   George R. Mars. M-A-R-S.
14  Q   And, Mr. Mars, where are you employed?
15  A   I'm employed with the Washington State Patrol.
16  Q   How long have you been employed with the Washington State
17      Patrol?
18  A   Since 1992.
19  Q   Have you had any employment with any other police agency
20      before that?
21  A   I was a security police officer in the United States Air
22      Force prior to that.
23  Q   And how long were you -- how long did you have that position
24      in the Air Force?
25  A   Four and a half years.

---

**Page 5**

1   Q   And what is the extent of your educational background?
2   A   High school. Very little college.
3   Q   Where did you go to high school, and did you graduate?
4   A   Yes.
5   Q   Where did you go to high school and when did you graduate?
6   A   I graduated in 1980, and I went to Cranberry High School,
7       which is back in Pennsylvania.
8   Q   And when were you in the Air Force?
9   A   Let's see, I was in the Air Force from '87 to '91. Or
10      excuse me, no, '92. July of '92 is when I got out.
11  Q   What have your assignments been with the Washington State
12      Patrol?
13  A   I've been assigned, obviously, when I first got hired, as a
14      cadet. Then I was assigned as a trooper on the road. And
15      then assigned as a SWAT detective, SIRT detective. And I
16      was in DCAU, our Drug Control Assistance Unit, for a little
17      while, and now I'm in our Organized Crime Unit.
18  Q   Taking these in order, where were you assigned as a trooper
19      on the road?
20  A   Let's see, I was assigned in Bremerton, and then spent a
21      year in Gig Harbor.
22  Q   And during what period were you a detective with the SIRT
23      unit?
24  A   Let's see, I became a detective with SIRT in '99, and I want
25      to say I left SIRT in 2004, I believe.

---

Vicky L. Pinson, CSR-RPR
James, Sanderson & Lowers Court Reporters (800) 507-8273

981b27cb-1122-4030-a1e0-693793cf3c67

Deposition of George Mars                                10/3/2006

Page 6

1  Q   All right. Can you tell me what the SIRT unit is?
2  A   SIRT stands for the Statewide Incident Response Team.
3        Basically, what it is, is we used to have what was
4        called the Clandestine Lab Team at one time. And I believe
5        it was '96. What they did is the Chief decided to combine
6        our lab team and our SWAT team, because lots of times our
7        SWAT team was doing lab entry and so on and so forth, so
8        they combined the two and called it the Statewide Incident
9        Response Team.
10 Q   And the Clandestine Lab Team, was that largely involved in
11       taking down meth labs?
12 A   Yes.
13 Q   And so these were people who were trained in kind of the
14       routine and the hazards involved in arresting people
15       involved in chemical lab with toxic materials?
16 A   Yes.
17 Q   After the combination of these two units into the SIRT team,
18       what was the mission of the SIRT team?
19 A   As far as --?
20 Q   What did you do? What kinds of things? I'm just looking
21       for a general view as to when the SIRT team would get
22       involved in law enforcement, which is ordinarily a local
23       issue. So I'm trying to figure out when a problem or under
24       what circumstances a law enforcement issue would be such
25       that a state unit would be called in.

Page 7

1  A   Okay. What happens is typically, being we're a state unit,
2        we respond all over the state. Typically, a lot of smaller
3        agencies, either, one, they don't have a SWAT team; either,
4        two, they don't have a clandestine lab team; or, three, they
5        don't have both. And they will call upon us to serve either
6        high risk search warrants, take-downs, you know, drug take-
7        downs, drug buys, where you're making a buy and it's a high
8        risk arrest, or like I just said, clandestine labs.
9  Q   Was there in 2002 a policy and/or procedure manual for the
10       SIRT team?
11 A   Yes, I believe so, yes.
12 Q   And does that manual have in it any criteria for when the
13       SIRT team will get involved in a case after being requested
14       by local authorities?
15 A   I'm not sure.
16 Q   Okay. Do you know whether there were, in fact, in August/
17       September of 2002, any criteria that defined when SIRT would
18       accept and/or refuse involvement when requested by local
19       authorities?
20 A   I believe so. That's why we did it.
21 Q   Yeah. I was asking whether there are any -- and this is
22       probably just a bad question -- were there any written
23       criteria that determined what cases were, quote, acceptable
24       for the SIRT team to work on when requested by local
25       authorities?

Page 8

1  A   There may have been. I'm unaware.
2  Q   All right. Let's take the case of Doug Wood for just a
3        minute. Apparently your unit, and perhaps even you, were
4        contacted by Detective Halsted originally on this matter.
5        Is that your recollection?
6  A   Both. The unit and myself.
7  Q   All right. Was there anybody but you, besides you, that was
8        contacted?
9  A   Yes. Either our sergeant or a lieutenant would have been
10       contacted. I don't know which one.
11 Q   Who was the sergeant in August of 2002?
12 A   We had two sergeants. Sergeant Chris Gundermann.
13 Q   And who was the other one?
14 A   Sergeant Dave Browne.
15 Q   And who was the lieutenant?
16 A   Lieutenant Jim Chromey.
17 Q   Is that C-R-O-M-E-Y?
18 A   C-H-R-O.
19 Q   Now, assume for a minute that a local agency calls you up
20       and says, We'd like you to help with X. "X" being some
21       problem. A drug take-down or an investigation of some
22       kind.
23       How is it decided, or how was it decided in August of
24       2002 whether the SIRT unit would, in fact, become involved?
25 A   I was just going to say that's decided at a higher level

Page 9

1        than me.
2  Q   Do you know at what level?
3  A   It would be the lieutenant or above.
4  Q   Okay. So a request is made by a local agency, and then
5        someone, lieutenant or above, would say yea or nay?
6  A   Yes, sir.
7  Q   Where were you physically stationed during August of 2002
8        when you were working with the SIRT team? What was your
9        location?
10 A   At the WESTNET office.
11 Q   Which is where, or was where?
12 A   Well, I don't know if I'm allowed to disclose that. It's
13       kind of, because of the security issues and stuff. It's in
14       Bremerton.
15 Q   Okay. I'm not going to ask you any more specifically than
16       that.
17 A   Okay, thank you.
18 Q   And were you then assigned to the WESTNET unit in some
19       fashion?
20 A   No, sir. That was a unique situation. I was a detective
21       with SIRT, but I needed an office, and Sergeant Drake at the
22       time just let me have my office there.
23 Q   Who is Sergeant Drake?
24 A   Sergeant Drake was the supervisor in charge of WESTNET at
25       the time.

3  (Pages 6 to 9)

Deposition of George Mars                              10/3/2006

---

Page 10

1  Q   Do you know what police agency he's with?
2  A   He's with the Washington State Patrol.
3  Q   So there was a supervisor that was in charge of WESTNET?
4  A   Yes, sir.
5  Q   All right. So it was a State Patrol employee who was in
6      charge of WESTNET?
7  A   Yes.
8          MR. STIER: Objection as to form.
9  BY MR. LEEMON:
10 Q   Was Sergeant Drake then assigned full-time to WESTNET by the
11     State Patrol, as far as you knew?
12 A   As far as I know.
13 Q   And during the time -- during what period of time were you
14     physically officed at the WESTNET office?
15 A   I believe it was from '99 to somewhere in 2002 I was at the
16     office.
17 Q   And then there were another couple of years you were in
18     SIRT. Where did you physically work during that time?
19 A   In Olympia.
20 Q   During the time you were officed with WESTNET, did you take
21     part in police activities with other police agencies, as
22     well, besides WESTNET?
23 A   You mean --?
24 Q   As a member --
25 A   Along with WESTNET, with other agencies?

