1

THE HONORABLE RONALD B. LEIGHTON

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8

9

DOUGLAS WOOD and SANDRA
KARLSVIK, husband and wife,

10

                                Plaintiffs,

11

        v.

12

13

KITSAP COUNTY; WEST SOUND
NARCOTICS ENFORCEMENT TEAM;
OFFICER MATTHEW DOUGIL WestNET);
GIG HARBOR POLICE DEPARTMENT;
DETECTIVE JOHN DOE SCHUSTER
(WestNET) DETECTIVE JOHN HALSTED
(POULSBO POLICE DEPT, WestNET, Badge
#606); DETECTIVE G.R. MARS (WSP
STATEWIDE INCIDENT RESPONSE
TEAM, Badge #685); DETECTIVE JOHN
DOE WILSON and JOHN DOES 1-25

14

15

16

17

18

19

                                Defendants.

20

No. C05-5575RBL

PLAINTIFFS' RESPONSE TO
DEFENDANTS' MOTIONS FOR
SUMMARY JUDGMENT

NOTED FOR HEARING:
JANUARY 5, 2007

21

**I.   STIPULATION OF DISMISSAL AS TO SOME DEFENDANTS AND MOTION
     REGARDING JOHN DOE DEFENDANTS**

22

23

        The Plaintiffs agree and hereby stipulate that the Defendants, City of Gig Harbor (Gig Harbor

24

Police Department) and Dale Schuster should be dismissed as Defendants.  In addition, and for the

25

reasons stated below, plaintiff asks that dismissal not be entered as to the John Doe Defendants in

26

order that Washington State Patrol Trooper Brian Ducommun and other members of the State Patrol

1   SWAT Team, whose identities and/or actions in the raid on Plaintiffs' house in question herein

2   remain unknown until further depositions can be taken, may be substituted as Defendants in place of

3   some of the John Doe Defendants named in the Complaint.

## II.      COUNTER STATEMENT OF FACTS

On a motion for summary judgment, the facts must be viewed in a manner most favorable to the

nonmoving party *Haskin v. Fontana*, 262 F.3d 871, 876 (9th Cir. 1991).   If, when viewed this way,

there remain issues of material fact, the motion for summary judgment must be denied.

Although Defendants Schuster, Halsted and Dougil provided the court with a copy of Mr.

Wood's deposition, the "Statement of Facts" contained in their motion for summary judgment

essentially ignores Mr. Wood's testimony and solely presents the evidence as limited portions of

various officers' testimony, even when it is in direct conflict with Mr. Wood's testimony.   In

addition, Defendants' presentation of the facts alleged to support the issuance of the search warrant

is misleading, and in some instances flat untrue in material respects.   Accordingly, Plaintiff presents

this Supplemental Statement of Facts indicating the evidence in the light most favorable to the

Plaintiff.   These are facts that a reasonable jury could accept, and require denial of the Defendants'

Motion for Summary Judgment.

## A.      FACTS "SUPPORTING" ISSUANCE OF SEARCH WARRANT

Although Defendants argue that there was probable cause for the issuance of the search

warrant herein, curiously neither of them has provided them a copy of the actual complaint for the

search warrant which was provided to the Court.  This complaint contains statements purporting to

support  probable cause, as well as an appended declaration which is "boiler plate" and describes

Officer Halsted's qualifications.  The complaint makes clear that the information primarily started

with Officer Dougil of the Gig Harbor Police Department.   Officer Halsted states that Officer

1   Dougil indicates that he spoke with an informant in 1998 who had apparently attempted to steal

2   some marijuana from a house at Mr. Wood's address. The complaint does not include the facts that

3   the "informant" was a person whom Office Dougil and others contacted numerous times concerning

4   various crimes, and who also was involved in criminal activity in other jurisdictions.   Nor does it

5   include the fact that the only credibility Officer Dougil gave this individual was the fact that he was

6   involved with marijuana and knew what marijuana looked like.   Dougil Dep. at 9:18-10: 19.  A jury

7   could find that in fact this story was just one that the burglar gave to the arresting officer and which

8   is a common story among juvenile burglars.   A jury could also find that the arresting officer told

9   Mr. Wood of this allegation shortly after the arrest of the intruder, and that the officer came to Mr.

10   Wood's house, inspected his house and property, and found there was no marijuana anywhere on the

11   property.   **Wood Decl. ¶ 7.**  The "informant" also described the property as having two geodesic

12   dome style buildings in one of which the "informant" "observed" pots and potting soil.   A jury

13   could find that the domes referred to are not in fact buildings at all, but are solar collectors which

14   
15   obviously never had anything "inside of them."   These domes are faced downward when not in use,

16   giving the appearance of a dome shape. Wood Decl. ¶ 19.