---

Page 11

1  Q   No. Again, terrible question. Were you solely working on
2      WESTNET cases during that time?
3  A   No. I worked with SWAT. We assisted other agencies, as
4      well.
5  Q   What percentage of your time would you say, if you can give
6      a reasonable percentage, was spent on assisting WESTNET in
7      their operations?
8  A   Approximately 10 percent.
9  Q   Let me go back a little bit and ask some preliminary
10     questions. Have you had your deposition taken before?
11 A   Yes.
12 Q   About how many times?
13 A   Once.
14 Q   In what connection was that deposition?
15 A   Meaning --?
16 Q   Was it a divorce case of yours? Was it a lawsuit involving
17     your work with the State Patrol? Was it some suit involving
18     something not including the State Patrol?
19 A   No, it was -- no, it had nothing to do with me as far as
20     personal life or anything like that.
21 Q   I was just using it as an example.
22 A   It's been a while. I can't recall exactly what it was. It
23     was a State Patrol matter, though.
24 Q   Do you remember if it was a suit against the State Patrol or
25     some members of the State Patrol?

---

Page 12

1  A   I don't recall.
2  Q   About how long ago was that?
3  A   Oh, gosh, maybe three years ago.
4  Q   Did you review anything to prepare for this deposition?
5  A   Yes.
6  Q   And what was it you reviewed?
7  A   My Safety Operations Plan and my SIRT report.
8  Q   I have something I'm going to mark as Exhibit 11. I just
9      substituted the last page of it because it has some writing
10     on it that's not on the document that I made my copies
11     from. So this one that's being marked will be complete, and
12     we'll describe what it is for the attorneys.
13         (Exhibit No. 11 was marked for identification.)
14 Q   Could you identify what Exhibit 11 is?
15 A   Yes, this is an Operations Safety Plan.
16 Q   Is that your Operations Safety Plan?
17 A   Yes, it appears to be.
18 Q   And that is No. 1 of 20. Does that mean there were 20
19     copies of that plan made?
20 A   Yes.
21 Q   And this one is, that I have here that has a Bates stamp on
22     the bottom that says "Wood 01010051," which I would have
23     used but for the fact we didn't have copies made. This one
24     says "master," and it's 1 of 20. Would this have been your
25     copy?

---

Page 13

1  A   Yes, I believe so.
2  Q   Is that your writing where it says "master"?
3  A   Yes, it looks like it.
4  Q   You can look at them. I believe they're identical at this
5      point. As you'll see, there's some handwriting on page four
6      of the one in your right hand, Exhibit 11, which was for
7      some reason blocked out of the one in your left hand.
8          MR. ROSEN: Counsel, I don't have any handwriting
9      on mine.
10         MR. LEEMON: Well, we're going to show you the
11     exhibit. Like I said, I made a copy of No. 11, and it would
12     have been better to have a copy of 1 of 20 which had the
13     handwriting. I don't know why it's blocked out. We'll find
14     out.
15         MR. ROSEN: In other words, you've substituted the
16     fourth page from what was 1 of 20 into Exhibit 11?
17         MR. LEEMON: Correct.
18 BY MR. LEEMON:
19 Q   Is that writing on the fourth page of Exhibit 11 yours?
20 A   It appears to be, yes.
21 Q   And what does the PIO stand for?
22 A   Public Information Officer.
23 Q   And that's Lieutenant Johnson?
24 A   Yes.
25 Q   All right. Now, what is -- District 1 of what?

---

4  (Pages 10 to 13)

Vicky L. Pinson, CSR-RPR
James, Sanderson & Lowers Court Reporters (800) 507-8273

981b27cb-1122-4030-a1e0-693793cf3c67

Deposition of George Mars                                    10/3/2006

---

Page 14

1   A   District 1 is State Patrol district. We have eight
2       districts in the state, and that's District 1 is basically
3       Pierce County.
4   Q   All right. And what is the notation there intended to
5       reflect?
6   A   Just that the District 1 PIO was Lieutenant Johnson.
7   Q   And does the mention of his name indicate that he got a copy
8       of this report or that he had been notified, or anything
9       else? Or just an indication of that's who it is.
10  A   From memory, I don't know. I can't say.
11  Q   Can you tell me, in general, why you would record the name
12      of the district public information officer on an Operations
13      Safety Plan for a SIRT operation?
14  A   Yes. Because, typically, what we do is one of our
15      requirements is to contact the PIO in the local district and
16      let them know we're going to be doing an operation in their
17      area.
18  Q   In case they get some questions about it?
19  A   From the media, yes.
20          (Exhibit No. 12 marked for identification .)
21  Q   Can you tell me what Exhibit 12 is?
22  A   It's our, actually it's my report.
23  Q   All right. And to whom is that report directed?
24  A   It's a report that I do that goes to my sergeant.
25  Q   Other than Exhibits 11 and 12, would there have been any

---

Page 15

1       other paperwork that you or another member of SIRT would
2       have prepared in connection with this particular operation?
3   A   From memory, I don't recall.
4   Q   If you'll see, the first part of Exhibit 12, in the
5       introduction there is an indication, quote, "The Washington
6       State Patrol Statewide Incident Response Team, SIRT, was
7       contacted by Detective Halsted from the West Sound Narcotics
8       Enforcement Team. He requested the aid of SIRT in serving a
9       search warrant at a residence located" -- and then gives the
10      address, closed-quote.
11          Would there be any written record maintained by anybody
12      at the State Patrol SIRT team that would record
13      contemporaneously Detective Halsted's request for
14      assistance?
15  A   I don't know.
16  Q   Do you know if there are any documents required in the form
17      of a formal request for assistance from a local agency to
18      SIRT to enable the provision of assistance by SIRT to the
19      local agency?
20  A   I don't know.
21  Q   How would you find out about an operation that Sergeant
22      Drake wanted you to take part in?
23  A   You mean as a SWAT member?
24  Q   Yeah.
25  A   The Sarg.

---

Page 16

1   Q   Would just tell you?
2   A   Yeah. And when I say "the Sarg," I'm not talking Sergeant
3       Drake. I'm talking Sergeant Browne or Sergeant Gundermann.
4   Q   So Sergeant Drake, who was working with WESTNET, would not
5       be the conduit to you. It would be your sergeant in the
6       SIRT unit.
7   A   Yes. Because I worked for SIRT.
8   Q   Okay. Would it ever occur that Sergeant Drake was the
9       person who was actually requesting assistance for WESTNET,
10      to SIRT?
11  A   Yeah, I guess.
12  Q   Now, you said that Detective Halsted contacted you and
13      contacted SIRT. What do you recall about Detective Halsted
14      contacting you?
15  A   I just recall that he contacted, said that he needed our
16      assistance in serving a search warrant at a residence down
17      in Pierce County.
18  Q   Did you ask any questions about what the WESTNET was doing
19      in Pierce County?
20  A   I don't recall.
21  Q   Do you know whether or not Pierce County is, in fact, a
22      member of WESTNET?
23  A   At the time, no, we had no members in WESTNET.
24  Q   In Exhibit 12 you went on to say:
25          Detective Halsted developed probable cause for the

---

Page 17

1       issuance of a search warrant for the residence during a
2       "Marijuana Spotting School."
3           What, if anything, do you remember about Detective
4       Halsted telling you that?
5   A   Just the fact that during the spotting school, they flew
6       over, and he spotted marijuana, I believe.
7   Q   Did he tell you when that was?
8   A   I don't recall.
9   Q   Do you know, do you have any information as to how long
10      before August of 2002 that school was?
11  A   Let me look through my report here.
12  Q   Okay.
13  A   In my Exhibit 11, under the Operations Safety Plan, it
14      indicates in there that they developed PC through
15      information they obtained during an ERAD fly-over of the
16      residence on August 27.
17  Q   Is it your recollection that the reference to developing
18      probable cause during a, quote, marijuana spotting school is
19      a reference to this same ERAD fly-over on August 27 of 2002?
20  A   I believe so.
21  Q   Do you know if there are, in fact, quote, marijuana spotting
22      schools that are conducted by any police training agency in
23      Washington?
24  A   Yes. I've heard there is, yes.
25  Q   Do you know who conducts those?