17   

18       Officer Dougil also said that he received a tip from the marijuana hotline in 2001, at least

19   nine months prior to the application for the search warrant herein, in which a tipster reported they

20   drove into the driveway of a property with Mr. Wood's address and "drove up to a residence" and

21   surprised two males unloading numerous marijuana plants from the bed of a truck.   Further

22   information, not provided in the complaint for the search warrant, was that no follow up or

23   investigation of any kind was done concerning this "tip" which was probably received by Officer

24   Dougil by fax, and that Officer Dougil did not even retain the supposed tip.  Dougil dep. at 14:12-

25   15:24 It also does not indicate that the driveway of Mr. Wood's home ends a significant distance

1    from the home, and that one could not drive up to the residence without first traveling over an open

2    filed.   Wood Decl. ¶ 8.   Officer Dougil had by this time flown over the residence in a helicopter

3    and had a sufficiently good view of the property to see a small patch of marijuana containing about

4    35 plants.   He clearly would have been in position to see that there was no driveway or road up to

5    the residence in question.

6

7        The complaint states that Officer Dougil advised Detective Halsted that "neighbors" in the

8    area have heard automatic gunfire sounds "coming from" the suspect's property.   The actual fact is

9    that this information did not come from "neighbors" (plural) but in fact came from one police officer

10   who also lived on Fox Island, several blocks away from Mr. Wood's property, and that that one

11   person only said that he heard automatic gunfire sounds coming from "the direction" of Mr. Wood's

12   property, and that he was unable to give any more specific information.   Dougil Dep. at 10:24-

13   11:16.   (In light of this clear testimony at Officer Dougil's deposition, it is frankly unbelievable

14   that now Sergeant Dougil would state to the Court in a sworn declaration that, "it had previously

15   been reported to me by other officers living in the area around 12 15th Ave. East on Fox Island, that

16   automatic gunfire had been heard coming from that property." This patently false statement made to

17

18   this Court under oath in support of this motion surely undermines Sergeant Dougil's credibility.)

19       Officer Halsted clearly understood the difference between saying gunfire is coming from

20   someone's property and that the information came from several people and saying that one person

21   indicated gunfire came "from the direction" of the property several blocks away.   Halsted Dep. at

22   24:24-25:23.   In fact, Officer Halsted received an email from Officer Dougil on August 29th,

23   several days before the complaint for the search warrant was signed that names the one officer who

24   provided the information and states that he hears gunfire coming "from the direction" of this

25

26

1    compound. Halsted dep. Ex. 27,  Officer Dougil verified in his deposition that this one officer who is

2    named in the email is the person from whom he got the information. **Dougil Dep. at 10:24-11:16**.

3        Finally, on Page 4 of the complaint for the search warrant, Officer Halsted identifies the

4    Organic Sunflower Foundation and Solar Steam Incorporated as companies which have owned the

5
     property in question and states that he knows from investigating marijuana growers that they
6
7    commonly place properties under fictitious names.  He did not state, however, nor did he indicate

8    what if any research, to determine whether those companies were fictitious, which was none.

9    Halsted Dep. at 10:20-11:9.

10       **B.    FACTS CONCERNING THE RAID**

11       At approximately 6:30 in the morning on September 5, 2002, a large body of officers,

12
     including approximately 10 officers from the Washington State Patrol SIRT Team (then the name
13
14   for the State's SWAT team) and numerous officers from other jurisdictions converged on the home

15   of Douglas Wood on Fox Island, Washington.   They came armed with automatic weapons and

16   handguns, body armor, helmets, battering ram, exploding distraction devices, a pry bar, and tear gas,

17   among other pieces of equipment.  **Dep. of Mars at pages 25-32**.  They parked their vehicles in the

18   driveway and approached Mr. Wood's home on foot.  Mr. Wood was alerted to their presence by

19   motion detectors, which he had installed in his driveway following a couple of burglaries in 1998.