---

5 (Pages 14 to 17)

Vicky L. Pinson, CSR-RPR
James, Sanderson & Lowers Court Reporters (800) 507-8273

981b27cb-1122-4030-a1e0-693793cf3c67

Deposition of George Mars                                    10/3/2006

Page 18

1  A   I can't say with certainty. I believe it's DEA, but I can't
2      say that with certainty.
3  Q   Okay. Let me go back to Exhibit 12. There's an indication
4      that on Wednesday, September 4, you and Detective Halsted
5      flew over the residence in attempt to get surveillance
6      photographs for SIRT's safety briefing. They took several
7      photos, but were unable to determine where the entry points
8      were.
9          First of all, what kind of a craft did you fly over the
10     residence in?
11 A   A fixed wing.
12 Q   And who flew it?
13 A   It was -- I don't know the pilot's name, but it was a State
14     Patrol plane.
15 Q   And what paperwork is involved in accessing a State Patrol
16     plane for such a fly-over?
17 A   I don't think there's any. It was just a phone call.
18 Q   So you think the State Patrol planes go up and come down
19     without any paperwork on the police side of it?
20 A   Well, let me rephrase that. There was no paperwork on my
21     part.
22 Q   Okay. Who did you call?
23 A   The representative over there. I don't recall who it was.
24 Q   Representative of what?
25 A   At the Aviation section. State Patrol Aviation section.

Page 19

1  Q   And where is that?
2  A   In Olympia. Tumwater, to be exact.
3  Q   This part you probably don't know, but I'll ask anyway. Do
4      you know anything about the flight plans that have to be
5      filed in order to conduct such a flight?
6  A   No, sir.
7  Q   And can you tell me where you took off from and what was the
8      duration of this flight on September 4th?
9  A   Oh, gosh. No, I don't recall.
10 Q   Do you remember if you did, in fact, take photographs,
11     flying over this property?
12 A   I don't recall. I don't recall. If I did, they will be in
13     my packet.
14 Q   Well, we received these things in kind of an interesting
15     way, so I'm not a hundred percent sure where some of the
16     photographs we got came from. So let me show you some
17     photographs and see if you recognize them or not.
18         (Exhibit No. 13 marked for identification.)
19 Q   And I can tell you that numerically in the documents that we
20     got, if this will be at all helpful to you, what you have,
21     Exhibit 13, was after this piece of paper that is empty, but
22     says Washington State Patrol Clandestine Laboratory Sign In
23     Sheet.
24         Just before that sheet are other documents that look
25     like they came from your file. I don't want to suggest

Page 20

1      anything to you, but that's where they came from.
2  A   Okay.
3  Q   Do you, in fact, recognize Exhibit 13?
4  A   Yes, I believe so.
5  Q   And what do you recognize 13 as?
6  A   It appears to be an overhead photograph of the area
7      surrounding the residence.
8  Q   And that's Mr. Wood's residence?
9  A   I believe so, yes.
10 Q   During this fly-over, do you recall whether it would have
11     been you or Detective Halsted or both that would have been
12     taking pictures?
13 A   No, I don't.
14 Q   If it were you taking pictures, would you have been required
15     to somehow log in that fact? Would there be a record of
16     what you had taken pictures of?
17 A   If I took any pictures, the pictures would have been in my
18     case file.
19 Q   And would they, would there have been a log as well as the
20     photographs, or just the photographs themselves?
21 A   Just the photographs.
22 Q   Do you remember anything, at all, other than what you've
23     already said about -- well, wait a second. Let me go back.
24         You don't remember where you took off from for this
25     flight; correct?

Page 21

1  A   I don't recall.
2  Q   Do you remember if it was in the day or at night?
3  A   It was a daytime flight.
4  Q   Do you remember if you flew over any other subject
5      properties during that flight?
6  A   No.
7  Q   No, you don't remember or no, you didn't fly over any other
8      properties?
9  A   I don't recall flying over any other properties.
10         MR. LEEMON: The court reporter would appreciate it
11     if you don't drop off the end of your sentences like that so
12     she can hear every word you say.
13         THE WITNESS: Okay.
14         (Exhibit No. 14 marked for identification 14.)
15 Q   Handing you No. 14, do you know what that is?
16 A   Yes.
17 Q   What is it?
18 A   It's a, basically, a field diagram of the area.
19 Q   Did you do that diagram?
20 A   Yes.
21 Q   Do you know when you did that diagram?
22 A   Prior to the safety briefing that was done.
23 Q   All right. Was it done for the purposes of use in the
24     safety briefing?
25 A   Yes.

6  (Pages 18 to 21)

Vicky L. Pinson, CSR-RPR
James, Sanderson & Lowers Court Reporters (800) 507-8273

981b27cb-1122-4030-a1e0-693793cf3c67

Deposition of George Mars                                           10/3/2006

Page 22

1  Q   This is a WESTNET record. And I want to ask you a question
2      about it.
3          (Exhibit No. 15 marked for identification.)
4  Q   15 appears to be a WESTNET record, and it appears to be a
5      narrative concerning the fly-over that occurred in August of
6      2002. And as you'll see at the first couple of sentences
7      there, there's an indication that the writer of that,
8      whoever it was, heard from a Gig Harbor detective during a
9      marijuana spotting school, information concerning marijuana
10     at this location.
11         Do you have any recollection now or does that refresh
12     your recollection as to whether or not the information that
13     Detective Halsted got from the marijuana spotting school was
14     not a fly-over of this property, but something told him by a
15     Gig Harbor police officer?
16 A   No, I don't recall.
17 Q   Okay, you don't remember ever hearing that?
18 A   No.
19 Q   Do you know whether or not anybody ever contacted anyone
20     from Pierce County since this property was in Pierce County,
21     to determine whether they had any information or any
22     thoughts about whether there might be marijuana growing on
23     this property?
24 A   I don't know if -- I don't know if WESTNET did.
25 Q   Okay, did you?