20
     Wood Decl. ¶ 17, 20.   Mr. Wood went to an upstairs window facing the direction from which the
21
22   men were coming. He opened the window and asked what was going on.  At this point, one or more

23   of the soldiers saw him in the window, and he was ordered to show them his hands.   Mars dep. at

24   32:19-25. The men then pointed their weapons at him.  They appeared tense and he was afraid they

25   were going to shoot. Wood Decl. ¶ 21.

26

In response, Mr. Wood raised his hands and showed them he had nothing in them. However, when he put them down again, they once again started screaming at him. He became extremely afraid at this point and believed that he might be shot. He then told the men that he was going to open the door and come out. Although he was told not to do so, he was so afraid that they saw him as some threat that he decided to come out anyway, and did so, keeping his hands in view all the way around the house. At that point, Trooper Wilson came up and put handcuffs on him. It was then that he was told the men were police and that they had a search warrant. Wood Decl. ¶ 21, 22.

Even though Mr. Wood had voluntarily opened the door and come out, others among the police proceeded to attempt to break into his house by smashing on his door and breaking a window. Although Mr. Wood asked Trooper Wilson to tell the men to stop and that the door was already open, Wilson refused to do so. Ultimately the police broke into the house with a pry bar, breaking the door latch and wood around the door. Wood Decl. ¶ 22 – 23; Mars Dep. at 34. It was Trooper Mars who broke the window. Mars Dep. at 35: 2-9.

Mr. Wood had a small patch of marijuana growing behind a shed near his house. The marijuana was being used solely as medical treatment for a painful and debilitating neurological condition called trigeminal neuralgia. Mr. Wood and his wife, who is a licensed physician and psychiatrist, took all the steps necessary to comply with the Washington Medical Marijuana law. Wood Decl. ¶ 11, 13, 15.

After the marijuana was found by the police, they asked Mr. Wood about it. He explained that it was medical marijuana, and had them get his wallet from which they produced a small, handwritten note signed by his wife concerning her advice about use of medical marijuana. This note was just something for Mr. Wood to keep with him. In addition, they had a copy of the

1   documentation recommended by the Washington State Medical Association. This documentation

2   was filled out regularly every year. However, none of the police officers challenged Mr. Wood's

3   documentation, and did not seem concerned with that. They were apparently more concerned with

4   trying to determine whether he had more than a 60 day supply of the marijuana, as permitted by the

5   Act. They sat at the table and Officer Halsted attempted to do the math to figure this out. Wood

6   Decl. ¶ 25.

7

8           During the raid, one of the State Trooper's, Brian Ducommun, shot Mr. Wood's Golden

9   Retriever in the eye with a pepper ball. These are projectiles used as less lethal weapons. When

10  they hit something solid, they break open and release a pepper spray substance. Ducommun Dep. at

11  18:8-17; 41-42. Although Trooper Ducommun indicates that he shot the pepper ball gun twice at

12  three dogs approaching him and growling, the dog that was shot, Clancy, was an 11 year old Golden

13  Retriever, who could not get up and down the stairs. Wood Decl. ¶ 27. The dogs had started

14  barking when the Troopers were trying to break into the house, and not before. Ibid. It ultimately

15  turned out that the dog was blinded in one eye. Wood Decl. ¶ 27.

16

17          Although one of the Troopers was designated to "Knock and Announce," and plans had been

18  made for one of the SIRT team members to announce their presence over a loud speaker, neither of

19  these took place. Mr. Wood complied with the officers' authority voluntarily and let them in on his

20  own.      Mars Dep. at 25:25-26:4; Wood Decl. ¶ 29. A reasonable jury could find that the

21  overwhelming show of force in this case was completely unnecessary, as was the destruction of

22  property and permanent injury to a family pet.

23

24

25

26

1

III.   **ARGUMENT**

2

   A.   **The search was made without probable cause.**

3

   Practically all of the material statements made in the application for the search warrant herein

4

are inaccurate and/or misleading, in some instances purposely so.  The description of the burglar

5

who had indicated he was attempting to steal marijuana from Mr. Wood's home neglects to mention

6

7

that he was a person well known to several police agencies and was making these statements while

8

being questioned on an unrelated offense.  Nor does it mention that Officer Dougil found him

9

credible only insofar as that he probably knew what marijuana looked like.  Finally, it does not

10

mention that this burglar gave the same story to the original arresting officer, who then checked Mr.