Page 23

1  A   We, the only one we contacted and talked to, as I recall,
2      was someone at Gig Harbor P.D.
3  Q   All right. There is, in Exhibit 11, if you'll look at it,
4      an indication that members of the Pierce County Sheriff's
5      Office would be involved in initiating this warrant service.
6  A   Where is that at?
7  Q   I'm looking at No. 2, Mission.
8  A   Okay, yes.
9  Q   Do you know if, in fact, any members of the Pierce County
10     Sheriff's Office did take part in the service of the
11     warrant?
12 A   Yes, I believe so.
13 Q   All right. Do you know where, if at all, it would be
14     recorded the names of any Pierce County officers who took
15     part in this?
16 A   Is there in your documentation, did you get a sign-in sheet
17     from the briefing?
18 Q   No, I did not. There would be one, I take it?
19 A   Typically, we have a sign-in sheet.
20 Q   Okay, that would be a good document. Is that something
21     that's usually kept with the SIRT file?
22 A   Yes, sir.
23 Q   And that would be the best way to find out who, from Pierce
24     County, was involved in this, if there were someone?
25 A   It would list, you know, what agencies were there, and would

Page 24

1      have a contact number for them, and stuff.
2  Q   All right. Is Exhibit 11, this Operations Safety Plan, a
3      document that is produced before the safety briefing?
4  A   Yes, sir.
5  Q   All right. It's a plan for that safety briefing in some
6      regards. Correct?
7  A   Yes, sir.
8  Q   There is on page two of that plan an indication that the
9      parade, if you will, of cars would be led by a Pierce County
10     officer, followed by a SIRT car, and then another Pierce
11     County car.
12         Do you know whether, in fact, that arrangement of the
13     procession actually took place?
14 A   I believe that SIRT led up the driveway in our fully marked
15     vehicle, followed by the Pierce County Sheriff's Office
16     deputy and his fully marked vehicle.
17 Q   Were you in the SIRT vehicle that led down the driveway?
18 A   Yes, sir.
19 Q   Who else was in there?
20 A   It would have been -- would you like names or badge numbers?
21 Q   Any or all.
22 A   Detective Paul Stanek. His badge number is 531.
23         Trooper Jeff Kershaw, K-E-R-S-H-A-W. Badge number is
24     851.
25 Q   Okay, let's hold on just a second. You are looking at page

Page 25

1      three of Exhibit 11?
2  A   Yes, sir.
3  Q   It says "Index" at the top and then it has "Administration
4      and Equipment," and it has "Team 1." Is this Team 1 all
5      State Patrol employees?
6  A   Yes, sir.
7  Q   Okay. All right. And you're telling me who these people
8      are by your recognition of their badge numbers?
9  A   Yes, sir.
10 Q   Well, why don't we just go down the list, here. Who is
11     685?
12 A   That would be myself.
13 Q   After your name, it says M16/Shield/Knock and Announce/D.D.
14     Can you tell me what each of those designations stands for?
15 A   An M16 is the 223, long gun, standard issue. What I
16     carried. The shield is a safety shield that --
17         (Interruption at the door.)
18         (Break in proceedings.)
19 BY MR. LEEMON:
20 Q   Just before Mr. Rosen took out the car behind him, we were
21     talking about the equipment.
22         Anyway, we were at the shield, which is a piece of
23     protective equipment, I take it?
24 A   Yes.
25 Q   And then it says, "Knock and Announce"?

7  (Pages 22 to 25)

981b27cb-1122-4030-a1e0-693793cf3c67

Deposition of George Mars                                          10/3/2006

Page 26

1  A  It's where I would knock and announce at the door.
2  Q  So you would be a person who was assigned to knock and
3     announce that it was a police serving a search warrant?
4  A  Yes, sir.
5  Q  And then it says D.D.  What does that mean?
6  A  That means distraction device.
7  Q  What does that refer to?
8  A  Distraction device is a tool that SWAT uses on entries. We
9     don't always deploy it, but we have it on our person and
10    what it is, is it's a device that you would throw.  It makes
11    a loud bang with a flash.
12 Q  A flash bag, is that what they're called?
13 A  Yes.  The correct terminology is distraction device now,
14    but, yes, sir.
15 Q  Okay.  Then 531, who is that?
16 A  Detective Paul Stanek.
17 Q  And MP5?
18 A  Is his long gun.  It's a 9 millimeter.
19 Q  And he would also have one of these distraction devices?
20 A  Yes, sir.
21 Q  In addition to these long guns that were listed here, all of
22    the officers involved would also have a service revolver,
23    wouldn't they?
24 A  Yes, sir.  Or an automatic.  Not necessarily a revolver.
25 Q  851 is who?

Page 27

1  A  That was, at the time was Detective Jeff Kershaw.
2  Q  And he had an M16 and a distraction device?
3  A  Yes, sir.
4  Q  140, it says, is the assistant team leader.  Who is that?
5  A  That is, at the time, Sergeant Chris Gundermann.
6  Q  And he had one of these MP 59 millimeter long guns, a
7     distraction device, and also had a taser?
8  A  Yes, sir.
9  Q  1033?
10 A  That is Trooper Steve Reeves.
11 Q  Okay.  And could you describe for me the Ram that is
12    indicated was assigned to Trooper Reeves?
13 A  Yes, sir.  That's a hand-held battering ram.  Once we knock
14    and announce, if the person doesn't come to the door in a
15    reasonable amount of time, we use that to gain entry if we
16    have to make forceful entry.
17 Q  About how long is it?
18 A  The battering ram?
19 Q  Yes.
20 A  About two and a half feet, maybe.
21 Q  Do you know how much it weighs?
22 A  No, sir.
23 Q  Does it have handles on it?
24 A  Yes.
25 Q  Next is 890.  Who is 890?

Page 28

1  A  That would be Trooper Brian Ducummens.
2  Q  Do you know how to spell that?
3  A  D-U-C-U-M-M-E-N-S.
4  Q  Okay.  What is the HG?
5  A  Handgun.
6  Q  All right.  And then the D.D. and P.B., what is that?
7  A  PB is pepper ball gun.
8  Q  Was there only one of these pepper ball guns along on the
9     raid?
10 A  Yes, sir.
11 Q  What does this pepper ball gun look like?
12 A  It's, if you're familiar with paint ball guns?
13 Q  Sure.
14 A  Similar to a paint ball gun.  It has a big hopper on the
15    top, with the long gun and a cylinder on the bottom.
16 Q  What is fired out of there?
17 A  A round projectile, pepper ball.  Or, you know, we have
18    water that would be for training and stuff.
19 Q  Do you know what's in the pepper balls?
20 A  I don't know if it's cayenne pepper.  It's an irritant.
21 Q  Okay.  And were you ever trained in the use of this pepper
22    ball gun?
23 A  Yes, sir.
24 Q  By whom?
25 A  By Sgt. Dave Browne.

Page 29

1  Q  And do you know if there were any visual aids used in the
2     training?  Any kind of a video or --?
3  A  I believe he had PowerPoint.
4  Q  Okay.  And what were you trained as far as how this pepper
5     gun was to be used?
6  A  It's used as a less-than-lethal device.
7  Q  And when you determine that it's appropriate to use it, how
8     is it used?
9  A  As far as --?
10 Q  Where do you shoot it?
11 A  Oh, in large areas.
12 Q  So you actually shoot it at a target, you know, shoot it at
13    whatever it is you're trying to stop or --
14 A  Deter, yes, sir.
15 Q  Do you know whether or not this is the same kind of pepper
16    ball gun that was used in Boston after they won the World
17    Series that killed a young woman by hitting her in the eye?
18 A  No, sir, I have no idea.
19 Q  Do you know who the maker of this pepper ball gun is?
20 A  No. I don't.
21 Q  Do you know what the muzzle velocity is of this pepper gun?
22 A  I don't recall.
23 Q  194 with an M16 and distraction device was the team leader.
24    Who is that?
25 A  That is Sgt. Dave Browne.