11

Wood's property and found nothing.  Since Office Dougil apparently had the police report from the

12

13

initial incident, these facts were certainly known to him and could easily have been known to Officer

14

Halsted.  The burglar claimed to observe pots and potting soil inside of one of two dome structures

15

on the property.   The complaint for the search warrant attempts to corroborate this information by

16

indicating that the photographs taken during the overflight show two dome buildings.  In fact, these

17

are not buildings at all, but are solar collectors.  In any event, the information from the "informant"

18

was four years old at the time of the application for the warrant.  About a year before the application

19

of the warrant Officer Dougil received a tip from the "Marijuana Hotline."  As set out above, the

20

details of that tip are physically impossible in light of the lay out of Mr. Wood's property.  This

21

22

should have been readily apparent when flying over the property.   The complaint for the warrant

23

then recites Detective Schuster and Officer Dougil's completion of the Aerial Marijuana Spotter

24

School.  However, the undisputed evidence indicates that at the time of the overflight of Mr. Wood's

25

property, at least Officer Dougil, and perhaps Detective Schuster, were both taking part in that

26

school.    Dougil Dep. at 7:8 – 8:11; 13:5-25.  Lt. Drake confirms this.  Drake Dec. at ¶ 4.  When

1    asked at his deposition whether the estimate on the flight log of 25 plants was his, Officer Dougil

2    testified, "Frankly from 700 feet, I couldn't tell what was down there but that it was green." Dougil

3    dep. at 26:2-10. Needless to say, this was not in the complaint for the search warrant.

4
       Finally, the statement Officer Dougil advised me that "neighbors in the area have heard

5
     automatic gunfire sounds coming from the suspect's property" appears to be intentionally false. An

6
     e-mail sent to Officer Halsted by Officer Dougil several days before seeking the warrant identifies
7
8    by name the one person who allegedly heard gunfire. That person lives several blocks away from

9    the area, and can only say that he heard gunfire coming "from the direction of the property." This

10   leaves the claim of seeing the marijuana in the flight from a helicopter at an altitude of 700 feet.

11
     Leaving aside the question of whether the police officers had completed or were taking the
12
13   Marijuana Aerial Spotters School, the affidavit says nothing about the amount of marijuana alleged

14   to have been seen which Officer Dougil estimated to be about 25 plants, which Mr. Wood says was

15   in a plot about the size of a small table.

16       Subtracting all of the intentional and reckless misstatements from the application for the

17   warrant, and considering the rest of the information alone, there is simply no basis for finding

18   probable cause to believe that Mr. Wood was committing a crime.   Under such circumstances, the

19   search warrant presented herein will not support the search made on Mr. Wood's property and his

20
     home. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2764, 57 L.Ed. 2d 667 (1978).   This test from
21
22   *Franks* is the one used in the Ninth Circuit to govern this question. *Hervey v. Estes*, 65 F.3d 784

23   (9th Cir. 1995). Under this standard, there is no difference between misstatements and omissions.

24   *Liston v. County of Riverside*, 120 F. 3d. 965, 972-3 (9th Cir 1997) (a civil rights case strikingly

25   similar to this one, in which both misstatements and omissions were made in an application for a

26

1   search warrant for drugs, and the Ninth Circuit rules that the plaintiffs had stated a valid civil rights

2   claim.)

3   **B.      The manner of conducting the search and seizure was unreasonable and violated Mr.**

4   **Wood's 4th Amendment Rights.**

5

6       Even assuming that the search warrant herein was supported by probable cause, the extreme

7   show of paramilitary force in this matter was unreasonable.  The actions of police in conducting

8   even a lawful arrest and an authorized search violate the 4th Amendment when they are not carried

9   out in a reasonable manner.  A show of overwhelming deadly force and destruction of property can

10  only be justified if circumstances make such conduct reasonable.  *Graham v. Connor*, 490 U.S. 386,

11  140 L. Ed. 2d 443, 109, S. Ct. 1865 (1989).  Both pointing a gun at an obviously unarmed and

12  unresisting person under circumstances not indicating any exigencies and unnecessarily destroying

13  personal property, including animals have been held to violate the plaintiff's rights under the Fourth

14  Amendment.  *Fuller v. Vines*, 36 F. 3d 65 (9th Cir. 1994); *Robinson v. Solano*, 278 F. 3d 1007 (9th.

15  Cir. 2002). (overruling *Fuller* to the extent it may be read as suggesting that the conduct of officers

16  in pointing a gun at a suspect during an actual seizure can never be excessive force.)  Both of these

17  cases were published before September 5, 2002, and the law in this regard, especially in light of

18  *Robinson* was clearly established.