8  (Pages 26 to 29)

981b27cb-1122-4030-a1e0-693793cf3c67

Deposition of George Mars                                    10/3/2006

## Page 30

1  Q   Okay. So both of your sergeants were there?
2  A   Yes, sir.
3  Q   1094, who is that?
4  A   That is Detective Orst Wilson.
5  Q   And what is the 40 mm?
6  A   That's a rubber exact impact round. It's another less-than-
7      lethal device that we use.
8  Q   And what is that shot out of?
9  A   It's shot out of a single shot 40 mm rifle.
10 Q   And he also had bolt cutters, in case they were necessary?
11 A   Yes, sir.
12 Q   And 343 is who?
13 A   That is Trooper Roger Hansberry.
14 Q   And he just had one of these flash bags and his handgun?
15 A   Yes, sir.
16 Q   And 92 is the command post. Who is that?
17 A   That is Lt. Jim Chromey.
18 Q   Now, let's see. Sgt. Browne and Sgt. Gundermann and Lt.
19     Chromey, were they all people who worked in either Olympia
20     or Tumwater?
21 A   Yes.
22 Q   Might as well go down the list of the things that they had.
23     Nomex gloves. What is Nomex?
24 A   Nomex is a fire retardant material.
25 Q   All right. APR/SCBA?

## Page 31

1  A   APR is air purifier respirator and self-contained breathing
2      apparatus.
3  Q   Did each member of the team have one of those?
4  A   No. We have self-contained breathing apparatus on our
5      vehicle. The APRs, every team member has a holder that they
6      carry them in on their sides.
7  Q   All right. The next one that I'm not sure I know what it
8      means is Key/Hooligan?
9  A   The key is just a term we use, it's the battering ram.
10 Q   Okay.
11 A   The hooligan is a bar. It's a bar that has a, you know,
12     like if we have a door that will not swing inward, and has
13     to be pried. It's a pry bar.
14 Q   Cold Fires?
15 A   Cold Fire is a device that we use, say, if we deploy a flash
16     bag distraction device and it would, by chance, start a fire
17     or something, we have the Cold Fires, to be able to douse
18     that.
19 Q   So it's some kind of fire extinguisher?
20 A   Yes.
21 Q   Is the Entry Vest a vest that marks you as police?
22 A   Yes.
23 Q   And NFDs is what?
24 A   It's a distraction device.
25 Q   What is the, do you know what the letters stand for?

## Page 32

1  A   Gosh, um, no, it's an old name. NFDs, no, I don't.
2  Q   Is this the same distraction device that's listed up above?
3  A   Yes, sir.
4  Q   Looking at Exhibit 12, which is your report -- and you can
5      look at this or not, as you wish. I'm just going to ask you
6      some questions about the service of this warrant.
7          It looks to me like you were, you, or your SIRT team
8      members were the first officers to actually approach this
9      house on foot. Is that right?
10 A   Yes.
11 Q   Do you know whether or not any of the officers from the
12     local agencies also approached, or was it mainly the State
13     Patrol SIRT team that was going in to the house?
14 A   There was mainly the SIRT that was going to make entry into
15     the residence.
16 Q   Now, as you walk -- were you the first one approaching the
17     residence?
18 A   Yes, sir.
19 Q   All right. And you then saw Mr. Wood standing in a window?
20 A   I saw a male, who I was able to later identify as Mr. Wood,
21     yes, standing in the upstairs window.
22 Q   Do you remember whether you or anybody else asked to see his
23     hands?
24 A   I remember hearing people shout. I don't recall who it was,
25     "Let me see your hands."

## Page 33

1  Q   And did he show his hands?
2  A   I don't know. I wasn't paying attention at that point.
3  Q   What were you concentrating on?
4  A   Concentrating on finding an entry point into the residence.
5  Q   And it says Detective Wilson took up a position of over --
6      I'm sure you meant watch over Wood.
7  A   Yes.
8  Q   And then you went to the south end of house where you saw
9      some stairs that led to a small landing.
10         On Exhibit 14, there, south is -- is south correctly
11     marked with north being at the top of the exhibit?
12 A   I believe so, yes.
13 Q   And do you know what this 1, 2, 3, and 4 on the diagram are?
14 A   Yes, sir. We number the sides. So if something would
15     happen, we would have to say meet at the "one-four" corner
16     or the "one-two" corner, or so on and so forth.
17 Q   All right. Where, then, was the steps leading to a wooden
18     landing that ended eight feet short of the doorway, if we're
19     going to use your 1, 2, 3, 4 notation?
20 A   It would be, as looking at Exhibit 14, here, it would be on
21     the side between the 1 and the 4.
22 Q   Okay. It next says, When they realized they weren't going
23     to be able to access that door, part of the entry team moved
24     to the basement door which was located at the northwest
25     corner. Which I take it is the 2 corner?

Vicky L. Pinson, CSR-RPR
James, Sanderson & Lowers Court Reporters  (800) 507-8273

981b27cb-1122-4030-a1e0-693793cf3c67

Deposition of George Mars                               10/3/2006

Page 34

1  A   Yes. Between the 2 and the 1.
2  Q   And were you included in that group that went around to the
3       what you're calling the basement door?
4  A   Yes, sir.
5  Q   And apparently there was some attempt to bang in the door
6       with the Ram, which was unsuccessful?
7  A   Yes, sir.
8  Q   Do you know whether or not anybody asked Mr. Wood to just
9       open the door?
10 A   I wasn't privy to that information.
11 Q   Is there any reason why you started smashing down the door
12      rather than going and asking him if he would just, please,
13      open it?
14 A   Well, because he was up there. We were compromised.
15 Q   Compromised in what sense?
16 A   Compromised that he knew we were there and he wasn't opening
17      up the door. He wasn't letting access. This all took time
18      to get down there, and stuff.
19 Q   All right. You're saying he wasn't opening up the door and
20      letting access. And what I'm asking you is if you know
21      whether anybody even asked him if he would open up a door
22      and/or let access.
23 A   No, I don't know.
24 Q   In any event, using the Ram, you weren't able to get that
25      lower door open?

Page 35

1  A   That's correct.
2  Q   And the next thing indicated is that you tried to get access
3       through a window. And how did you do that?
4  A   Tried to rake and break it.
5  Q   What does that mean?
6  A   It's just where you break the window and rake it, and then
7       gain entry through that opening.
8  Q   By raking, you mean getting rid of the broken glass?
9  A   Yes, sir.
10 Q   Do you know who, if anybody, took photographs of this
11      service of the warrant?
12 A   You mean of the site afterwards?
13 Q   Yes.
14 A   We did not. SIRT did not, that I recall.
15 Q   Do you know what Detective Wilson was doing while you had
16      gone around to try to open the door and/or obtain entry
17      through a window?
18 A   He was at the front of the building, I believe. And like I
19      indicated in my report, in overwatch over Mr. Wood.
20 Q   Okay. Now, in the end of the third paragraph in Exhibit 12
21      there's an indication that, "Again SIRT was unable to gain
22      access due to a wood/metal covering over the window."
23      It says, "See attached photos." Do you know what
24      photos that's referring to?
25 A   No, I don't.