19      In light of the overwhelming military-like force employed in executing this search warrant,

20  and in light of the destruction of Mr. Wood's property and the permanent injury to his family pet, we

21  must look at the circumstances to determine what possibly could have justified this kind of a raid.

22  Counsel for Defendants Schuster, Halsted and Dougil suggest the following at Page 5 of his motion:

23  "These included the reported use of gunfire on the property, surveillance and warning devices

24  reported to be present on the property, as well as a 'bunker-like reinforced residence.'"  Taking the

1    last of these first, there is no indication whatsoever that the Defendants knew anything about the

2    nature of the construction of Mr. Wood's property prior to their entry onto the property. The plans

3    for this raid were made before they encountered the passive solar engineering features that they

4    interpreted as "fortifications." Indeed, to the first officer in, they were not what he expected. Mars

5
     Dep at 52:12-16. The citation given in Defendants' motion (*Id.*) does not give any indication of
6
     where evidence exists that this was known beforehand. If one follows these notations in the motion
7
8    back to the last actual citation, it is a general citation on Page 4 to the Declarations of Defendants

9    Schuster and Halsted.   Nothing in either of those declarations supports that citation.   Nor is there

10   any information of any "surveillance" devices on the property.   To the contrary, the evidence is

11   undisputed that there are none.   Wood Decl. ¶17.   There is no explanation of how the presence of
12
     motion detectors justifies overwhelming force, especially in the face of a "suspect" who makes
13
14   himself see and raises his hands. Finally is the question of "the reported use [sic] of gunfire on the

15   property."   There was no such evidence whatsoever as discussed above.   No firearms were

16   registered to this property, nor had any ever been connected in any way with this property.   This

17   allegation, which Defendants apparently are attempting to make true merely by repetition is simply

18   false, as set out above.

19
         The sum total of the information the officers had in determining the manner to conduct this
20
21   search and arrest, assuming the truth of the visual spotting of this small patch of marijuana, was that

22   the Plaintiff appeared to have about 25 marijuana plants growing in an area close to a shed near his

23   house.   On the only other occasion known to the police to have any relationship between this

24   property and criminal activity, the Plaintiff, having discovered two juveniles trying to burglarize his

25   property called the police.   In light of the fact that one of these burglars was known to be Officer

26   Dougil's "informant" who said he went there to steal drugs, and in light of the fact that the burglars

1    actually did not succeed in their attempted crime, Mr. Wood's cooperation both with the police and

2    with the prosecution of the two juveniles in Juvenile Court, in no way indicates a tendency to be

3    anything other than cooperative with the police.

4
        This is what the police knew or should have known beforehand.  Nothing in this information
5
     provides a justification for this kind of paramilitary assault, complete with a helicopter hovering
6
7    overhead.

8        The Plaintiff's position is made even stronger by what occurred when the police actually

9    appeared on the property.   Mr. Wood appeared in a window and asked the police what was

10   happening.   He raised his hands when asked to, and indicated a wish to open the door and come

11   outside.    The response of the police from this point on is not only not reasonable, it is virtually

12   incomprehensible.  There simply is no reasonable explanation for insisting on attempting to break
13
     into a property when the property owner is offering to let the police in without any use of force
14
15   whatsoever.   In determining the reasonableness of police activity, it is appropriate to consider

16   alternatives available to the police. See, e.g., *Frunz v. City of Tacoma*, 468 F.3d 1141, 1145-6 (9th

17   Cir. 2006). A simple civilized conversation would have accomplished everything that the police

18   wanted to and/or had a right to accomplish.  Furthermore, a civilized approach to the service of this
19
     warrant would also have saved the Plaintiff's old family pet from permanent blindness in one eye.
20
21       The actions of the police in the service of this warrant simply cannot meet the Constitutional