Page 36

1          MR. STIER: Where does it say "See attached
2  photos"?
3          MR. LEEMON: End of the third paragraph is what I
4  have.
5          MR. STIER: Not on mine.
6  BY MR. LEEMON:
7  Q   In fact, it isn't on yours, is it?
8  A   Yeah, it's not on mine either.
9  Q   I have this on a document that is listed as Wood 0101004, 5,
10      6, and 7. And it may be that this is a later version of the
11      same report, because there are two places where it says,
12      "See attached photos."
13         Here, let me give you my copy. Is there any Bates
14      stamp number on the lower right – no, there's not. All
15      right, well, this is the one that I'm looking from, and I
16      guess they were taken from a different place in the
17      production. Let me give you my copy which has those
18      numbers, and you'll see.
19         MR. STIER: The 01 number series would probably be
20      from me.
21         MR. LEEMON: Yeah, and that's what I would imagine.
22         MR. STIER: I don't know where you got this
23      (indicating.)
24         MR. LEEMON: Maybe directly from the police in the
25      first instance. I don't know. I, unfortunately, did not

Page 37

1  make these exhibits.
2          THE WITNESS: Yeah, I see where it says that.
3  BY MR. LEEMON:
4  Q   And it says that on the last page, as well?
5  A   Each opening was fortified. See attached photos. Yes, sir.
6  Q   And can you explain to me why it would say "see attached
7       photos" on that document and not the copy that we made
8       Exhibit 12?
9  A   I have no idea.
10 Q   All right. On the copy we made Exhibit 12, does that have
11      your signature on it?
12 A   Yes, sir, it does.
13 Q   Okay. But from this, you would imagine that if there are
14      some photographs, they would be with your report, then?
15 A   Either mine or WESTNET's, yes, sir.
16 Q   There are some other photographs here that I actually don't
17      know who took.
18         (Exhibit No. 16 marked for identification.)
19 Q   Can you tell me what Exhibit 16 is?
20 A   It says it's a Statewide Incident Response Team Clandestine
21      Laboratory Checklist.
22 Q   What is that?
23 A   It's, I believe this is the checklist that the sergeant
24      does.
25 Q   Okay. And that would be either Gundermann or Browne, in

10 (Pages 34 to 37)

Vicky L. Pinson, CSR-RPR
James, Sanderson & Lowers Court Reporters (800) 507-8273

981b27cb-1122-4030-a1e0-693793cf3c67

Deposition of George Mars                                    10/3/2006

## Page 38

1  this case?
2  A  Yes, sir.
3  Q  All right. You see, there, where it has some stars, and it
4     says "Tactical"?
5  A  Yes, sir.
6  Q  Do you know what that refers to?
7  A  It just means that it was a tactical warrant search entry.
8     It wasn't a clandestine lab.
9  Q  Do you know if this is just indicating what's in the file?
10    The checklist, the checkmarks?
11 A  I believe that's what that indicates.
12       (Exhibit No. 17 was marked for identification.)
13 Q  Do you know what Exhibit 17 is?
14 A  It's a Case File Checklist.
15 Q  And what is that?
16 A  It's, again, a checklist that the sergeant gets when a case
17    file is turned in. He goes down through the list.
18 Q  And it indicates that you're the case officer, and then
19    there's some initials there on 10-16.
20       Do you know who that is?
21 A  Well, looking at it, it looks like it's GG -- or CG, which
22    would indicate, possibly, Chris Gundermann.
23 Q  So he was one of the sergeants. And would he be one of the
24    people who would approve your paperwork in this kind of a
25    situation?

## Page 39

1  A  Yes, sir.
2  Q  Now, if you'll look at that document, it is Bates stamped at
3     the bottom, and Exhibit 16 is 38 and Exhibit 17 is 39. And
4     then I received some pictures that were not marked as to who
5     took them, or whatever, and unfortunately, they're black and
6     white copies and so I know they're not going to be any
7     good. And I don't even know if I have copies to use.
8         MR. STIER: Can I see them?
9         MR. LEEMON: Yes, you can (indicating).
10        MR. STIER: They've got the State Bates number on
11    them.
12        MR. LEEMON: Correct.
13        MR. STIER: So they obviously came from the State.
14    I don't know where we got them.
15        MR. LEEMON: Well, I don't either. That's what I'm
16    going to ask this fella. I actually thought I had copies so
17    I wouldn't have to use that. Just a moment. Here we go. I
18    do.
19       (Exhibit No. 18 marked for identification.)
20 Q  These follow, sort of closely, in number to some of the
21    other documents we got from the State. It looks like these
22    may have even been taken with an old-fashioned camera, using
23    film.
24       Do you have any recollection as to whether anyone from
25    your team was assigned to take photographs, or whether they,

## Page 40

1  in fact, did?
2  A  I would -- it's not uncommon for the sergeants to have one
3     of the members take photos. I recall seeing these photos,
4     particularly this one, here (indicating), on the bottom. I
5     recall that one.
6  Q  The bottom, with the window?
7  A  Yes, sir.
8  Q  Do you know, I can't make out, obviously any of these people
9     because I don't know them. But do you know who is pictured
10    in that?
11 A  Yes, sir. That's Deputy Chief Jewel, a deputy chief with
12    the State Patrol. He's since retired.
13 Q  And what was his last name?
14 A  Jewel.
15 Q  And that's spelled how?
16 A  I believe it's J-E-W-E-L.
17 Q  And so there was a deputy chief of the State Patrol present
18    at the execution of this search warrant?
19 A  He was, yes. He wasn't with the team up there during the
20    time. He was on perimeter, probably, with Lt. Chromey.
21 Q  Now, interestingly enough, I got blowups of 1, 2, 3, 4, 5,
22    6, 7, 8 of these photographs. There were apparently 10 in
23    the original series.
24       If you will look at photograph 10A, this is just
25    somebody in a trooper's uniform. I don't imagine you can

## Page 41

1  tell me who that was, can you?
2  A  No. It's, it's a SWAT member.
3  Q  And you can tell that by his garb?
4  A  Yes, sir, the uniform.
5  Q  Do you know what Deputy Chief Jewel is pointing at or what
6     is near his hand in this photograph?
7  A  It's hard to see what it is that's near his hand, but as I
8     recall, and in looking at this photograph, that's the window
9     or a window in the top of the residence. And as indicated
10    in my report, the windows were heavily fortified, as well.
11    And I don't know what he's pointing at there because of the
12    clarity of the picture. And my memory, I just don't recall.
13 Q  Now, when you say the windows are heavily fortified, what do
14    you mean by that?
15 A  Well, fortified, sir, as you can see in this photograph,
16    whatever it is that he's pointing at, is sitting on a
17    device. And to the left of the device is a weight attached
18    to a pulley or something, and it looks that that structure
19    or that fixture would slide up and down, covering the
20    window.
21 Q  What, if any, information do you have about the construction
22    of solar energy homes?
23 A  None.
24 Q  Do you know whether, for example, in order to maintain an
25    energy efficient home, you have to make it as air tight as

Vicky L. Pinson, CSR-RPR
James, Sanderson & Lowers Court Reporters (800) 507-8273

981b27cb-1122-4030-a1e0-693793cf3c67

Deposition of George Mars                                    10/3/2006

---

**Page 42**

1  possible?
2  A  No.
3  Q  Do you know whether or not Mr. Wood had any background or
4     history in working with solar energy?
5  A  No.
6  Q  If we look back at Exhibit 12, we're now, I'm looking at the
7     fourth paragraph, and it says that you were still trying to
8     gain access in the residence.  And Detective Wilson got
9     Mr. Wood to lower his, quote, draw bridge, allowing access
10    to the house.
11       How did you find out that Mr. Wood had opened that top
12    floor door?
13 A  I don't recall.  All I can say is we have radio
14    communications between members, so either radio
15    communication, or a runner come back and said, "We have
16    entry," or someone yelled around the corner.  I don't
17    recall.
18 Q  Now, when you got that communication, what did you do?
19 A  Just helped out, I believe.
20 Q  Pardon?
21 A  I think I left someone there, two people at the rear.  And
22    then I believe I went around front with the two guys, I
23    believe.
24 Q  All right.  And did you then go in the stairs from that
25    landing?