22   test of reasonableness. There was nothing reasonable about this raid from the planning to its

23   execution.   It proceeded upon an insistence to use force where none was necessary.  In the 30 years

24   that Mr. Wood had lived on this property, there were no claims that he had sold drugs of any kind to

25   anyone.   There were no allegations that he had been violent toward anyone.  The likelihood that he

26   could be some sort of dangerous nefarious character and keep this quiet in a community as small as

1   Fox Island for all that time is preposterous.  In fact, he was a well-known inventor and manufacturer

2   of solar energy and the caretaker of property he had turned over to a charitable foundation, part of

3   which was being used as a nature conservancy.    All of this was easily discoverable.  Although

4   Plaintiff only has to prove that the actions of the police in the execution of this search warrant were

5   unreasonable, a reasonable jury could in fact find that they were outrageous.

6

7

8       **C.     Officers Halsted and Dougil were personally responsible for the manner in
             which this raid was conducted.**

9

10      Plaintiff agrees that the Defendants must be found personally responsible in order for the

11  Plaintiff to prevail on his Civil Rights claims.    Nonetheless, although Officers Halsted and Dougil

12  may have had a minimal role in the violence and destruction visited on the Plaintiff, they are both

13  directly responsible.    Officer Dougil was the initiator of the entire incident.  He relayed as reliable

14  information from informants he knew to be otherwise.   Incidents purporting to show that Mr. Wood

15  had possessed drugs at times four years and one year previously.   No reasonable police officer

16  should have given any credence to either of these "tips."  Furthermore, he was the source of the

17  information which probably caused the greatest amount of trouble in this case, the patently false

18  information, repeated in a sworn declaration to this Court, that other police officers [in the plural]

19  had heard automatic weapons fire coming from Mr. Wood's property, when he knew that in truth

20  one police officer living several blocks away said he heard such gunfire coming from the general

21  direction of Mr. Wood's land.  There is a world of difference between someone growing a small plot

22  of marijuana, estimated by the officers who claimed to see it to be 25 plants, on a large tract of

23  property, on a rural part of a small island, and a person alleged to be growing marijuana who has the

24  potential of being armed, not only with weapons, but with automatic weapons.  This difference was

25

26

1   created, expanded, and presented by Officers Dougil and Halsted to the Judge issuing the search

2   warrant, to the SWAT team officers who were conducting this raid.

3       In order to find a defendant liable for a violation of civil rights, it must be shown that the

4   defendant "caused" the violation.   This does not require that the harm caused must be actually

5   produced at the hands of the defendants.  It is enough that the defendant set in motion a series of acts

6   by others or knowingly refuse to terminate a series of acts by others, which he knew or should have

7   known, would cause the others to inflict the constitutional injury. *McRorie v. Shimoda*, 795 F.2d

8   780, 783, (9th Cir. 1986); cited with approval in *Larez v. City of Los Angeles*, 946 F. 2d 630, 646 (9th

10  Cir. 1991).

11      **D.      The liability of the Defendant State Patrol Officers.**

12      The fact is clear that before the members of the State Patrol SWAT team took any action

13  against Mr. Wood, his property, or his pets, he appeared in the window, asked what was going on,

14  and showed his hands when told to do so.   In short, he was in every way cooperative.  Further, he

15

16  was so frightened by the actions and reactions of the armed paramilitary force appearing at his home,

17  that he offered to open the door and come out, and did so while keeping his hands in plain view, so

18  as to cause no alarm. He then did those things and promptly submitted to being handcuffed.

19      It is undisputed that Mr. Woods appeared in the window and was seen by the police officers.

20

21  While there may be some conflict as to the timing of what occurred next, it is plain that upon seeing

22  the police presence, Mr. Woods "gave up."   A reasonable jury could find that any action taken

23  thereafter by way of destroying Mr. Wood's property and injuring his dog was unnecessary and

24  unreasonable.