---

**Page 43**

1  A  I just went up to the top, yes.  I didn't enter the
2     residence up there.
3  Q  Okay, did anyone enter the residence?
4  A  From my team or from --
5  Q  From your team.
6  A  The people that were down below?  I don't recall.
7  Q  Do you know if anybody associated with SIRT entered the
8     residence?
9  A  Oh, yes, I believe so.  Yes.
10 Q  And who was that, do you know?
11 A  I don't recall who it was, no.
12 Q  The indication at the bottom of that fourth paragraph is
13    that SIRT entered the residence and cleared it and found no
14    other personnel.
15       How long did that take place and do you remember how
16    many officers there were involved in it?
17 A  In the clearing, no, I don't, because I wasn't up there when
18    that happened.  I kind of got up there after the fact.
19 Q  So the people had already gone into the residence --
20 A  Oh, yes, sir.
21 Q  -- before you got there?
22 A  Yes, sir.
23 Q  And the, do you know how many people went in before you?
24 A  No.
25       MR. STIER:  Objection as to form.

---

**Page 44**

1  Q  Yeah, because he just said he didn't go in.
2        Before you got there, you don't know how many people
3     were inside.  Do you know if Detective Wilson was inside by
4     that time?
5  A  No, I don't recall.
6  Q  Do you know where Mr. Wood was, while these officers were
7     entering and clearing the residence?
8  A  No.  No.
9  Q  Okay.  So now you're up on the landing, near the back
10    stairs.  People had already gone in.  What happens next?
11 A  Then I tell them to open the back door.  We couldn't get
12    in.  So as I recall, they went in and they opened the rear
13    door for us and let us in.  And then I went in to the lower
14    level.
15 Q  So when you told them to open that rear door, you then went
16    down the stairs and back around to where the lower door was?
17 A  As I recall, yeah.
18 Q  And what happened next after they opened the door?
19 A  Just went in, and basically it had been cleared.  Because
20    when they come downstairs to open the door for us, they
21    clear that to make sure there's no other personnel in there.
22 Q  And what happened then?  Did you then enter the house?
23 A  Yes.  Yes, I went in the lower level.
24 Q  Do you know who went in with you?
25 A  Oh, gosh.  No, I don't recall.

---

**Page 45**

1  Q  All right.  In the bottom paragraph on the second page of
2     Exhibit 12, it says, "SIRT members met three large growling
3     dogs coming up the basement stairs as they were descending
4     them."
5        Who was coming up and who was descending?
6  A  All I recall is that Trooper Ducummens was descending.  He
7     had the pepper ball gun.  And I don't recall who was with
8     him when they were going down.  And as I indicated, what was
9     told to me was that the three dogs were coming up.
10 Q  So some members -- do you know where Trooper Ducummens
11    entered the house?
12 A  He had to have entered from up top, because at that point
13    the rear door had not been opened.
14 Q  So by the time you got into this place, had this dog already
15    been shot?
16 A  Oh, yes.
17 Q  Did you see the dog?
18 A  No, sir.
19 Q  And do you know where the dogs had been during the time that
20    the first officers entered the house after Mr. Wood opened
21    the door?
22 A  No.
23 Q  It says, here, that, "SIRT deployed several pepper balls on
24    the lead dog in order to deter its aggressive approach."
25       By "SIRT," do you mean Trooper Ducummens?

---

12  (Pages 42 to 45)

Deposition of George Mars                                    10/3/2006

Page 46

1  A  I believe it was Trooper Ducummens that was assigned the
2     pepper ball that day.
3  Q  There was only one pepper ball gun there.
4  A  Yes, sir.
5  Q  What was the effect on the atmosphere in the basement of the
6     home, from the deploying of these several pepper balls?
7  A  Strictly from memory, I believe there was an irritant in the
8     air.  A slight irritant.
9  Q  Did everybody leave that area?
10 A  Not that I recall, no.
11 Q  Anybody use any kind of protective device against the
12    irritant?
13 A  I don't recall.
14 Q  Do you know whether any other kind of chemical deterrent,
15    either by way of tear gas or any other kind of chemical
16    irritant, was deployed on the service of this, other than
17    the pepper balls?
18 A  No, I don't know anything else.
19 Q  Did you have any other kind of – did you have any tear gas
20    with you?
21 A  No.  In the vehicle, you know.  That's SOP.
22 Q  What kind of tear gas did you have in the vehicle?
23 A  Oh, gosh.  I can't say exactly what it was.  I don't recall.
24 Q  Okay.  Do you have some means of firing canisters of tear
25    gas, as well, in the vehicle?

Page 47

1  A  Yes, sir.
2  Q  And what would that be?
3  A  A 37 mm gun that will launch a projectile.
4  Q  And you don't know what exactly the nature is of the tear
5     gas that you carried?
6  A  No, I don't recall what it was, sir.
7  Q  All right.  After you entered the house, what happened next,
8     as you saw it?
9  A  As I entered, there was no one downstairs.  I mean, no
10    suspects or anything downstairs.  It was all officers and
11    stuff.
12       I searched around just briefly, and then we all went
13    outside and gathered in front of the residence for a
14    briefing, debriefing.
15 Q  Where was Mr. Wood at this point?
16 A  When I came out, I believe he was in custody in one of the
17    patrol cars, if I remember correctly.
18 Q  And what was discussed at the debriefing?
19 A  Just what happened, basically.
20 Q  Prior to this incident had you ever worked on any other
21    cases with Detective Halsted?
22 A  Yes, I had been involved with cases with him.
23 Q  On this particular case, was there any expectation that
24    there would be any more than one person, more than one
25    suspect at this home when you served the search warrant?

Page 48

1  A  Yes.
2  Q  And what led you to believe there might be another person
3     there?
4  A  I don't recall.
5  Q  Who determined the number of officers that would take part
6     in the service of this search warrant?
7  A  Ultimately, it would be the sergeants.
8  Q  And do you know what part, if any, Deputy Chief Jewel had in
9     the operational planning of this raid?
10 A  No, I don't know, if any.
11 Q  In the fly-over that was done by WESTNET, there was an
12    indication that they saw about 25 marijuana plants growing
13    close to the house.
14       Is that the kind of operation that SIRT usually takes
15    part in?
16 A  Is –?
17 Q  Arresting somebody growing 25 plants near their house, when
18    there's no indication of sales or distribution or anything
19    like that?
20 A  We are, like I said earlier, we assist agencies throughout
21    the State.  Once they call and make the request, it's run
22    through our chain of command, and the determination is made
23    at a higher level than me that if we're going to be doing
24    that or not.
25       (Exhibit No. 19 marked for identification.)

Page 49

1  Q  Do you know what Exhibit 19 is?
2  A  It's a WSIN Subject Card.
3  Q  And WSIN stands for what?
4  A  Western State Information Network, I believe.
5  Q  Do you know who filled that out?
6  A  No.
7  Q  Do you know, there's a notation in there that says,
8     "Violator Class."  Do you know what that refers to, where it
9     says 4?
10 A  There's a check sheet that indicates there's different
11    violator classes, one through whatever, that you go off of.
12    And I don't recall what the "4" stands for, no, sir.
13 Q  Do you know whether it's highest to lowest, one to some
14    other number?  Whether Class 1 is the highest or lowest
15    level class?
16 A  No, I don't recall.
17 Q  I just have one other document I want you to identify here.
18       (Exhibit No. 20 marked for identification.)
19 Q  Exhibit 20 is a document that was in your packet.  It wasn't
20    filled out, however.  So I don't know.  What is Exhibit 20?
21 A  It's says it's a Call Out/Response Checklist.
22 Q  Is that a document that you recognize?
23 A  Yes, I believe so.  Yes.
24 Q  What's the purpose of that document?
25 A  It's just, I'm looking.  I've never filled one out.