25      The United State Supreme Court has held that the requirement of knocking and announcing

26  in executing a search warrant is a Constitutional requirement of the Fourth Amendment. *Hudson v.*

1 | *Michigan*, ___ U.S. ___, 165 L.Ed.2d 56, 126 S.Ct. 2159 (2006).    One of the reasons for this is

2 | allowing the occupants of the premises to be searched to know that there are people wanting to enter,

3 | and that those people are police, to allow the person "to collect oneself". 21 S. Ct. 2165.    Here, part

4 | of that requirement was unnecessary, as Mr. Wood saw the police.  However, their failure to identify

5 | themselves, but instead pointing heavy caliber automatic weapons at him, entirely failed to fulfill the

6 | other part of that reason.  Here Mr. Wood did not know that the invaders were police until he had left

7 | his home voluntarily.  Instead of allowing him to collect himself, they proceeded to terrify him.

8 |

9 | The other reason for the "Knock and Announce" requirement, is to avoid exactly what

10 | happened here, *i.e.*, the destruction of property.  "The **knock-and-announce** rule gives individuals

11 | 'the opportunity to comply with the law and to avoid the destruction of property occasioned by a

12 | forcible entry.'"    *Ibid.* (Citation omitted.) Here, Mr. Wood was attempting to voluntarily open the

13 | door and to accede to the authority of the police.    Notwithstanding this apparent show, the police

14 | insisted on trying (albeit unsuccessfully) to break into his house, damaging his door and breaking out

15 | a window.  There simply is no good explanation for why this behavior was needed or reasonable.

16 | Trooper Wilson was specifically requested to stop the others from trying to break into Mr. Wood's

17 | house, and refused to do so.    He is certainly responsible for the constitutional violations that

18 | followed.

19 |

20 | The police went through a safety briefing before the raid.  They knew that Mr. Wood and his

21 | wife were the only people believed to be on the premises.    Whatever flimsy information the police

22 | had about Mr. Wood, they had no information whatsoever connecting his physician wife to any

23 | criminal activity of any kind.  Once Mr. Wood acceded to the authority of police and allowed

24 | himself to be arrested and put in handcuffs, there was no reasonable possibility of any person posing

1    any danger to the police being present.   It simply looks as if the police insisted on breaking into Mr.

2    Wood's home because (they believed) they could.

3          This same reasoning applies to the shooting of Mr. Wood's dog.   Again, the police were

4    there to search for a small plot of marijuana growing outdoors.  Mr. Wood was in custody and

5
     outside the residence.   In Mr. Wood's account, the only time he heard his dog's barking, was
6
7    because officers were trying to break into his house.  However, even in Trooper Ducommun's

8    version, he shot the dog because it was coming up the stairs and acting in an aggressive manner.

9    The idea that he therefore had to shoot the dog, even with a pepper ball gun, assumes there is some

10   reason for needing to get down the stairs to "secure the property" at that moment.  A reasonable jury

11   could find that a reasonable step to take at that point is to simply back up.   With Mr. Wood being in

12
     handcuffs and cooperative, there undoubtedly would have been a way to quickly get the dogs out of
13
14   the basement (like going downstairs and opening the door) without having to injure the dogs.   There

15   was nothing dangerous that was even suspected of being down the basement and there simply was

16   no important reason in reality for having to rush down the stairs at that moment.

17         Finally, with regard to the John Doe defendants, there are still unidentified members of the

18   State Patrol who should properly be defendants in this matter.  Because of delays in discovery,

19
     which are not claimed to be anyone's fault, the parties have asked for and received a continuance
20
21   that should allow for the taking of necessary depositions.  In addition to Trooper Ducummons, the

22   persons in charge of this raid and who should have stopped the violence as soon as Mr. Woods

23   appeared, should also be added as defendants.

24   **III. CONCLUSION**

25         The Ninth Circuit has noted that because the reasonableness of police in the exercise of force

26   "nearly always requires a jury to sift through factual contentions, and to draw inferences therefrom,

1   we have held on many occasions that summary judgment ... in excessive force cases should be

2   granted sparingly."   *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); See generally, *Smith v. City*

3   *of Hemet*, 394 F.3d 689,700-1 (9th Cir. 2005).   Here there are considerable issues of material fact to

4   be determined, and to the degree the evidence is undisputed, it clearly shows the unreasonableness of

5   the police actions in the face of an acquiescent arrestee.   This court should deny the motions for

6   
7   Summary Judgment.

8   

9           Respectfully submitted this 29th day of December, 2006.

10  

11                                          LEEMON + ROYER

12  

13  

14  

15  

16                                          _____

17                                          Mark Leemon, WSBA #5005

18  

19  

20  

21  

22  

23  

24  

25  

26