13 (Pages 46 to 49)

Vicky L. Pinson, CSR-RPR
James, Sanderson & Lowers Court Reporters (800) 507-8273

981b27cb-1122-4030-a1e0-693793cf3c67

Deposition of George Mars                                    10/3/2006

---

Page 50

1  Q   Do you know if that's something that's usually filled out by
2      a supervisor, or who usually does fill it out?
3  A   I guess that would have been me. I would have been the one
4      to fill that out.
5  Q   Have you filled them out in other cases?
6  A   No. I don't recall. No.
7         No, my SWAT report indicates who we contact – not the
8      SWAT report, but on the Safety Ops Plan, here. Points of
9      contact. People that we've contacted, and so on and so
10     forth.
11        This, here, (Exhibit 20) and as you look through it,
12     Chemist, Fire Department, HAZMAT Team, Department of
13     Ecology, Health Department. This is geared, as I'm looking
14     at it, it is geared more for a clandestine type lab
15     operation.
16 Q   Okay. Maybe that's why it wasn't filled out.
17        In Exhibit 11, the Operations Safety Plan, there's
18     reference to, "At Sergeant Browne's discretion, he will
19     announce on LERN" – what does that stand for?
20 A   It's a law enforcement radio network.
21 Q   In other words, he's just going to do it on the radio. It's
22     not a PA system or anything like that.
23 A   No, sir. No.
24 Q   Okay. Continue to the last page of that. There's an "HIDTA
25     De-confliction (Watch Center)."

---

Page 51

1         What does that mean?
2  A   High Intensity Drug Trafficking – Agency, maybe? What it
3      is, is we require, we call HIDTA, and we say, On such and
4      such date we're going to serve a search warrant at such and
5      such location between the hours of such and such, and such
6      and such. Then everyone that does an operation is required
7      to do that. And it's just a deconfliction so that some
8      other agency isn't serving a warrant there at the same time
9      we are.
10 Q   And you don't end up with police agencies shooting each
11     other when you're walking in.
12 A   Yeah, just so you don't end up with two agencies there.
13 Q   When it says "District 1, Message in Captains log," do you
14     know what that refers to?
15 A   Yeah. What that is, is I call up Communications and let the
16     District 1 Captain know, just for his information, that SIRT
17     is going to be serving a search warrant in his district.
18     And it's just a courtesy call.
19 Q   What is District 1?
20 A   As I explained earlier, there's eight districts in the
21     state. District 1 is Pierce County and, I believe, Thurston
22     County. State Patrol district.
23 Q   What district is Thurston County in? Excuse me, Kitsap
24     County.
25 A   District 8.

---

Page 52

1  Q   Now, after this incident, did you ever discuss it with any
2      of the WESTNET members?
3  A   I'm sure we did, just in passing conversation.
4  Q   Do you have any recollection of any such conversations?
5  A   Not particulars, no.
6  Q   Did you ever talk to Detective Halsted about his previous
7      information concerning this residence?
8  A   As far as the fly-over?
9  Q   No, as far as anything. As far as the tips that supposedly
10     WESTNET had gotten. The --
11 A   I don't recall.
12 Q   Was the circumstance that was found here when you were
13     serving this warrant what you had expected to find?
14 A   As far as the residence goes, no.
15 Q   Why is that?
16 A   Because of what I still call fortification of the residence.
17 Q   Okay. What you're calling fortifications, do you have any
18     information that would be sufficient to let you know whether
19     or not they have a function in making the house energy
20     efficient?
21 A   Other than what you just told me today, no.
22 Q   And I didn't mean to tell you anything. I meant to be
23     asking you. But do you have any information whether the
24     securing of the windows or the styrofoam in the door or any
25     of those things have heat retention properties?

---

Page 53

1  A   I didn't know there was styrofoam in the doors.
2  Q   There's a picture here that shows it, so I thought maybe you
3      did.
4  A   But to answer your question, no.
5  Q   All right. Did you ever speak with Mr. Wood?
6  A   No, sir.
7         MR. LEEMON: I don't have any other questions.
8             * * *
9
10            EXAMINATION
11 BY MR. ROSEN:
12 Q   In looking at Exhibit 18, if I can have you look at that.
13     The bottom photograph, there.
14 A   Yes.
15 Q   What material is the device that covers the window made
16     from?
17 A   You know, I don't recall. It appears there's a 2x4 across
18     there, and then some wood or something there. I don't
19     recall.
20 Q   The weights that are, that you see on the left-hand side, is
21     that a weight? That cylindrical device?
22 A   Yes, I believe so.
23 Q   And do you know what that was made from?
24 A   No.
25 Q   Do you know whether that was made out of metal?

---

14 (Pages 50 to 53)

Deposition of George Mars                                    10/3/2006

Page 54

1  A    Oh, it was a metal.  But I don't know.
2  Q    Okay.  So that --
3  A    It was a heavy weight, and it was metal.  Again, I'm just
4       going by the photograph because I didn't go up and examine
5       it.  It's just recollection from seeing the actual color
6       photographs.
7  Q    But you do recall that those weights were made of metal?
8  A    I believe so, yes.
9  Q    And were the panels that cover the device that would protect
10      the window made from wood?
11 A    I don't know.  I don't recall.
12 Q    Okay.
13          MR. ROSEN:  That's all the questions I have.
14          MR. STIER:  No questions here.
15          (Deposition concluded at 12:25 p.m.)
16              (Signature reserved.)
17                  * * *
18
19
20
21
22
23
24
25

Page 56

1                    CERTIFICATE
2  STATE OF WASHINGTON )
                        ) ss.
3  COUNTY OF KING      )
4
       I, VICKY L. PINSON, a Certified Shorthand Reporter and
5  Notary Public in and for King County, Washington, do hereby
6  certify that on OCTOBER 3, 2006, I reported in machine
7  shorthand the deposition of GEORGE R. MARS, called as a
8  witness for purposes of discovery in the above-entitled
9  cause; that the subscribing of the completed deposition by
10 the witness was reserved; that the foregoing transcript was
11 prepared under my personal supervision and constitutes a
12 true record of the testimony of the said witness.
13     I further certify that I am not an attorney or counsel
14 of any parties, nor a relative or employee of any attorney
15 or counsel connected with the action, nor financially
16 interested in the action.
17     WITNESS my hand and seal in Seattle, County of King,
18 State of Washington, this 10th day of October, 2006.
19
20
21
22
                   _____
                       Notary public in and for the state
23                     of Washington, residing at Seattle.
24
25 My commission expires 08-09-10.

Page 55

1              CHANGE/SIGNATURE SHEET
2      I, the undersigned GEORGE R. MARS, do hereby
   certify that I have read the foregoing deposition and that, to the
3  best of my knowledge, said deposition is true and accurate, with
   the exception of the following corrections listed below:
4
5  PAGE   LINE    CHANGE
6
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19
20
21 Signature _____ Date _____
22
23 Witness:    GEORGE R. MARS
   Case name:  WOOD vs. WESTNET, et al
   Cause No.:  U.S. DISTRICT COURT NO. C05-5575RBL
24 Date:       OCTOBER 3, 2006
25 Reported by: VICKY L. PINSON, RPR-CCR, License No. 2559

                                          15 (Pages 54 to 56)

981b27cb-1122-4030-a1e0-693793cf3c67